# EXHIBIT A

# REDACTED IN ITS ENTIRETY

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AZURITY PHARMACEUTICALS, INC.,

Plaintiff,

v.

ANNORA PHARMA PRIVATE LIMITED,

Defendant.

C.A. No. 20-753 (LPS)
C.A. No. 21-196 (LPS)

**DEFENDANT, ANNORA PHARMA PRIVATE LIMITED'S INITIAL INVALIDITY
CONTENTIONS REGARDING U.S. PATENT NOS. 10,772,868 & 10,799,476**

Pursuant to the Case Scheduling Order entered in this matter (D.I. 19), Annora Pharma
Private Ltd. ("Annora"), hereby submits its Initial Invalidity Contentions with respect to the
claims of U.S. Patent Nos. 10,772,868 ("the '868 patent"), and 10,799,476 ("the '476 patent")
(collectively, "patents-in-suit") asserted by Plaintiff Azurity Pharamceuticals, Inc. ("Azurity").

Pursuant to 21 U.S.C. § 355(j)(2)(B), Annora provided confidential notice by letter dated
December 23, 2020 to Azurity ("Annora's Notice Letter") that Annora is seeking approval to
market a drug product under its Abbreviated New Drug Application ("ANDA") No. 214467
before the expiration date of the '868 patent. Annora's Notice Letter sets forth, among other
things, detailed statements of factual and legal bases that the claims of the patents-in-suit are
invalid and/or not infringed.  Annora hereby incorporate by reference Annora's Notice Letter as
it relates to the invalidity of the asserted claims of the patents-in-suit as if fully set forth herein.

Annora contends that the prior art discussed herein render the asserted claims of the
patents-in-suit invalid under 35 U.S.C. §§ 103. Exemplary prior-art citations and statements
explaining the invalidity of the asserted claims are specified in the following disclosure and
claim charts.  Annora also provides exemplary combinations of prior art and the motivation to

1

combine such references for purposes of Annora's obviousness defenses.  Such combinations are exemplary, and Annora reserves the right to rely on any combination or combinations of the prior art references cited or discussed in these disclosures.  Annora also contemporaneously produces with this submission the references required under Paragraph 4(d) of the Delaware Default Standard for Discovery, to the extent the same are not already in the possession of Azurity or have been previously produced by Annora.

Annora further contends that the asserted claims of the patents-in-suit invalid under 35 U.S.C. § 112 for lack of written description and enablement.

To the extent these contentions contain any information that may be protected from discovery under the attorney-client privilege, the attorney work-product immunity or any other applicable privilege or immunity, such disclosure is inadvertent and does not, nor is it intended to, constitute a waiver of any such privilege or immunity.

## I.    GENERAL STATEMENTS

### 1.    Claim Construction

These contentions should not be interpreted as a statement of Annora's position with regard to the proper claim construction of any claim term.  Instead, Annora has made certain assumptions, to the extent necessary and appropriate, with respect to the meaning of claim terms for the purpose of these contentions, including any claim terms that are indefinite.  By making these assumptions, Annora does not admit that any claim language satisfies 35 U.S.C. § 112, ¶ 2. Likewise, the use of claim terms herein should not be understood to suggest or imply a common, usual, ordinary, customary, plain, or accepted meaning in the art for any such term.  To the extent Annora determines that a different meaning is appropriate for any claim term, or that any

claim term does not constitute a claim limitation, Annora reserves the right to assert that meaning in connection with claim construction proceedings.

### 2.    Ongoing Discovery and Disclosures

Discovery in this case is in its early stages, and Annora's investigation, including Annora's search for prior art, is ongoing.  Annora therefore reserves the right to further supplement or alter the positions taken and information disclosed in these Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts.

Moreover, because expert discovery has not started, Annora reserves the right to amend these Invalidity Contentions as a result of new information disclosed through the parties' experts. Therefore, Annora reserves all rights to further supplement or amend these Invalidity Contentions if and when further information becomes available.  These Invalidity Contentions are provided without prejudice to the rights of Annora to introduce at trial any subsequently discovered evidence or expert opinions relating to currently known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequently discovered facts. Moreover, facts, documents and things now known may be imperfectly understood and, accordingly, such facts, documents and things may not be included in the following Invalidity Contentions. Annora reserves the right to conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents and things notwithstanding the written statements herein. Annora further reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents and things that are not currently recalled but might be recalled at some time in the future.

The information set forth below is provided without in any manner waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other actions, on the grounds of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement or clarify any of the statements provided below at any time.

Annora's invalidity positions in these contentions may be in the alternative and do not constitute any concession or admission by Annora for purposes of invalidity, enforceability, claim construction, and/or infringement.  *See, e.g., Vanmoor v. Wal-Mart Stores, Inc*., 201 F.3d 1363, 1366 (Fed. Cir. 2000).  For example, Annora's Section 112 arguments may be in the alternative to Annora's obviousness arguments and should not be viewed, in any way, to be concessions about the prior art or knowledge of one of ordinary skill in the art.

### 3.      Prior Art Identification and Citation

It should be recognized that a person of ordinary skill in the art ("POSA") would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field.  To understand and interpret any specific statement or disclosure in a prior art reference, a POSA would rely upon other information including other publications and general knowledge relevant to the subject matter of the patents-in-suit.  Annora therefore reserves the right to rely upon other unidentified portions of the prior art references, other publications, other relevant knowledge, and expert testimony to provide context and to aid understanding and interpretation of any identified portions.  Annora also reserves the right to identify additional art that is not part of the combinations upon which it relies but demonstrates the state of the art.  For example, Annora reserves the right to rely on additional references that

show the common use and function of the excipients, and amounts thereof, to which the claims are directed.  As an additional example, Annora reserves the right to rely on general references texts that describe the development of pharmaceutical formulations.  Annora also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions were inherently disclosed in the prior art and/or would have been obvious to a POSA, including on the basis of modifying or combining certain cited references.

Annora hereby incorporates by reference any rejections made by the Patent and Trademark Office ("PTO") during the prosecution of the applications leading to the patents-in-suit.  Annora reserves the right to assert any art cited in the prosecution history of the patents-in-suit or its related applications as a basis for contending that the Asserted Claims are invalid.  Annora further identifies as prior art upon which they may rely those references identified in Information Disclosure Statements during the prosecution of the patents-in-suit.  Annora also reserves the right to rely upon any admissions relating to prior art in the patents-in-suit or its prosecution history.

In addition, Annora reserves the right to rely on all prior art and all evidence of the relevant state of the art and prior sales produced by Azurity.

### 4.      Reservation of Rights

Annora reserves all rights to modify, amend, or otherwise supplement these invalidity contentions, including with the addition of prior art references, should further discovery, the Court's claim construction, or other circumstances so require.  Annora further reserves the right to supplement and/or amend these contentions if Azurity asserts claim constructions different from those relied upon by Annora; if Azurity is permitted to assert additional or different

infringement allegations at a later date; if Azurity asserts an interpretation of prior art different from that used herein, including assertions that any limitations of the asserted claims are not disclosed in the prior art identified herein; and based upon information, documents, things, or electronically stored information produced in this or any other action or regulatory proceeding involving any of the patents at issue in this litigation (whether by Azurity or a third party to this action).Annora further reserves the right to modify, amend, or otherwise supplement these invalidity contentions, including the addition of prior art references, in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Court, the Court's Scheduling Order, any agreement of the parties, or any order of the Court.

Nothing in this statement of contentions should be construed as limiting Annora's statutory rights under 35 U.S.C. § 282 to provide notice of "the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Federal Claims, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit" thirty days before trial. 35 U.S.C. § 282(c).

Azurity has the burden to establish that the asserted claims are entitled to the priority date of any earlier-filed application. *See Dynamic Drinkware, LLC v. National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015). To establish an earlier priority date, each earlier application in the chain must fully disclose the claimed invention by meeting all requirements of 35 U.S.C. §112. *In re NTP, Inc*., 654 F.3d 1268, 1277 (Fed. Cir. 2011). Annora reserves the right to (i) challenge the patents-in-suit's entitlement to priority to previous applications, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto.

## II.      INVALIDITY LEGAL STANDARDS

### 1.      Obviousness (35 U.S.C. § 103)

Patent claims are invalid if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a); *see Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161−62 (Fed. Cir. 2007); *TQ Delta, LLC v. DISH Network LLC*, 929 F.3d 1350, 1360 (Fed. Cir. 2019).

Invalidity under 35 U.S.C. § 103 is a legal conclusion based on the following factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time when the invention was made; and (4) any other evidence of obviousness or nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17−18 (1966); *see also TQ Delta*, 929 F.3d at 1360 ("Obviousness is a question of law based on underlying findings of fact.") (internal citation and quotations removed).

To determine the level or ordinary skill in the art, the relevant field of art must be identified; courts accomplish this by looking to "the nature of the problem confronting the inventor."  *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1338 (Fed. Cir. 2010) (quoting *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1375 (Fed. Cir. 2004)); *see also Ruiz v. A.B. Chance Co.*, 234 F.3d 654 (Fed. Cir. 2000) ("The determination of the level of ordinary skill in the art is an integral part of the *Graham* analysis.").  A person of ordinary skill in the identified art is presumed to have knowledge of all pertinent prior art.  *Custom Accessories*, 807 F.2d at 962.  "A reference qualifies as prior art for an obviousness determination under § 103 only when it is analogous to the claimed invention."  *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011); *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986) (quoting *In*

*re Wood*, 599 F.2d 1032, 1036 (C.C.P.A. 1979)); *see also In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992) ("A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem.").

The legal test for obviousness is a flexible inquiry focused on the objective reach of the claims. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415-16, 419 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); *see also Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 930 F.3d 1325, 1352 (Fed. Cir. 2019) ("obviousness demands a more expansive and flexible approach") (internal quotations and citation removed).  Importantly, obviousness must be evaluated as of the time of invention so as not to improperly inject hindsight bias into the inquiry.  *See Graham*, 383 U.S. at 36 (instructing courts to "resist the temptation to read into the prior art the teachings of the invention in issue" and "'guard against slipping into use of hindsight'") (quoting *Monroe Auto Equip. Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir. 1964)); *Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1087 (Fed. Cir. 1995) ("Obviousness may not be established using hindsight . . . .").  A patent may be proved obvious under the "teaching, suggestion, or motivation" ("TSM") test "if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art."  *KSR*, 550 U.S. at 407 (internal citation and quotation marks omitted).  Conversely, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *Id.* at 416 (citing *United States v. Adams*, 383 U.S. 39, 51−52 (1966)).

        An obviousness determination, however, does not require
        application of the TSM test.  Rather, the inquiry must also "take

account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418−19. Moreover, a patent may be found obvious when the combination of elements was obvious to try. *Id.* at 420. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*Id.* at 421. Conversely, the obvious to try standard is not met when "the inventor would have had to try all possibilities in a field unreduced by direction of the prior art." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009); *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988) (foreclosing an obvious to try analysis when the patentee simply "var[ies] all parameters or tr[ies] each of numerous possible choices until [arriving] at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful"); *see also Allergan, Inc.*, 754 F.3d at 972−73.

Generally, where the limitations of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). Formulators routinely optimize such variables during development of a new formulation. *Id.; see also Titanium Metals Corp. v. Banner*, 778 F.2d 775, 783 (Fed. Cir. 1985). Discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art. *In re Boesch*, 617 F.2d 272, 276 (C.C.P.A. 1980).

Importantly, courts must consider all objective evidence of nonobviousness (also called secondary factors or considerations)—such as unexpected results, commercial success, long-felt

9

need, licensing by competitors, and failure of others—before making an obviousness

determination. *In re Cyclobenzaprine*, 676 F.3d at 1075−76. Still, the burden of production is

shifted to require the patentee to produce evidence of nonobviousness, which may include

objective evidence of nonobviousness, "after the challenger has successfully made his prima

facie case demonstrating that the patent might be obvious." *Novo Nordisk*, 719 F.3d at 1353. In

some cases evidence of secondary considerations "simply cannot overcome a strong prima facie

case of obviousness." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).

### 2.     Lack of Written Description (35 U.S.C. § 112)

To satisfy the written description requirement, "the patent specification must clearly

allow persons of ordinary skill in the art to recognize that [the inventor] invented what is

claimed." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (internal

quotations and citation omitted). This means that "the disclosure must. . . convey with reasonable

clarity to those skilled in the art that. . . [the inventor] was in possession of the invention."

*Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (internal quotations

and citation omitted) (affirming district court's finding that the patent claims were invalid); *see

also Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005); *In re Curtis*, 354 F.3d 1347, 1350-

52 (Fed. Cir. 2004) (affirming Board's finding that a prior application "did not provide an

adequate written description of the later-claimed genus of friction enhancing coatings"); *Purdue

Pharma L.P. v. F.H. Faulding & Co.*, 48 F.Supp.2d 420, 427 (D. Del. 1999); *Agilent Techs., Inc.

v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009) ("[T]he purpose of the written

description requirement is to prevent an applicant from later asserting that he invented that which

he did not . . ."); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir.

2011) (written description requirement is satisfied only if the inventor "convey[s] with

reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate[s] that by disclosure in the specification of the patent"). Under this requirement, the patent's specification must describe what is claimed with sufficient detail such that a person of ordinary skill in the art can conclude that "the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed Cir. 2010) (citation omitted); *see also Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,* 541 F.3d 1115, 1122 (Fed. Cir. 2008) ("[T]he applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." (citation omitted)).

"[T]he hallmark of written description is disclosure. Thus, 'possession as shown in the disclosure' is a more complete formulation." *Ariad,* 598 F.3d at 1351. The test for written description involves an objective inquiry into whether the specification describes the invention sufficiently to allow a person of ordinary skill in the art to understand it and know that the inventor actually invented the claimed invention. *Id.* The operative time for this determination is the date of the patent's filing. *Id.* ("The law must be applied to each invention at the time it enters the patent process, for each patented advance has a novel relationship with the state of the art from which it emerges."). The Federal Circuit has stated that, when determining whether a patent specification complies with the written description requirement:

> [T[he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology. For generic claims, we have set forth a number of factors for evaluating the adequacy of the disclosure, including "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue.

*Id.* (quoting *Capon*, 418 F.3d at 1359).  Finally, "actual 'possession' or reduction to practice outside of the specification is not enough ... it is the specification itself that must demonstrate possession." *Id.* at 1352.  Where the specification fails to disclose claimed features for which a POSA "would not have thought it would work," the claims fail to satisfy the written description requirement.  *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1377, 1381-84 (Fed. Cir. 2019) (finding "upon [the patentee's]' insistence as part of its obviousness analysis that ordinarily skilled artisans would not have" had a reasonable expectation of success based on the teachings of the prior art, and subsequently concluding the claims were invalid under §112 as not described "because the specification [similarly] provide[d] no experimental data or analytical reasoning showing the inventor possessed" the claimed method).

### 3.    Lack of Enablement (35 U.S.C. § 112)

Under 35 U.S.C. § 112, ¶ 1, an inventor is obligated to set forth in the specification "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out of his invention."

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC,* 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Genentech, Inc. v. Novo Nordisk, A/S,* 108 F. 3d 1361, 1365 (Fed. Cir. 1997)); *see also Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,* 166 F.3d 1190, 1195-96 (Fed. Cir. 1999); *In re Goodman,* 11 F.3d 1046, 1050 (Fed. Cir. 1993); 35 U.S.C. § 112, ¶ 1. "Whether undue experimentation is

needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations," including the quantity of experimentation necessary and the amount of direction or guidance presented. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Enablement of one mode of practicing the invention will not satisfy the enablement requirement if the invention is broadly claimed. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.,* 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Liebel-Flarsheim Co. v. Medrad, Inc.,* 481 F.3d 1371, 1378-79 (Fed. Cir. 2007).

Where one of ordinary skill in the art "would have been required to engage in an iterative, trial-and-error process to practice the claimed invention even with the help of the . . . specification," the invention is not sufficiently enabled. *Wyeth & Cordis Corp. v. Abbott Labs,* 720 F.3d 1380, 1386 (Fed. Cir. 2013) (internal quotations omitted) (affirming summary judgment of invalidity for nonenablement where evaluating claimed candidate compounds would "take technicians weeks to complete" and the "specification offer[ed] no guidance or predictions about particular substitutions that might preserve" the effects of the claimed method of treatment); *see also In re '318 Patent Infringement Litig.*, 583 F.3d at 1327 ("Thus, at the end of the day, the specification, even read in the light of the knowledge of those skilled in the art, does no more than state a hypothesis and propose testing to determine the accuracy of that hypothesis. That is not sufficient.").

Whether a patent complies with the enablement requirement is a question of law and is determined from the perspective of a person of ordinary skill in the art as of the filing date of the specification. *EnzoBiochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1371-72 (Fed. Cir. 1999). The Court must make an enablement determination "*retrospectively,* i.e., by looking back to the filing date of the patent application and determining whether undue experimentation *would have been*

required to make and use the claimed invention at that time." *Id.* Although the enablement inquiry is viewed from the perspective of a person of ordinary skill in the art, that person's knowledge is not a "substitute for a basic enabling disclosure." *Genentech,* 108 F.3d at 1366 (recognizing that the specification, not knowledge of a person of ordinary skill in the art, must supply novel aspects of an invention to constitute adequate enablement).

## III.    THE PATENTS-IN-SUIT

### 1.    Identification of Asserted Claims

On June 9, 2021, Azurity provided disclosure of asserted claims of the patents-in-suit.  In these contentions, Azurity asserts that Annora's ANDA product infringes the following claims of the patents-in-suit:

| Patent | Asserted Claims |
|---|---|
| '868  patent | 1-5, 8-18, 21-25, 28-30 |
| '476 patent | 1-14 |

### 2.    The '868 Patent

The '868 patent is entitled "Enalapril Formulations."  The '868 patent issued on September, 15, 2020 from Application No. 16/242,898 filed on January 8, 2019. This application is a continuation of U.S. patent application Ser. No. 16/177,159, filed Oct. 31, 2018 (now U.S. Patent 10,786, 482), which is a continuation of U.S. patent application Ser. No. 16/003,994, filed Jun. 8, 2018 now U.S. Patent 10,154,987), which is a continuation of U.S. patent application Ser. No. 15/802,341, filed Nov. 2, 2017 (now U.S. Pat. No. 10,039,745, issued Aug. 7, 2018), which is a continuation of U.S. patent application Ser. No. 15/613,622, filed Jun. 5, 2017 (now U.S. Pat. No. 9,808,442, issued Nov. 7, 2017), which is a continuation of U.S. patent application Ser. No. 15/081,603, filed Mar. 25, 2016 (now U.S. Pat. No. 9,669,008, issued Jun. 6, 2017), which claims the benefit of U.S. Provisional Patent Application No. 62/310,198, filed Mar. 18, 2016.

14

The following claims of the '868 patent have been asserted against Annora:

**1.** A stable oral liquid formulation, consisting essentially of:
  (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;
  (ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;
  (iii) about 1 mg/ml of a preservative that is sodium benzoate; and
  (iv) water;
  wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;
  wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

**2.** The stable oral liquid formulation of claim 1, comprising a sweetener.

**3.** The stable oral liquid formulation of claim 2, wherein the sweetener is sucralose.

**4.** The stable oral liquid formulation of claim 1, comprising a flavoring agent.

**5.** The stable oral liquid formulation of claim 1, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, or a tartrate buffer.

**8.** The stable oral liquid formulation of claim 1, wherein the buffer concentration is about 10 mM to about 20 mM.

**9.** The stable oral liquid formulation of claim 1, wherein the buffer maintains the pH between about 3 and about 4.

**10.** The stable oral liquid formulation of claim 1, wherein the buffer maintains the pH at about 3.3.

**11.** The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3° C. for at least 18 months.

**12.** The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3° C. for at least 24 months.

**13.** A stable oral liquid formulation, consisting essentially of:
  (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;
  (ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

(iii) about 1 mg/ml of a preservative that is sodium benzoate; and

(iv) water;

wherein the formulation comprises a sweetener and a flavoring agent, wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

**14.** A stable oral liquid formulation, comprising consisting essentially of:

(i) about 10% to about 25% (w/w of solids) enalapril or a pharmaceutically acceptable salt or solvate thereof;

(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

(iii) about 19% (w/w of solids) of a preservative that is sodium benzoate; and

(iv) water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both; wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

**15.** The stable oral liquid formulation of claim 14, comprising a sweetener.

**16.** The stable oral liquid formulation of claim 15, wherein the sweetener is sucralose.

**17.** The stable oral liquid formulation of claim 14, comprising a flavoring agent.

**18.** The stable oral liquid formulation of claim 14, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

**21.** The stable oral liquid formulation of claim 14, wherein the buffer concentration is about 10 mM to about 20 mM.

**22.** The stable oral liquid formulation of claim 14, wherein the buffer maintains the pH between about 3 and about 3.5.

**23.** The stable oral liquid formulation of claim 14, wherein the buffer maintains the pH at about 3.3.

**24.** The stable oral liquid formulation of claim 14, wherein the formulation is stable at about 5±3° C. for at least 18 months.

**25.** The stable oral liquid formulation of claim 14, wherein the formulation is stable at about 5±3° C. for at least 24 months.

**28.** The stable oral liquid formulation of claim 1, comprising about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof.

**29.** The stable oral liquid formulation of claim 1, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate.

**30.** The stable oral liquid formulation of claim 1, wherein the buffer comprises a buffer selected from a citrate, a phosphate, a citrate/phosphate, an acetate, a tartrate, a lactate, a glycinate, and an amino acid buffer.

### 3.    The '476 Patent

The '476 patent is entitled "Enalapril Formulations." The '476 patent issued on October 13, 2020 from Application No. 16/883,553 filed on May 26, 2020. This application is a continuation of U.S. patent application Ser. No. 16/242,898, filed Jan. 8, 2019 (now U.S. Patent 10,722,868), which is a continuation of Ser. No. 16/177,159, filed Oct. 31, 2018 (now U.S. Patent 10,786, 482), which is a continuation of U.S. patent application Ser. No. 16/003,994, filed Jun. 8, 2018 (now U.S. Pat. No. 10,154,987, issued Dec. 18, 2018), which is a continuation of U.S. patent application Ser. No. 15/802,341, filed Nov. 2, 2017 (now U.S. Pat. No. 10,039,745, issued Aug. 7, 2018), which is a continuation of U.S. patent application Ser. No. 15/613,622, filed Jun. 5, 2017 (now U.S. Pat. No. 9,808,442, issued Nov. 7, 2017), which is a continuation of U.S. patent application Ser. No. 15/081,603, filed Mar. 25, 2016 (now U.S. Pat. No. 9,669,008, issued Jun. 6, 2017), which claims the benefit of U.S. Provisional Patent Application No. 62/310,198, filed Mar. 18, 2016.

The following claims of the '476 patent have been asserted against Annora:

**1.** A stable oral liquid formulation, consisting essentially of:
(i) about 1.0 mg/ml of enalapril maleate;
(ii) a buffer comprising citric acid and disodium hydrogenphosphate, wherein the buffer is present in the oral liquid formulation at a concentration of between about 5 mM and about 20 mM;

17

(iii) about 1 mg/ml of a preservative that is sodium benzoate;
(iv) a sweetener, wherein the sweetener is sucralose and is present at about 0.7 mg/ml in the oral liquid formulation;
(v) a flavoring agent; and
(vi) water;

wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C.

2. The oral liquid formulation of claim 1, wherein the flavoring agent has strawberry flavor.

3. The oral liquid formulation of claim 1, wherein the citric acid is anhydrous.

4. The oral liquid formulation of claim 1, wherein the citric acid is present at about 1.82 mg/mL in the oral liquid formulation.

5. The oral liquid formulation of claim 1, wherein the buffer is present in the oral liquid formulation at a concentration of between about 10 mM and about 20 mM.

6. The oral liquid formulation of claim 1, wherein the buffer is present in the oral liquid formulation at a concentration of about 10 mM.

7. The oral liquid formulation of claim 1, wherein the buffer is present in the oral liquid formulation at a concentration of about 11 mM.

8. The oral liquid formulation of claim 1, wherein the pH of the oral liquid formulation is below 4.5.

9. The oral liquid formulation of claim 1, wherein the pH of the oral liquid formulation is between about 3 and about 4.

10. The oral liquid formulation of claim 1, wherein the pH of the oral liquid formulation is about 3.3.

11. The oral liquid formulation of claim 1, wherein the pH of the oral liquid formulation is adjusted by HCl, NaOH, or both.

12. The oral liquid formulation of claim 1, wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at about 5±3° C.

13. The oral liquid formulation of claim 1, wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 24 months at about 5±3° C.

**14.** The oral liquid formulation of claim 1, wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 6 months at about 25±5° C.

### 4.      The Specification

The specification[1] is generally directed to enalapril oral liquid formulations.  '868 patent at 5:13-14.  The specification states that such formulations are "are advantageous over conventional solid dosage administration of enalapril ranging from ease of administration, accuracy of dosing, accessibility to additional patient populations such as to children and the elderly, and an increased patient compliance to medication."  *Id.* at 5:18-23.  The specification states that the claimed stable enalapril oral liquid formulations are ready-to-use and "require no extra steps or manipulation prior to administration to a subject."  *Id.* at 5:60-63.  Additionally, the specification states that the claimed enalapril oral liquid formulations "do not require or need mannitol or colloidal silicon dioxide for stability and dissolution."  *Id.* at 5:64-66.

The specification states that enalapril "refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof."  *Id.* at 6:5-6.  The oral liquid formulations "include, but are not limited to, solutions (both aqueous and nonaqueous), suspensions, emulsions, syrups, slurries, juices, elixirs, dispersions, and the like."  *Id.* at 6:23-25.

The specification discloses liquid formulations having enalapril concentrations ranging from about 0.6 to 1.2 mg/ml.  *Id.* at 6:56-58.  It also discloses a many different amounts and ranges of concentrations of enalapril.  *Id.* at 6:58-7:13. The sweetener used in the formulations include "natural and synthetic sugars, natural and artificial sweeteners, natural extracts and any material that initiates a sweet sensation in a subject."  *Id.* at 8:37-40.  The specification describes

---

[1] The '868 and '476 patents share a common specification and have no meaningful difference between them.  Therefore, Annora cites to the '868 patent specification herein for the sake of brevity.

preservatives to improve sterility of the formulation.  Exemplary preservatives identified in the specification "include ascorbic acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its salts, erythorbic acid, fumaric acid, malic acid, propyl gallate, sodium ascorbate, sodium bisulfate, sodium metabisulfite, sodium sulfite, parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts), benzoic acid, sodium benzoate, potassium sorbate, vanillin, and the like." *Id*. at 10:24-32.  Sodium benzoate is identified as an example of a preservative.  *Id*. at 10:61-11:32.  The specification notes that "modulation of the pH is desired to provide the best antimicrobial activity of the preservative, sodium benzoate. In some embodiments, the antimicrobial activity of sodium benzoate drops when the pH is increased above 5." *Id*. at 10:42-46.

The specification further discloses inclusion of buffering agents to "maintain the pH of the liquid enalapril formulation." *Id*. at 13:22-24.  It discloses a range of non-limiting examples of buffer.  *Id*. at 13:24-45.  "Stable" is defined as "enalapril oral liquid formulations having about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period." *Id*. at 18:41-45. The specification identifies different storage periods for which the formulation should remain stable, ranging from 1 month to 36 months, and at storage temperatures ranging from about 2° C to 8° C.  *Id*. at 18:64-19:19.

### 5. The Prosecution History of the Patents-in-Suit

The prosecution history of the patents-in-suit demonstrates that the U.S. Patent Office repeatedly rejected the claims under 35 U.S.C. §§ 102 and/or 103.  It further shows that all elements of the patents-in-suit were known in the prior art or would have been obvious to a person of ordinary skill in the art ("POSA").  The prosecution history demonstrates that before

the priority dates of the asserted claims, that there were only finite numbers of relatively basic choices leading to the purported claimed inventions, that making and testing those choices would have been routine to a POSA, and that the resulting purported claimed inventions would have been predictable.

Below is a summary of the prosecution history of the patents-in-suit. It is not intended to be complete. Annora reserves all rights to rely upon the prosecution of the patents-in-suit in their entirety for purposes of Annora's defenses in this litigation.

As noted above in Sections III.2 and III.3, the applications for the patents-in-suit are continuations of a series of applications directed to stable enalapril oral liquid formulations. U.S. Patent Application No. 15/081,603, filed Mar. 25, 2016 (issued as U.S. Pat. No. 9,669,008 ("the '008 patent"), on June 6, 2017) was the parent application ("the '603 application"). During prosecution of the '603 application, the Applicant asserted, in response to an obviousness rejection, that the claimed invention "is directed to novel stable enalapril oral liquid formulations with excellent stability and uniformity properties where the formulation is stable at about 5+3 °C for at least 12 months." '603 application, Applicant's Arguments and Remarks dated February 03, 2017 at 7. The Applicant argued that such stability would be unexpected. *Id*. at 19-22 (citing inventor declaration). The alleged inventor, Gerold L. Mosher, submitted a declaration in support of the Applicant's response stating that the application related to "enalapril oral liquid formulations that are stable for least 12 months at 5±3 °C. The present oral liquid formulations contain enalapril, sucralose, a citric acid buffer, sodium benzoate and water at a pH of less than 3.5. Development of this described enalapril formulation was oriented on preparing a safe, stable, soluble oral liquid with minimal degradation and having acceptable taste for pediatric patients." *See* Declaration of Gerold Mosher Under 37 C.F.R. § 1.132 dated February 2, 2017 at

¶ 9 ("Mosher February 2017 Declaration").  The Mosher February, 2017 Declaration also stated that the prior art did not "describe [the claimed] stability of at least 12 months at 5±3 °C or any means of achieving this stability for enalapril formulations."  *Id*. at 4.  The claims of the '603 application, as originally filed, required "a buffer comprising about 1.82 mg/ml citric acid."  *See* '603 application, claim 1.  In the response field in connection with the Mosher February 2017 Declaration, the Applicants amended the claims to require a specific buffer combination of "1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate. *See* '008 patent Prosecution History, Amendment after Non-Final Rejection dated February 03, 2017.   The claims that were ultimately issued as U.S. Patent No. 9,669,008 were directed to a stable enalapril oral liquid formulation containing a buffer comprising 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate, about 1 mg/ml sodium benzoate preservative, and water, wherein the formulation is stable at about 5±3° C. for at least 12 months, and has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period.  *See e.g.,* '008 patent at claim 1.

After obtaining patents directed to stable enalapril oral liquid formulations containing a citrate buffer, the Applicant sought to pursue claims that were broader in scope, such as with respect to the '868 patent.  The Applicant presented the same arguments of unexpected stability and also relied on the same Mosher February 2017 Declaration.  *See, e.g.,* '868 patent Prosecution History, Response to Office Action dated August 1, 2019.  The Examiner failed to appreciate that the data was based on a single buffer combination and concentration such that it was not commensurate in scope to the claims of the '868 patent (directed to a stable enalapril oral liquid formulation consisting essentially of a buffer to maintain the pH below 4.5, about 1 mg/ml of a preservative that is sodium benzoate and water, wherein the formulation is stable at

22

about 5±3° C. for at least 12 months, and has about 95% or greater of the initial enalapril amount

and about 5% w/w or less total impurities or related substances at the end of the given storage

period). In fact, the Applicant continued to rely on Mosher February, 2017 Declaration, which

stated that "[t]he present oral liquid formulations contain enalapril, sucralose, *a citric acid*

*buffer*, sodium benzoate and water at a pH of less than 3.5."  Mosher February, 2017 Declaration

at ¶ 9; *see also* Declaration of Gerold Mosher Under 37 C.F.R. § 1.132 dated May 14, 2020 at ¶

14 ("Mosher May 2020 Declaration") (describing "formulations prepared with citric acid and

sodium citrate, and formulations prepared with citric acid only (no sodium citrate) with the pH

being adjusted with HCl or NaOH.").

## IV.    IDENTIFICATION OF PRIOR ART

### 1.    Earliest Effective Filing date of the '868 and '476 Patents

The patents-in-suit claims priority to earlier filed applications filed as early as March 18,

2016.  There is, however, no presumption that the asserted claims of the '868 and '476 patents

are entitled to the priority date of any earlier-filed application.  *See Dynamic Drinkware, LLC v.*

*National Graphics, Inc*. 800 F.3d 1375, 1380 (Fed. Cir. 2015); *PowerOasis, Inc. v. T-Mobile*

*USA, Inc*., 522 F.3d 1299, 1305 (Fed. Cir. 2008) ("When neither the PTO nor the Board has

previously considered priority," there is no presumption that claims "are entitled to the effective

filing date of an earlier filed application.").  Azurity has the burden to establish that the claimed

invention is properly described as of the earlier priority date.  *Id*.  Absent specific evidence of

entitlement to an earlier priority date, the patents-in-suit must be assigned its actual filing date.

*Id*.  To establish an earlier priority date, each earlier application in the chain must fully disclose

the claimed invention by meeting all requirements of 35 U.S.C. §112.  *In re NTP, Inc*., 654 F.3d

1268, 1277 (Fed. Cir. 2011).  Annora reserves the right to (i) challenge the patents-in-suit's

entitlement to priority to previous applications, (ii) challenge any alleged date of conception or reduction to practice; and (iii) identify additional prior art thereto. Annora's contentions apply equally no matter which priority date is used.

### 2.      Scope and Content of Prior Art

Annora identifies herein the prior art known at this time that it asserts invalidates, alone or in combination, each of the asserted claims under at least 35 U.S.C. § 103 from the perspective of a person having ordinary skill in the art. To the extent that any of the elements of the asserted claims are deemed missing from the references, such elements would have been known or obvious to a person of ordinary skill in the art at the time of the invention. *See KSR, Int'l Co. v. Teleflex, Inc*., 550 U.S. 398 (2007). Annora also incorporates by reference its statements at the outset of these contentions concerning the supplementation or amendment of these contentions.

For prior art patents and publications identified in these Invalidity Contentions, Annora reserve the right to rely on inherency, public use, offer for sale, and/or sale of the products described in those prior art patents or publications once Annora have had an opportunity to take discovery on these subjects.

| Abbreviation | Title | Publication Date | Author(s) | Publisher/ Source |
|---|---|---|---|---|
| '225 Publication | U.S. Patent Publication No. 2011/0166225 | 2011 | Verma H., et al. | |
| '247 Publication | U.S. Patent Publication No. 2015/0174247 | 2015 | Maruishi pharmaceutical Co., Ltd | |
| '378 Publication | U.S. Patent Publication No. 2003/0139378 | 2003 | Merck & Co | |
| '563 Publication | U.S. Patent Publication No. 2009/0221563 | 2009 | Johnson & Johnson | |
| '747 patent | U.S. Patent No. 8,568,747 | 2013 | Silvergate Pharmaceuticals, Inc. | |

| Abbreviation | Title | Publication Date | Author(s) | Publisher/ Source |
|---|---|---|---|---|
| Allen | Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids | 1998 | Allen, L.V., et al. | Am. J. Health-Sys. Pharm. |
| Boukarim | Preservatives in liquid pharmaceutical preparations | 2009 | Boukarim C. et al. | J. Applied Research |
| Boulton | The Stability of an Enalapril Maleate Oral Solution Prepared from Tablets | 1994 | Boulton, D.W. et al. | Aust J Hosp Pharm |
| Dawson | Guidelines for Compounding Oral Medications for Pediatric Patients | 1991 | Dawson L.M. and Nahata M.C. | J. Pharm. Tech. |
| Epaned Kit | Packaging Insert of EPANED™ (enalapril) for Oral Solution | 2013 | Silvergate Pharmaceuticals, Inc. | FDA |
| FDA Pharmaceutical Development Guidance | FDA's Guidance for Industry Q8(R2) Pharmaceutical Development | 2009 | FDA | FDA |
| FDA Stability Guidance | FDA's Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products | 2003 | FDA | FDA |
| Handbook | Handbook of Pharmaceutical Excipients | 2009 | Rowe C.R. et. al | Pharmaceutical Press |
| Ip & Brenner | Enalapril maleate | 1987 | Dominic P. Ip and Gerald S. Brenner | Analytical Profiles of Drug Substances |
| Merck Index | The Merck Index | 1996 | | Merck Co. |
| Nahata 1998 | Stability of enalapril maleate in three extemporaneously prepared oral liquids | 1998 | Nahata M.C. et al. | Am J Health Syst Pharm |
| Nahata 1999 | Lack of Pediatric Drug Formulations | 1999 | Nahata M.C. | Pediatrics |
| Remington 1995 | Remington: The Science and Practice of Pharmacy | 1995 | | Mack Publishing Company |

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Richey | Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence | 2013 | Richey, R.H. et al | BMC Pediatrics |
| Sosnowska | Stability of extemporaneous enalapril maleate suspensions for pediatric use prepared from commercially available tablets | 2009 | Sosnowska K. et. al. | Acta Pol Pharm |
| WHO Report | WHO Expert Committee on Specifications for Pharmaceutical Preparations | 2012 | WHO | WHO |

Without limiting the contents of the prior art references on which Annora relies, Annora sets forth a summary of each prior art reference below.  Where elements are disclosed at multiple locations within a single prior art reference, Annora has not necessarily identified every location in that reference.  Likewise, where a reference is listed for one or more claim elements, Annora has not necessarily identified every element of that claim, or claim in that patent, to which that reference applies.  Annora may rely on uncited portions of the identified prior art, references identified in the prior art disclosed herein, other documents, and expert testimony. The citations to a particular Example, Table, or Figure from a reference include the caption and description and any text relating to the same. Similarly, citations to particular text referring to an Example, Table, or Figure also include the Example, Table, or Figure and caption.

      **a.**    **Allen, L. V. et al., "Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids," Am J Health-Syst Pharm, Vol. 55, 1915-20 (1998) ("Allen")**

Allen, L. V. et al., "*Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids,*" Am J Health-Syst Pharm (Vol. 55), 1915-20 was published in 1998.  Thus, Allen was published more

than one year before the earliest possible priority date for the patents-in-suit. Therefore, Allen constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Allen reports stability of enalapril maleate, 1 mg/ml, in extemporaneously prepared oral solutions.  Allen at 1915-1916.  Allen notes that enalapril has maximum stability at a pH of ~3, and at a pH >5, the rate of decomposition increases.  *Id*. at 1917.  The pH of the formulations studied in Allen were between 3.9-4.8, noted as being "somewhat closer to the pH for maximum stability."  *Id*. at 1919.  Allen reports that enalapril maleate l mg/mL was stable in three oral liquids compounded extemporaneously from sweetened vehicles and tablets for 60 days when stored without light at 5 and 25 °C.  *Id*.

### b.  Packaging Insert of EPANED™ (enalapril) for Oral Solution (2013) ("Epaned Kit")

The Packaging Insert of EPANED™ (enalapril) for Oral Solution ("Epaned Kit") was approved on August 13, 2013. Thus, the Epaned Kit label was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, the Epaned Kit is at least § 102(b) prior art to the patents-in-suit.

The Epaned Kit contains 150 mg of enalapril maleate in a 150 mL bottle.  Epaned Kit at p. 1.  Reconstitution with 150 mL of ORA-SWEET® SF provided results in a 1 mg/mL EPANED oral solution. *Id.*  The Epaned Kit states that it contains "a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution. The Ora-Sweet SF contains purified water, glycerin, sorbitol, sodium saccharin, xanthan gum, and flavoring. Buffered with citric acid and sodium citrate. Preserved with methylparaben (0.03%), propylparaben (0.008%), and potassium sorbate (0.1%)." *Id.* at 10-11.

The Epaned Kit states that the recommended initial dose for adults is 5 mg once a day, with a maximum dose of 40 mg daily as needed to help achieve blood pressure goals.  *Id*. at p. 3. For pediatric use, the recommended starting dose is 0.08 mg/kg (up to 5 mg) once daily.

c.     **Boulton D.W. et al., "*The Stability of an Enalapril Maleate Oral Solution Prepared from Tablets*," Aust J Hosp Pharm, Vol. 24(2), 151-156 (1994) ("Boulton")**

Boulton D.W. et al., "*The Stability of an Enalapril Maleate Oral Solution Prepared from Tablets*," Aust J Hosp Pharm, Vol. 24(2), 151-156, was published in 1994. Thus, Boulton was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Boulton constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Boulton discusses a study assessing the stability of an enalapril maleate oral solution prepared from tablets.  Boulton at Abstract, 151.  The formulations were prepared with Isotonic Citrate Buffer (pH 5.0) "since it contains commonly available ingredients and provides a balance between the acidic pH required for stability of enalapril and tolerability when administered orally."  *Id*. at 152.  Hydroxybenzoate was used as preservative.  The formulations were stored at three temperatures: 5±3°C, 25±2°C and 40±2°C for 90 days.  *Id*. at 153.

Boulton reported that "[d]ecomposition in pH 5.0 buffer was significantly slower than in distilled water [ ], consistent with the maximum stability being at pH 3."  *Id*. at 155.  It also reports that "[h]ydroxybenzoate preservatives did not affect the rate of decomposition of enalapril and appeared to be chemically stable in the formulations studied."  *Id*.  At 5°C, the "decomposition of enalapril was not significant over 90 days."  *Id*.  Boulton therefore states that oral solutions with citrate buffer (pH 5.0) "can be expected to maintain greater than 90% of original potency when stored in a refrigerator for up to 30 days."  *Id*.  It also notes including preservatives would be suitable, and provides for a "convenient and flexible dosage form." *Id.* at 155-56.

28

        **d.**      **Boukarim C. et al., "*Preservatives in liquid pharmaceutical preparations*," J. Appl. Res., Vol. 9 (1-2), 14-17 (2009) ("Boukarim")**

Boukarim C. et al., "*Preservatives in liquid pharmaceutical preparations*," J. Appl. Res., Vol. 9 (1-2), 14-17 was published in 2009. Thus, Boukarim was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Boukarim constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Boukarim discusses the use of sodium benzoate, potassium sorbate, and methyl hydroxybenzoate as commonly used preservatives in liquid pharmaceutical preparations. Boukarim at p. 14.  Boukarim notes that "typical allowed concentrations" for sodium benzoate range from 0.1-0.2% (w/w).  *Id*.

        **e.**      **Dawson L.M. and Nahata M.C., "*Guidelines for Compounding Oral Medications for Pediatric Patients*," J. Pharm. Tech, Vol. 7, 168-175 (1991) ("Dawson")**

Dawson L.M. and Nahata M.C., "*Guidelines for Compounding Oral Medications for Pediatric Patients*," J. Pharm. Tech, Vol. 7, 168-75, was published in 1991 ("Dawson").  Thus, Dawson was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Dawson constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Dawson identifies various sources of active ingredients intended for development of liquid formulations and notes that "[o]nce a suitable source of drug has been found, it must be determined if the product will be prepared as a solution or a suspension, and which excipients will be added. These include vehicles (flavored, sweetened, or both), suspending and/ or viscosity-increasing agents, preservatives, flavorings, and coloring agents."  *Id*.

Dawson discloses solutions wherein active ingredients may be "dissolved in water, an aqueous pharmaceutical solution containing sugar (syrup), or a sweetened hydroalcoholic

solution (elixir)." *Id*. at 169.  Dawson discloses that "Ora-Sweet is a commercially available formulation of sucrose, glycerin, sorbitol, and a flavoring agent. It is buffered with citric acid and sodium phosphate to a pH of 4.2, and preserved with methylparaben 0.02% and potassium sorbate 0.1 %. It can be used as a flavored vehicle for aqueous solutions of drugs dissolved in small amounts of water, glycerin, or sorbitol." *Id*. at 171.

Dawson also notes that "many pediatric medications are formulated with sweetening agents," in order to improve palatability.  *Id*. at 171.

Dawson also recognizes the use of preservatives in liquid formulations because "[w]ithout the use of preservatives, formulation would need to be prepared dose by dose, immediately before patient administration-a very expensive process." *Id*. at 173.  It identifies benzoic acid as a suitable preservative, and explains that it is "used in concentrations of 0.05-0.1 %. It is active only at pHs of 4 or below. The salt form, sodium benzoate, is used when a more water-soluble product is desired." *Id*.

Dawson also discloses that pH and storage temperature significantly affect stability of liquid formulations.  *Id*. at 174.  It notes that "if a drug is somewhat soluble in water, the pH of the product is adjusted to match the pH of maximum stability." *Id*.  Further that "a constant cool temperature aids in maintaining the physical stability of a product. Elevated temperatures usually favor chemical degradation; therefore, refrigeration improves chemical stability." *Id*.

###### f. Dominic P. Ip and Gerald S. Brenner, "*Enalapril maleate*," Analytical Profiles of Drug Substances, Vol. 16, 207-243 (1987) ("Ip & Brenner")

Dominic P. Ip and Gerald S. Brenner, "*Enalapril maleate*," Analytical Profiles of Drug Substances, Vol. 16, 207-243 was published in 1987 ("Ip & Brenner").  Thus, Ip & Brenner was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Ip & Brenner constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Ip & Brenner disclose the solubility of enalapril in various solvents, including water.  Ip & Brenner at 224.  Ip & Brenner discusses the stability of enalapril maleate in aqueous buffer solutions has been studied as a function of pH in the range of 2-7.  *Id*. at 236.  Ip & Brenner states that "[m]aximum solution stability occurred around pH 3." *Id*.  It also notes that "[t]he rate of enalapril loss and the mode of degradation are dependent upon the solution pH." *Id*.

> **g.** **Nahata M.C. et al., "*Stability of enalapril maleate in three extemporaneously prepared oral liquids*," Am J Health Syst Pharm, Vol. 55, 1155-1157 (1998) ("Nahata 1998)**

Nahata M.C. *et al*., "*Stability of enalapril maleate in three extemporaneously prepared oral liquids*." Am J Health Syst Pharm, Vol. 55, 1155-1157 published in 1998 ("Nahata 1998). Thus, Nahata 1998 was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Nahata 1998 constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Nahata 1998 reports results from a study determining the stability of extemporaneously prepared solutions of 1 mg/ml of enalapril maleate in deionized water, citrate buffer solution, and a sweetened suspending agent (Ora-Sweet and Ora-Plus) at 4 and 25°C.  Nahata 1998 at 1156. The formulations were stored at 4°C and 25 °C.  *Id.*  Samples were collected on days 0, 7, 14, 28, 42, 56, 70, and 91 for visual inspection and analysis by high-performance liquid chromatography.  *Id.*  The pH of the citric acid buffer was 5.0, and the pH was measured at each sampling time as well.  *Id.*

The study reported that at 4°C, the mean concentration of enalapril in the three liquids was >94% of the initial concentration throughout the 91-day study period.  *Id.*, Table 1.  The pH did not change by more than 0.1 pH unit at this temperature.  *Id.*  At 25°C, the mean

concentration of enalapril was >90% for 56 days in deionized water and >92% for 91 days in both citrate buffer solution and the sweetened suspending agent.  *Id*.

  **h.**  **Nahata M. C. et al., "*Lack of Pediatric Drug Formulations*," Pediatrics, Vol. 104 (3), 607-609 (1999) ("Nahata 1999")**

Nahata M. C. *et al*., "*Lack of pediatric drug formulations*," Pediatrics, Vol. 104 (3), 607-609 was published in September, 1999 ("Nahata 1999").  Thus, Nahata 1999 was published more than one year before the earliest possible priority date for the patents-in-suit. Therefore, Nahata 1999 constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Nahata 1999 discusses the absence of suitable dosage forms for pediatric administration and highlights the need for development of ready-to-use liquid formulations for this patient population.  Nahata 1999 at 607, 609.  Nahata 1999 identifies enalapril as an example of medications which were not available in liquid dosage forms as of the publication date.  *Id*. at 608, Table 1.  Nahata 1999 notes that drug stability is "one of the most important steps in deciding whether a drug can be administered and stored in a liquid dosage form."  *Id.* at 608.  Nahata 1999 states that "[a]t least 90% of the drug should remain as an active component during storage for it to be considered stable."  *Id*.  Nahata 1999 also notes that palatability of a liquid dosage form is important for patient acceptance.  *Id*.

  **i.**  **Sosnowska et. al., "*Stability of extemporaneous enalapril maleate suspensions for pediatric use prepared from commercially available tablets*," Acta Pol Pharm, Vol. 66 (3),  321-326 (2009) ("Sosnowska")**

Sosnowska et. al., "*Stability of extemporaneous enalapril maleate suspensions for pediatric use prepared from commercially available tablets*," Acta Pol Pharm, Vol. 66 (3), 321-326 was published in 2009 ("Sosnowska").  Thus, Sosnowska was published more than one year before the earliest possible priority date for the patents-in-suit.  Therefore, Sosnowska constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Sosnowska discusses a study directed at stability of extemporaneously compounded enalapril maleate oral formulations of 0.1 mg/mL and 1.0 mg/mL, in sugar-containing and sugar-free vehicles stored in the absence of light at 4°C and 25°C for 30 days.  Sosnowska at 321-322. The suspensions contained deionized water, methyl hydroxybenzoate (0.2%) as a preservative, hydroxyethylcellulose as the suspending agent and citric acid as the pH adjusting agent.  *Id.* at 325.  The pH was adjusted using citric acid to 3.0.  *Id.* at 322.  Enalapril maleate stability was quantified after 7, 14, 21, and 30 days using HPLC.  *Id.* at 322, 324.  Sosnowska reported that "results obtained in this work confirmed that enalapril maleate was stable in suspensions stored both at 25°C and 4°C. All suspensions showed only 1%-2% degradation after 30 days of storage."  *Id*. at 325.  Sosnoswka concludes that such oral liquid formulations "may provide flexible and convenient dosage forms for pediatric patients."  *Id*. at 326.

### j. U.S. Patent No. 8,568,747, "Enalapril Formulations", (2013) ( ("the '747 Patent")

U.S. Patent No. 8,568,747 titled "Enalapril Formulations" issued on October 29, 2013 ("the '747 patent"). Thus the '747 patent was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, the '747 patent is at least § 102(b) prior art to the patents-in-suit.

The '747 patent discloses oral liquid formulation of enalapril maleate prepared by reconstituting with citric acid, sodium citrate, benzoic acid and sucralose, and other ingredients. The '747 patent at 7:11-10:50.  The '747 patent discloses that "enalapril powder compositions described herein are useful for the preparation or reconstitution of an enalapril oral liquid. Oral liquids include, but are not limited to, solutions (both aqueous and nonaqueous), suspensions, emulsions, syrups, slurries, juices, elixirs, dispersions, and the like."  *Id*. at 11:41-46.

According to the '747 patent, the enalapril oral liquid compositions are stable in various storage conditions including refrigerated and ambient conditions for at least 36 weeks at $5 \pm 3°C$. *Id*. at 13:29-32.  The disclosed refrigerated conditions are "at about 2° C., about 3° C., about 4° C., about 5° C., about 6° C., about 7° C. or about 8° C."  *Id*. at 13:45-48.  Stable is defined as the enalapril oral liquid compositions having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period.  *Id*. at 13:7-10.  The specification discloses the following enalapril concentrations:

> In some embodiments, enalapril is present in about 1% w/w to about 30% w/w of the powder composition. In some embodiments, enalapril is present in about 2% w/w to about 25% w/w, about 5% w/w to about 20% w/w, about 7% w/w to about 18% w/w, about 10% w/w to about 16% w/w, or about 12% w/w to about 15% w/w of the powder composition. In other embodiments, enalapril is present in about 1% w/w, about 2% w/w, about 3% w/w, about 4% w/w, about 5% w/w, about 6% w/w, about 7% w/w, about 8% w/w, about 9% w/w, about 10% w/w, about 11% w/w, about 12% w/w, about 13% w/w, about 14% w/w, about 15% w/w, about 16% w/w, about 17% w/w, about 18% w/w, about 19% w/w, about 20% w/w, about 21% w/w, about 22% w/w, about 23% w/w, about 24% w/w, about 25% w/w, about 26% w/w, about 27% w/w, about 28% w/w, about 29% w/w or about 30% w/w of the powder composition. In certain embodiments, enalapril is present in about 1% w/w of the powder composition. In certain other embodiments, enalapril is present in about 2% w/w of the powder composition. In certain other embodiments, enalapril is present in about 10% w/w of the powder composition. In certain other embodiments, enalapril is present in about 14% w/w of the powder composition. In certain other embodiments, enalapril is present in about 15% w/w of the powder composition. In certain other embodiments, enalapril is present in about 20% w/w of the powder composition.

*Id*. at 6:23-47.  The '747 patent specifically states that "enalapril is present in about 1%."  *Id*. at 6:23-24.  The '747 patent discloses examples with 1mg/ml enalapril solution formulations.  *Id*. at Example 2.

The '747 patent also discloses non-limiting examples of buffering agents:

> Buffering agents maintain the pH when enalapril powder compositions are reconstituted into a liquid form. Non-limiting examples of buffering agents include, but are not limited to, sodium bicarbonate, potassium bicarbonate, magnesium hydroxide, magnesium lactate, magnesium glucomate, aluminum hydroxide, aluminum hydroxide/sodium bicarbonate co precipitate, a mixture of an amino acid and a buffer, a mixture of aluminum glycinate and a buffer, a mixture of an acid salt of an amino acid and a buffer, and a mixture of an alkali salt of an amino acid and a buffer. Additional buffering agents include sodium citrate, sodium tartarate, sodium acetate, sodium carbonate, sodium polyphosphate, potassium polyphosphate, sodium pyrophosphate, potassium pyrophosphate, disodium hydrogenphosphate, dipotassium hydrogenphosphate, trisodium phosphate, tripotassium phosphate, sodium acetate, potassium metaphosphate, magnesium oxide, magnesium hydroxide, magnesium carbonate, magnesium silicate, calcium acetate, calcium glycerophosphate, calcium chloride, calcium hydroxide, calcium lactate, calcium carbonate, calcium bicarbonate, and other calcium salts.

*Id*. at 7:17-37.

The '747 patent also discloses including of sweetening agents. *Id*. at 7:60-8:37. The '747 patent identifies sucralose as a suitable sweeting agent for use with enalapril. *Id*. at 8:4-7.

The '747 patent further discloses including "flavoring agent or flavorant to enhance the taste or aroma of the composition in liquid form. *Id*. at 8:52-54. The '747 patent identifies strawberry as a "suitable natural flavor". *Id*. at 8:57-67.

### k.    "Handbook of Pharmaceutical Excipients," Sixth Ed. (2009) ("the Handbook")

The sixth edition of the "Handbook of Pharmaceutical Excipients," Rowe C.R. et. al, was published in 2009 ("the Handbook"). Thus, the Handbook was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, the Handbook constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The Handbook discloses the characteristics, properties, methods of manufacture and use of various pharmaceutical excipients.  The Handbook teaches that sodium benzoate is "used in preference to benzoic acid in some circumstances, owing to its greater solubility."  *Id*. at 627. The Handbook teaches that sodium benzoate "is used primarily as an antimicrobial preservative" in pharmaceuticals and used "in concentrations of 0.02-0.5% in oral medicines."  *Id*.  The Handbook teaches that "[s]odium benzoate has both bacteriostatic and antifungal properties attributed to undissociated benzoic acid; hence preservative efficacy is best seen in acidic solutions (pH 2-5)."  *Id*.  It is "relatively inactive above approximately pH 5."  *Id*.

The Handbook teaches that preservatives such as methyl paraben (often used in combinations of methyl-, ethyl-, propyl-, and butylparaben) "exhibit[ ] antimicrobial activity of pH 4-8. Preservative efficacy decreases with increasing pH owing to the formation of the phenolate anion."  *Id*. at 442.

The Handbook also teaches several "widely used" buffering agents "to adjust the pH of solutions" such as citric acid monohydrate, sodium citrate and disodium hydrogen phosphate.  *Id*. at 181, 640-41, 656.  The Handbook also teaches that hydrochloric acid as an acidifying agent in a variety of pharmaceutical and food preparations, and sodium hydroxide used as an alkalizing agent.  *Id*. at 308-09, 648.

The Handbook also teaches that sucralose is used as a sweetening agent in beverages, foods, and pharmaceutical applications.  *Id*. at 701-702.

### l.    FDA's  Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products (2003) ("FDA Stability Guidance")

The FDA's Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products, was published in November 2003 ("FDA Stability Guidance").  Thus, the FDA Stability Guidance was published more than one year before earliest possible priority date for the

patents-in-suit. Therefore, the FDA Stability Guidance constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The FDA Stability Guidance is "intended to define what stability data package for a new drug substance or drug product is sufficient for a registration application within" the United States.  FDA Stability Guidance at 1.   The FDA Stability Guidance discloses required testing frequency for long-term studies to be "sufficient to establish the stability profile of the drug substance. For drug substances with a proposed retest period of at least 12 months, the frequency of testing at the long-term storage condition should normally be every 3 months over the first year, every 6 months over the second year, and annually thereafter through the proposed retest period." *Id*. at 9.  "At the accelerated storage condition, a minimum of three time points, including the initial and final time points (e.g., 0, 3, and 6 months), from a 6-month study is recommended." *Id*.

The FDA Stability Guidance teaches that "a drug product should be evaluated under storage conditions (with appropriate tolerances) that test its thermal stability and, if applicable, its sensitivity to moisture. The storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use." *Id*.  at 10.  For drug products intended for storage in a refrigerator, the FDA Guidance discloses the following conditions for stability testing:

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term | 5°C ± 3°C | 12 months |
| Accelerated | 25°C ± 2°C/60% RH ± 5% RH | 6 months |

*Id*. at 13.

The FDA Stability Guidance teaches that in evaluating stability data, the approach "of a quantitative attribute that is expected to change with time is to determine the time at which the 95 percent, one-sided confidence limit for the mean curve intersects the acceptance criterion." *Id*. at 15.

> ### m.     Remington: The Science and Practice of Pharmacy, Nineteenth Ed., (1995) ("Remington 1995")

The 19th edition of Remington: The Science and Practice of Pharmacy ("Remington 1995") was published in 1995.  Thus, it is prior art to the patents in suit at least under § 102(a) and § 102(b).

Remington 1995 teaches determining optimal conditions for drug stability through studying the influence of pH, buffer species and solvent.  Remington 1995 at 229.  Remington notes that "[t]he terms buffer, buffer solution and buffered solution, when used with reference to hydrogen-ion concentration or pH, refer to the ability of a system, particularly an aqueous solution, to resist a change of pH on adding acid or alkali, or on dilution with a solvent."  *Id*. at 225.  It also teaches that "[c]haracteristic of buffered solutions, which undergo small changes of pH on addition of acid or base, is the presence either of a weak acid and a salt of the weak acid, or a weak base and a salt of the weak base."  *Id*. at 225-26.

Remington 1995 also teaches that the Henderson-Hasselbalch equation may be used to calculate the concentration of the buffers as well as resultant pH, and "is useful also for calculating the ratio of molar concentrations of a buffer system required to produce a solution of specific pH."  *Id*. at 226.  Further, Remington 1995 teaches that buffer concentration can determine "[t]he ability of a buffer solution to resist changes in pH upon addition of acid or alkali may be measured in terms of buffer capacity."  *Id*. at 227.

38

n.       **The WHO Expert Committee on Specifications for Pharmaceutical Preparations, Forty Sixth Report, (2012) ("WHO Report")**

The forty-sixth report of the WHO Expert Committee on Specifications for Pharmaceutical Preparations was published in 2012 ("WHO Report").  Thus, it is prior art to the patents in suit at least under § 102(a) and § 102(b).

The WHO Report teaches points to consider in the development of paediatric medicines. *Id*. at 199-223.  The WHO Report discloses that "manipulation [of dosage forms] itself can increase the potential for inaccurate dosing and in general can increase the variability of the product. Such handling may be potentially hazardous for the patient as it may affect the stability, bioavailability and accuracy of dosing…"  *Id*. at 199.  For convenient and reliable administration, the WHO Report teaches that "[p]aediatric medicines should preferably be presented as formulations that are ready to administer," and that the need "to manipulate the dose prior to administration should be kept to a minimum."  *Id*. at 201-202.  The WHO Report also teaches as palatability of the formulation is "crucial to adherence."  *Id*. at 202.  The WHO Report stated that "[p]alatability is the overall acceptance of the taste, flavour, smell, dose volume or size, and texture of a medicine to be administered by mouth or to be swallowed."  *Id*.

The WHO Report further teaches that "[t]he oral route is the preferred and most appropriate route of administration to paediatric patients."  *Id*. at 210.  "Oral liquid preparations include aqueous solutions, suspensions, emulsions and syrups. They are most appropriate for children in the youngest age groups who are unable to swallow solid dosage forms. The advantage of oral liquid preparations is that variable dose volumes can be measured and administered."  *Id*.

o.     **The Merck Index, 12th Edition, (1996) ("Merck Index")**

The 12th edition of the Merck Index was published in 1996 ("Merck Index").  Thus, it is

prior art to the patents in suit at least under § 102(a) and § 102(b).The Merck Index discloses the

chemical and physical properties of enalapril, and teaches that in water, it has a pH of 2.6.

Merck Index at 3610.

p.     **FDA's Guidance for Industry Q8(R2) Pharmaceutical Development (2009) ("FDA Pharmaceutical Development Guidance")**

The FDA's Guidance for Industry Q8(R2) Pharmaceutical Development, was published

in November 2009 ("FDA Pharmaceutical Development Guidance").  Thus, the FDA

Pharmaceutical Development Guidance was published more than one year before earliest

possible priority date for the patents-in-suit. Therefore, the FDA Pharmaceutical Development

Guidance constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The FDA Pharmaceutical Development Guidance is intended to provide guidance on

disclosures to be made by manufacturer with regard to the design of quality pharmaceutical

products and the pharmaceutical development studies that should be carried out as a part of the

development process.  FDA Pharmaceutical Development Guidance at 2-3.

The FDA Pharmaceutical Development Guidance discloses that for microbiological

attributes of the drug product, the discussion should include "[t]he selection and effectiveness of

preservative systems in products containing antimicrobial preservative or the antimicrobial

effectiveness of products that are inherently antimicrobial." *Id*. at 8.  It further discloses that

"[t]he lowest specified concentration of antimicrobial preservative should be demonstrated to be

effective in controlling microorganisms by using an antimicrobial preservative effectiveness test.

The concentration used should be justified in terms of efficacy and safety, such that the

minimum concentration of preservative that gives the required level of efficacy throughout the intended shelf life of the product is used." *Id*.

> **q.     Richey, R.H., "*Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence*," BMC Pediatrics, Vol. 13(81), (2013) ("Richey")**

Richey, R.H., "*Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence*," BMC Pediatrics, Vol. 13(81), was published in 2013 ("Richey").  Thus, Richey was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, Richey constitutes at least § 102(a) and § 102(b) prior art to the patents-in-suit.

Richey reports an observational study investigating drug manipulations occurring in clinical practice for medications intended for pediatric use.  Richey at 3.  Richey discloses that a "predominant concern" with manipulations involving a wide range of drugs in pediatric patients "was whether the manipulated medicine would provide an accurate dose." *Id*. at 6.

> **r.     U.S. Patent Publication No. 2011/0166225, "Oral Liquid Compositions of Rhein or Diacerein", (2011) ( ("'225 Publication")**

U.S. Patent Publication No. 2011/0166225 titled "Oral Liquid Compositions of Rhein or Diacerein" was published on July 7, 2011 ("the '225 Publication"). Thus the '225 Publication was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, the '225 Publication is at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The '225 Publication discloses liquid pharmaceutical compositions for oral administration comprising rhein or diacerein.  '225 Publication at Title, Abstract, [0011].  It discloses oral liquid formulations with excipients including sweeteners, flavoring agents, preservatives and buffering agents.  *Id*. at [0021].

41

Suitable sweeteners disclosed in the '225 Publication include "water-soluble sweeteners derived from naturally occurring water-soluble sweeteners, e.g. sucralose…" *Id*. at [0026]. Flavoring agents disclosed in the '225 Publication include "fruit essences" such as strawberry. *Id*. at [0029]. Preservatives disclosed in the '225 Publication include "sodium benzoate." *Id*. at [0033]; *see also* Examples 4-6. Buffering agents disclosed in the '225 Publication include sodium citrate, and disodium hydrogenphosphate. *Id*. at [0035].

> **s.   U.S. Patent Publication No. 2003/139378, "Liquid Bisphosphonate Formulations for Bone Disorders", (2003) ( ("'378 Publication")**

U.S. Patent Publication No. 2003/0139378 titled "Liquid Bisphosphonate Formulations for Bone Disorders" was published on July 24. 2003 ("the '378 Publication"). Thus the '378 Publication was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, the '378 Publication is at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The '378 Publication discloses oral liquid formulations of bisphosphonate with a suitable carrier and a pharmaceutically acceptable buffer. '378 Publication at [0077]. Non-limiting examples of buffers disclosed in the '378 Publication include "citrate, tartrate, fumarate, phosphate, succinate, acetate, and mixtures thereof." *Id*. at [0082]. It also discloses embodiments where the buffer is selected from citrate and tartrate, and contains "a sufficient amount of one or more of the following compounds chosen from disodium hydrogenphosphate, potassium dihydrogenphosphate, sodium hydrogenphthalate, trisodium citrate dihydrate, disodium hydrogen tartrate dihydrate, and disodium formate." *Id*. at [0083]. The '378 Publication also discloses that "[i]n addition to the foregoing buffers, various bases, such as sodium hydroxide, potassium hydroxide, ammonium hydroxide, and the like, can be used to further adjust the pH of the buffer system in an upward direction. Alternatively, an aqueous acid,

such as aqueous hydrochloric acid, can be used to further adjust the pH of the buffer system in a downward direction." *Id*. at [0084].

The '378 Publication also discloses including a preservative system, with non-limiting examples of preservatives being "benzoic acid and its pharmaceutically acceptable salts, for example, sodium benzoate . . .." *Id*. at [0092].

The '378 Publication also discloses suitable flavoring agents such as "peach, berry, strawberry, all citrus flavors, tomato, apple, tutti-frutti and mixtures thereof." *Id*. at [0096].

### t.    U.S. Patent Publication No. 2009/0221563, "Oral Suspension Comprising Meloxicam", (2009) ("'563 Publication")

U.S. Patent Publication No. 2009/0221563 titled "Oral Suspension Comprising Meloxicam" was published on September 3, 2009 ("the '563 Publication"). Thus the '563 Publication was published more than one year before earliest possible priority date for the patents-in-suit. Therefore, the '563 Publication is at least § 102(a) and § 102(b) prior art to the patents-in-suit.

The '563 Publication discloses oral liquid formulations which are suspensions comprising meloxicam. '563 Publication at [0001]. The '563 Publication discloses formulations with taste modifying agents such as bulk sweeteners which are "sorbitol, mannitol, fructose, sucrose, maltose, isomalt, glucose, hydrogenated glucose syrup, and xylitol, and mixtures thereof." *Id*. at [0013]. Strawberry is identified as a suitable flavoring agent in the '563 Publication. *Id*.

It also discloses buffer systems comprises an aqueous mixture of an appropriate amount of an acid such as citric acid, and a base, "in particular sodium hydroxide, disodium hydrogen phosphate or sodium hydrogen carbonate." *Id*. at [0015].

The '563 Publication also discloses including preservatives to prevent microbial contamination such as "benzoic acid and the sodium or potassium salts thereof." *Id*. at [0018].

43

u.      **U.S. Patent Publication No. 2015/0174247, "Oral Pharmaceutical Preparation of Aripiprazole", (2015) ("'247 Publication")**

U.S. Patent Publication No. 2015/0174247 titled "Oral Pharmaceutical Preparation of Aripiprazole" was published on June 25, 2015 ("the '247 Publication"). Thus the '247 Publication was published before the earliest possible priority date for the patents-in-suit. Therefore, the '247 Publication is at least § 102(e) prior art to the patents-in-suit.

The '247 Publication discloses an oral pharmaceutical preparation of aripiprazole. '247 Publication at Abstract. The '247 Publication discloses using buffering agents to adjust pH, including combinations of buffering agents, such as "sodium citrate," and "disodium hydrogenphosphate." *Id*. at [0044].

The '247 Publication discloses formulations sweeteners and identifies sucralose as a preferred option. *Id*. at [0051]. The '247 patent also identifies strawberry as a suitable flavoring agent. *Id*. at [0052]. The '247 Publication also discloses including preservatives to prevent microbial contamination such as sodium benzoate. *Id*. at [0053].

## V.      THE LEVEL OF ORDINARY SKILL IN THE ART

The subject area of the patents in suit is pharmaceutical compositions, and a person of ordinary skill in the art ("POSA") would have at least a graduate degree (such as a Ph.D., M.S., or Pharm.D.) in a subject relating to the field of pharmaceutical formulation science and experience with the development and formulation of pharmaceutical dosage forms, including oral liquid formulations for various patient populations, including a familiarity with formulation design and/or evaluation of oral liquid pharmaceutical dosage forms. A POSA would also work as part of a multi-disciplinary team and draw on the specialized expertise of other members of that team.

## VI.   THE ASSERTED CLAIMS OF THE PATENTS IN SUIT ARE INVALID UNDER 35 U.S.C. § 103

As set forth in **Exhibit A** and as discussed below and above, asserted claims of the '868 and '476 patents are invalid as obvious over the prior art alone or in combination with the knowledge of a POSA, including the combinations of prior art references discussed below for each particular asserted claim.  Annora identifies below exemplary combinations of references that render the Asserted Claims of the '868 and '476 patents obvious.  Invalidity need not be proven with resort to certain specific combinations of references, but instead must involve a holistic analysis of the prior art considered in view of the ordinary knowledge and creativity possessed by those of ordinary skill in the art, consistent with how a person of ordinary skill in the art would have proceeded when faced with a given problem. Indeed, these references all contribute to the scope and content of the prior art, which is the appropriate analysis under *Graham* and *KSR*.  Those cases do not require Annora to prove obviousness through an arbitrary characterization of references as "primary" and/or "secondary."  Accordingly, although Annora identifies exemplary combinations of references that render the Asserted Claims obvious, the combinations of references discussed below are not intended to be exhaustive, but rather, to provide examples of combinations of the above references that render the Asserted Claims obvious.

### A.   Administration of an Oral Liquid Formulation of Enalapril was Known

As of the priority date of the patents in suit, the Epaned Kit was the only available enalapril product for administration as an oral liquid on the market.  The Epaned Kit contains 150 mg of enalapril maleate in a 150 mL bottle, and required reconstitution with 150 mL of ORA-SWEET® SF resulting in a 1 mg/mL EPANED oral solution.   Epaned Kit at 1, 4.  The bottle of Ora-Sweet SF diluent provided in the Epaned Kit was to be added to the enalapril

45

powder prior to dispensing to the patient.  *Id*. at 4.  The Epaned Kit consists of "a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution. The Ora-Sweet SF contains purified water, glycerin, sorbitol, sodium saccharin, xanthan gum, and flavoring. Buffered with citric acid and sodium citrate. Preserved with methylparaben (0.03%), propylparaben (0.008%), and potassium sorbate (0.1%)."  Epaned Kit at 10-11. The recommended dosage in adults was 5 mg once daily up to a maximum of 40 mg once daily.  In children, the recommended starting dose was 0.08 mg/kg (up to 5 mg) once daily.

The prior art also taught that enalapril powder compositions could be used to prepare liquid formulations as "solutions (both aqueous and nonaqueous), suspensions, emulsions, syrups, slurries, juices, elixirs, dispersions, and the like." '747 patent at 11:41-46.

## B.    A POSA Would Have Been Motivated to Develop a Ready-To-Use Formulation

In view of the Epaned Kit being the only liquid enalapril product on the market, a  POSA would have been motivated to make a ready-to-use product for several reasons, including that it would be more convenient to dispense, improve dosing accuracy by eliminating product manipulation, improve patient compliance and accessibility, and reduce manufacturing costs such as by eliminating need for a proprietary product such as ORA-SWEET® SF that was used in the Epaned Kit.  All of these advantages of ready-to-use oral liquids were known and would have been common sense to POSAs.  For instance, the WHO Report recommended that "[p]aediatric medicines should preferably be presented as formulations that are ready to administer. The need for health professionals, parents or caregivers to manipulate the dose prior to administration should be kept to a minimum."  WHO Report at 201-202.  Similarly, Richey noted that a "predominant concern" with manipulations involving a wide range of drugs in

46

pediatric patients "was whether the manipulated medicine would provide an accurate dose." Richey at 6; *see also* Sosnowska at 321.  The WHO Report further teaches that "[t]he oral route is the preferred and most appropriate route of administration to paediatric patients."  WHO Report at 210.  "Oral liquid preparations include aqueous solutions, suspensions, emulsions and syrups. They are most appropriate for children in the youngest age groups who are unable to swallow solid dosage forms. The advantage of oral liquid preparations is that variable dose volumes can be measured and administered."  *Id.*

Taking the commonsense approach of retaining aspects of the Kit that made sense, and using information already disclosed in the '747 patent, when designing ready-to-use, would require a POSA to (a) optimize, using a buffer, the pH of the enalapril oral liquid formulation such that it was stable over the shelf-life, and (b) incorporate  sodium benzoate as a preservative which was commonly used in liquid formulations and was known to have optimal antimicrobial activity at the target pH range for enalapril, which is more stable at pH levels below 4 where parabens lose preservative efficacy.

### C.    A POSA Would Have Understood the Necessity of Using a Buffer to Prevent Degradation of Enalapril Over the Shelf-life of the Product

A POSA motivated to formulate a ready-to-use oral liquid formulation of enalapril would be aware of stability-related factors that would be required to be maintained throughout the drug product shelf life.  *See, e.g.,* Dawson at 168-169 (noting the United States Pharmacopeia (USP) criteria for physical, chemical, microbiological, therapeutic and toxicological stability); Sosnowska at 321 ("It is important that the drug should be stable in the vehicle for the proposed duration of storage and administration of the product."); Nahata 1999 at 608 (drug stability is "one of the most important steps in deciding whether a drug can be administered and stored in a liquid dosage form.").  As Dawson noted, "[o]nce a suitable source of drug has been found, it

must be determined if the product will be prepared as a solution or a suspension, and which excipients will be added. These include vehicles (flavored, sweetened, or both), suspending and/or viscosity-increasing agents, preservatives, flavorings, and coloring agents." Dawson at 169; *see also* Sosnowska at 321 ("The characteristics of the vehicles (pH, taste, viscosity, stability, presence of preservatives) determine its suitability and compatibility for use with the drug."); *see also* '747 patent at 7:17-37 (noting that buffering agents maintain the pH when enalapril is reconstituted into a liquid form).

In fact, stability of a drug product is required by the FDA. FDA Stability Guidance at 1. (defining "what stability data package for a new drug substance or drug product is sufficient for a registration application within" the United States.) The FDA Stability Guidance requires that "a drug product should be evaluated under storage conditions (with appropriate tolerances) that test its thermal stability and, if applicable, its sensitivity to moisture. The storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use." *Id.* at 10.

In this case, the Epaned Kit would have been the obvious source to a POSA looking to prepare a ready-to-use oral liquid formulation that was stable. The approach taken by a POSA would involve routine optimization, given the information that was known about reconstituting the Epaned Kit, to include buffer components in order to adjust the pH to the known stability of enalapril; and the obvious replacement with sodium benzoate as a preservative known to be effective at the target pH.

### 1. A POSA would be aware that enalapril was pH sensitive and would have been motivated to prepare a liquid formulation of enalapril with a pH below 5, including around 3.3

The well-known properties of enalapril would have motivated the POSA to maintain the pH of the dosage form at a level that would decrease the likelihood of degradation.  The properties of enalapril were well known by the priority date.  Ip & Brenner disclosed various properties of enalapril.  They discussed the stability of enalapril maleate in aqueous buffer solutions has been studied as a function of pH in the range of 2-7.  Ip & Brenner at 236.  They stated that "[m]aximum solution stability occurred around pH 3."  *Id*.; *see also* Merck Index at 3610 (reporting pH of enalapril in water as 2.6).  It also notes that "[t]he rate of enalapril loss and the mode of degradation are dependent upon the solution pH."  Ip & Brenner at 236.

The prior art taught that "enalapril has maximum stability at a pH of ~3, and at a pH >5, the rate of decomposition increases."  Allen at 1917.  Further, that formulations at pH 3.9-4.8 were "somewhat closer to the pH for maximum stability."  *Id*. at 1919. The prior art also reported that "[d]ecomposition in pH 5.0 buffer was significantly slower than in distilled water [ ], consistent with the maximum stability being at pH 3."  Boulton at 155; *see also* Sosnowska at 325-326.

Determining the appropriate pH for an enalapril oral liquid formulation would be a matter of routine optimization for a POSA.  The prior art taught that "[i]n the broad realm of knowledge concerning the preparation and action of drugs few, if any, variables are so important as pH."  Remington 1995 at 229; *see also* Dawson at 168-169, 174.  It also taught that "evidence for enhanced stability of systems when these are maintained within a narrow range of pH, as well as of progressively decreasing stability as the pH departs from the optimum range, is abundant."  Remington 1995 at 230.  Therefore, a POSA, armed with the knowledge about the chemical

properties of the active ingredient, would invariably perform routine studies in order chose the appropriate pH of the formulation.

A POSA would also have investigated the impact of pH on the formation of the degradants of the enalapril to determine an optimal pH for maintaining the stability of the drug. The prior art taught formation of degradants of enalapril, enlaprilat and diketopiperazine over time. *See* '747 patent, 3:1-11, 4:1-9, Examples 6-7. Therefore, a POSA would know that in formulating enalapril oral liquid formulation, an optimal pH must be chosen that would limit the amount of degradation of enalapril over the shelf-life of the product. This effort would have led a POSA to a selection of a pH below 4, particularly including a pH of about 3 to about 3.5, and ideally about 3.3.

Thus, the POSA would have been motivated to maintain the pH of an enalapril oral liquid formulation product below 5, including about 3.3, to improve the stability of the formulation.

> **2.     A POSA would be aware that buffering agents could maintain the pH of enalapril liquid formulations and would have been motivated to use a buffer to maintain desired pH.**

In view of the need to maintain a pH below 5, and preferably about 3.3, a POSA would have invariably used one or more buffering agents in the formulation. The use of buffers is common to most all liquid formulations, and identification of the specific buffer agent(s) and concentrations thereof is a routine step in development of liquid drug formulations. *See, e.g.,* '747 patent at 7:17-37 (disclosing buffering agents to maintain the pH of enalapril compositions in liquid form); Handbook at 181, 640-41, 656 (noting that citric acid monohydrate, sodium citrate and disodium hydrogen phosphate are "widely used" as buffering agents "to adjust the pH of solutions."); Remington 1995 at 225 (teaching that "[t]he terms buffer, buffer solution and buffered solution, when used with reference to hydrogen-ion concentration or pH, refer to the

ability of a system, particularly an aqueous solution, to resist a change of pH on adding acid or alkali, or on dilution with a solvent."); '225 Publication at [0035]; '378 Publication at [0082]-[0083]; '563 Publication at [0015]; '247 Publication at [0044].

And the prior art taught the use of a buffer to control the pH of liquid enalapril formulations.  *See* Epaned Kit at 11; Boulton at 152; Sosnowska at 322; Nahata 1998 at 1156; the '747 patent at 7:17-37.  In addition, the prior art taught the use of a buffer to ensure an appropriate pH for oral liquid formulations of enalapril would have maximum stability at around pH 3.0.  Ip & Brenner at 236; Allen at 1917; Boulton at 155.

Thus, the POSA would have been motivated to maintain the pH of an enalapril oral liquid formulation product by using a buffering agent.  A POSA would also have had a strong expectation of success in using a buffer.  For example, citrate and phosphate buffers had been used successfully to maintain the pH of enalapril liquid formulations.  *See* Epaned Kit at 11; Boulton at 155 (reporting that "[d]ecomposition in pH 5.0 buffer was significantly slower than in distilled water [ ], consistent with the maximum stability being at pH 3."); Allen at 1917; Nahata 1998 at 1156.

### 3. A POSA would understand the need for adequate buffer capacity in order to maintain pH during shelf life of product, which would involve routine optimization.

The prior art taught that buffer concentration can determine "[t]he ability of a buffer solution to resist changes in pH upon addition of acid or alkali may be measured in terms of buffer capacity."  Remington 1995 at 227.  A POSA would understand the need to have adequate buffer capacity in order to maintain the pH during the shelf life of the product.  *See* FDA Stability Guidance at 10.  Further, determining the amounts or molar concentration of the buffer to maintain the formulation at the desired pH would have been nothing more than a routine lab

procedure.  Indeed, there are even equations, such as the Henderson-Hasselbalch equation and derivatives thereof, that POSAs can use when determining an appropriate buffer agent and concentration.  *See* Remington 1995 at 226.

Thus, the POSA would be motivated to carry out routine optimization studies to determine the adequate buffer concentration for an enalapril oral liquid formulation product in order to maintain pH during shelf life.

### D.    A POSA Would Have Been Aware of the Necessity to Include a Compatible Preservative such as Sodium Benzoate in an Enalapril Oral Liquid Formulation

A POSA would be aware of the need to include a preservative in order to prevent microbial contamination of the product.  *See, e.g.*, Dawson at 173 (disclosing that "[w]ithout the use of preservatives, [liquid] formulations would need to be prepared dose by dose, immediately before patient administration-a very expensive process."); Boulton at 155 (stating that inclusion of a preservatives in enalapril liquid formulations would be "suitable.")  In fact, the FDA requires assessment of preservative effectiveness and microbial contamination as part of its review process.  *See* FDA Stability Guidance at 9 (explaining that stability studies should include testing of preservative content (e.g., antioxidant, antimicrobial preservative) and effectiveness thereof); FDA Pharmaceutical Development Guidance at 8.  The use of preservatives is especially important in liquid pharmaceutical formulations because they are particularly susceptible to microbial contamination.  Boukarim at 14.

The prior art discloses the use of sodium benzoate as a very commonly used preservative for liquid pharmaceutical preparations.  Boukarim at p. 14 (identifying sodium benzoate as "[a]mong the most commonly used preservatives in the conservation of liquid pharmaceutical preparations"); Handbook at 627 (identifying sodium benzoate as being used primarily as an

antimicrobial preservative); Dawson at 173; '225 Publication at [0033]; '378 Publication at [0092]; '563 Publication at [0018]; '247 Publication at [0053].

The target pH of oral liquid formulation would have also led a POSA to the selection of sodium benzoate, as its "preservative efficacy is best seen in acidic solutions (pH 2-5)." Handbook at 627.  Conversely, the paraben preservatives in the proprietary Ora-Sweet® Diluent component of the Epaned Kit were known to lose efficacy at a pH below 4.  *Id.* at 442.  Using sodium benzoate would therefore have been the obvious choice.  Further, the determination of the amount of preservative to use is a straightforward process that is invariably confirmed through experimentation reported in support of any drug product applications with the FDA. Boukarim notes that "typical allowed concentrations" for sodium benzoate are 0.1-0.2% (w/w). Boukarim at 14; *see also* Handbook at 627.  It would therefore have been obvious to a POSA to use 1mg/mL sodium benzoate to preserve an enalapril oral liquid formulation.

### E.    A POSA Would Have Understood the Benefits of Including a Sweetening Agent and Flavorant to Improve the Palatability of an Enalapril Oral Liquid Formulation

A POSA would be aware of the need to include a sweetening agent and flavorant in order to make enalapril oral liquid formulations more palatable, and thereby promote patient compliance and adherence, as well as the marketability of the product.  *See, e.g.*, WHO Report at 202 (stating that palatability of the formulation is "crucial to adherence."); Dawson at 171 (stating that "many pediatric medications are formulated with sweetening agents," in order to improve palatability); Nahata 1999 at 608. The prior art taught various sweetening agents, such as sucralose, and flavorants in oral liquid formulations.  *See* '747 patent at 8:4-7, 8:52-54; 8:57-67; Dawson at 171-172, 173; Handbook at 701-702; '225 Publication at [0026], [0029]; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0051]- [0052].  The prior

art also taught liquid formulations of enalapril containing sweeteners and flavorants. *See* Epaned Kit at 10; '747 patent at 7:60-8:67; Nahata 1998 at 1156. It would therefore have been obvious to a POSA to include a sweetening agent and/or flavorant in an enalapril oral liquid formulation.

### F.     The Asserted Claims of the '868 Patent

As described above and in more detail below, there is no difference between what was known in the prior art and the asserted claims of the '868 patent.

### a.     Claims 1, 11-14, 24-25, and 28 of the '868 Patent

Claims 1, 11-14, 24-25 and 28 recite a stable oral liquid formulation, consisting essentially of certain specified amounts of enalapril, a buffer, sodium benzoate and water. The claims require that the buffer maintain the pH at about 4.5 or below. Some of the dependent claims also require a sweetener or flavoring agent. Further, claims 1, 13-14 require that the formulation is stable at about 5±3° C. for at least 12 months and has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period. Claims 11-12 and 24-25 require that the formulation is stable at about 5±3° C. for at least 18 months or 24 months. Claim 28 further requires the concentration of enalapril to be 1 mg/ml. Further, claim 14 requires enalapril to be present in "about 10% to about 25% (w/w of solids)."

As of the priority date, enalapril was an FDA-approved pharmaceutical agent with well-known benefits. *E.g.*, Epaned Kit, *see also* '747 patent; Boulton; Allen; Nahata 1998; Sosnowska. The Epaned Kit was the only available liquid enalapril product on the market. Epaned Kit at 1. The Epaned Kit consists of "a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution. The Ora-Sweet SF contains purified water,

glycerin, sorbitol, sodium saccharin, xanthan gum, and flavoring. Buffered with citric acid and sodium citrate.  Preserved with methylparaben (0.03%), propylparaben (0.008%), and potassium sorbate (0.1%)." *Id.* at 10-11.  The recommended dosage in adults was 5 mg once daily up to a maximum of 40 mg once daily.  In children, the recommended starting dose was 0.08 mg/kg (up to 5 mg) once daily.  *Id.* at 1, 4.

As described above, a POSA would have been motivated to prepare a ready-to-use formulation that offered the same dosing as the existing Epaned Kit that eliminated the hassles and downsides of the need to preparation the solution for administration.  Thus, a POSA would have pursued a solution containing 1 mg/mL enalapril.  This concentration also makes it easier to dose the product than other concentrations.  Other prior art references also teach 1 mg/ml enalapril maleate liquid formulations. '747 patent at Example 1; Boulton at 152, Allen at 1915-1916, Nahata 1998 at 1156; Sosnowska at 321-322.  Further, the prior art also taught formulations wherein the w/w % concentration of enalapril was in the range of "about 1%w/w to about 30% w/w." '747 patent at 6:23-47.

A POSA would have understood the need to use the basic excipients present in most all liquid oral formulations, including buffer, preservation, sweetening agent, and flavorant.  E.g., '225 Publication (describing use of all of same); '378 Publication (same); '563 Publication (same); '247 Publication (same).

With respect to buffers, a POSA would have known the need to include buffers in order to maintain the stability of enalapril during the shelf life of the product.  First, the prior art taught the use of a buffer to control the pH of enalapril.  *See* Epaned Kit at 11 (disclosing a citric acid and sodium citrate buffer); Boulton at 123-124 (disclosing use of isotonic citrate buffer and phosphate buffer); Sosnowska at 325 (disclosing use of citrate acid); Nahata 1998 at 1156

(disclosing use of citrate buffer);'747 patent at 7:11-41; '225 Publication at [0035] (describing use of sodium citrate, and disodium hydrogenphosphate); '378 Publication at [0077, 0082, 0083, 0087] (same); '563 Publication at [0015] (same); '247 Publication at [0044] (same). Second, a POSA would have understood the importance of selecting a buffering agent that is suitable for us in maintaining a pH below 5, and ideally about 3.  The prior art disclosed stability of enalapril maleate in aqueous buffer solutions has been studied as a function of pH in the range of 2-7.   Ip & Brenner at 236.  They stated that "[m]aximum solution stability occurred around pH 3."  *Id.* The prior art taught that "enalapril has maximum stability at a pH of ~3, and at a pH >5, the rate of decomposition increases."  Allen at 1917.  Further, that formulations at pH 3.9-4.8 were "somewhat closer to the pH for maximum stability."  *Id.* at 1919. The prior art also reported that "[d]ecomposition in pH 5.0 buffer was significantly slower than in distilled water [ ], consistent with the maximum stability being at pH 3."  Boulton at 155; *see also* Sosnowska at 325-326.

A POSA would have also understood the need to include sufficient buffer agent(s) to provide adequate buffer capacity to maintain the pH of the solution.  A POSA would have determined the suitability of the claimed concentrations of buffer through routine experimentation.  Such efforts would include common quantitative chemical calculations, the known acidity/basicity of the buffering agent, and/or experiments aimed at assessing the stability of the drug at different concentrations of buffer over the shelf life of the product.

A POSA also would have understood the need to include a preservative in the liquid oral formulation to protect against microbial contamination.  *See* Boukarim at 14; FDA Stability Guidance at 9; FDA Pharmaceutical Development Guidance at 8.  The prior art also taught that sodium benzoate was one of the most commonly used preservatives for liquid formulations and it was known to have maximum preservative efficacy around pH 2-5, the claimed pH of the

enalapril liquid oral formulation.  Boukarim at 14; Handbook at 627; '225 Publication at [0035]; '378 Publication at [0092]; '563 Publication at [0018]; '247 Publication at [0053]. The claimed concentration of sodium benzoate (1 mg/mL, or about 19%) would have also been obvious because was known to be used in a narrow concentration range, and would have been determined by routine practice because the FDA requires such tests.

The prior art taught that inclusion of flavoring agents, including strawberry flavoring, or sweetener, including sucralose, in pediatric formulations was preferable.  Dawson at 171-172; Handbook at 701-702; '225 Publication at [0026], [0029] ; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0051], [0052].  Enalapril liquid formulations such as the Epaned Kit using sweeteners and flavoring agents were known in the art.  Epaned Kit at 10; '747 patent at 7:60-8:37; Nahata 1998 at 1156. This is also common sense, since a POSA would appreciate that patients are less likely to take medications that do not have a favorable taste profile.

Finally, a POSA would have been motivated to produce a product with a two-year shelf life and so would have invariably selected a formulation that satisfied the stability requirements as claimed in claims 1, 11-14 and 24-25.[2]  Additionally, the claimed stability requirements are a part of routine testing conducted by pharmaceutical companies as required by the FDA.  *See* FDA Stability Guidance at 4-5 (noting that "storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use.")  Therefore, stability testing at 5±3° C. for at least 12 months, 18 months and 24 months, would be a matter of routine FDA-mandated testing.  The 12-month stability duration was the minimum required for FDA

---

[2] These stability requirements are also merely the inherent property of the claimed composition and are therefore not limiting. *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) (citation omitted).

submissions, and the 24-month duration is most commonly pursued for commercial reasons. Furthermore, the claimed percentage requirements ("95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances") corresponds to a standard stability guidance threshold. *See* FDA Stability Guidance at 7.  The prior art taught that enalapril oral liquid compositions are stable in various storage conditions including refrigerated and ambient conditions, including 5° C±3° C for at least 36 weeks, and having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period. '747 patent at 13:7-10, 13:29-48.  Therefore, a POSA, would have a strong expectation that routine stability development efforts would yield an enalapril oral liquid formulation that was stable through its shelf life.

Thus, in view of the prior art, a POSA prior to the filing date of the '868 patent would have been motivated to develop a ready-to-use 1mg/ml enalapril oral liquid formulation containing buffer at a concentration of 5-20 mM, and about 1 mg/mL sodium benzoate as a preservative.  Further, a POSA would have had a reasonable expectation of success in formulating a stable enalapril oral liquid formulation.  For at least these reasons, asserted claims 1, 11-14 and 24-25 are invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA.

Exemplary combinations of references that demonstrate the obviousness of the claimed invention include:

- '747 patent alone or in view of one or more of Allen, Handbook, and/or Dawson

- Epaned Kit alone or in view of one or more of Allen, Handbook, '747 patent, and/or Dawson

- Allen alone or in view of one or more of Handbook, '747 patent, and/or Dawson

- One of '747, Epaned Kit, or Allen in view of one or more of Handbook and/or Dawson, and further in view of Nahata 1999 or WHO Report and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- Epaned Kit in view of one or more of Ip & Brenner; Boukarim; and/or Handbook and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- '747 patent in view of one or more of Ip & Brenner; Boukarim; and/or Handbook and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- Epaned Kit in view of one or more of Ip & Brenner; Dawson; and/or '747 patent

- Epaned Kit in view of one or more of Allen, Ip & Brenner; Boukarim; Dawson; and/or '747 patent

- '747 in view of one or more of Ip & Brenner; Dawson; and/or Epaned kit

- '747 in view of one or more of Allen, Ip & Brenner; Boukarim; Dawson; and/or Epaned kit

### 2. Claims 2-4 of the '868 Patent

Claims 2-4 depend from claim 1 and further requires that the stable oral liquid formulation comprise a sweetener, that is sucralose, and further that the stable oral liquid formulation comprise a flavoring agent. As discussed above, the prior art disclosed the use of sweeteners with enalapril oral liquid formulations. *See* Epaned Kit at 10; '747 patent at 8:4-7. Further, the prior art taught that inclusion of flavoring agents or sweetener in oral liquids, especially those for pediatric administration, was preferable. '747 patent at 8:4-7, 8:52-54; 8:57-67; Dawson at 171-172, 173; Handbook at 701-702; '225 Publication at [0026], [0029]; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0051]-[0052]. Sucralose was reported to be used as a sweetening agent in pharmaceutical applications. Handbook at 702; '747 patent at 8:4-7; '225 Publication at [0026], [0029]; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0051]-[0052]. Including a sweetener and/or a flavoring agent would have been common sense to a POSA given that the claimed liquid

formulation is also intended for use in pediatric patient populations.  For these reasons and those discussed above, claims 2-4 are invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of Dawson and/or the Handbook and/or '225 Publication and/or '378 Publication and/or '563 Publication and/or '247 Publication (to the extent such reference(s) is not already part of the previously enumerated combination).

### 3.      Claims 5 and 30 of the '868 Patent

Claims 5 and 30 depend from claim 1 and further require the buffer to comprise "a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, or a tartrate buffer," or "selected from a citrate, a phosphate, a citrate/phosphate, an acetate, a tartrate, a lactate, a glycinate, and an amino acid buffer."  As discussed above, the prior art taught that the use of buffers such as a citrate buffer or phosphate buffer could successfully to control the pH of enalapril liquid formulations.  *See* Epaned Kit at 11 (citrate buffer); Boulton at 123-124; Sosnowska at 325; Nahata 1998 at 1156;'747 patent at 7:17-37.  Further, the claimed buffers are suitable for the target pH range for enalapril and are commonly used in various pharmaceutical preparations and choosing a buffer from the claimed group would be a matter of routine optimization for a POSA. *See, e.g.,* '225 Publication at [0035]; '378 Publication at [0082]-[0083]; '563 Publication at [0015]; '247 Publication at [0044].  For these reasons and those discussed above, claims 5 and 30 are invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of one or more of the '747 patent; Epaned Kit; Boulton; Sosnowska; Nahata 1998; '225 Publication; '378 Publication; '563 Publication; and/or '247

Publication (to the extent such reference(s) is not already part of the previously enumerated combination).

### 4.      Claims 8 and 21 of the '868 Patent

Claim 8 depends from claim 1, and claim 21 depends from claim 14, and each claim and further require the buffer concentration to be "about 10 mM to about 20 mM." As discussed above, a POSA would have also understood the need to include sufficient buffer agent(s) to provide adequate buffer capacity to maintain the pH of the solution. A POSA would have determined the suitability of the claimed concentrations of buffer through routine experimentation. Such efforts would include common quantitative chemical calculations, the known acidity/basicity of the buffering agent, and/or experiments aimed at assessing the stability of the drug at different concentrations of buffer over the shelf life of the product. *See* Remington 1995 at 226-227. For these reasons and those discussed above, claims 8 and 21 are invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of Remington 1995 (to the extent such reference(s) is not already part of the previously enumerated combination).

### 4.      Claims 9-10 and 22-23 of the '868 Patent

Claims 9-10 depend from claim 1 and 22-23 depend from claim 14. Claim 9 further requires the buffer to maintain the pH of the oral liquid formulation "between about 3 and about 4." Claim 22 further requires the buffer to maintain the pH of the oral liquid formulation "between about 3 and about 3.5." Claims 10 and 23 further require the buffer to maintain the pH of the oral liquid formulation "at about 3.3." These narrower pH values are not novel, and were well known to be within the target pH range for providing stable liquid formulations of

enalapril. *See* Ip & Brenner at 236; Allen at 1917; Boulton at 155.  Therefore, a POSA would fully expect success in using a buffer to obtain and maintain a pH of about the known stable pH of enalapril by conducting routine lab work.  For these reasons and those discussed above, claims 9-10 and 22-23 are invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of one or more of Ip & Brenner, Allen and Boulton (to the extent such reference(s) is not already part of the previously enumerated combination).

### 5.    Claims 28 and 29 of the '868 Patent

Claims 28 and 29 depend from claim 1.  Claim 28 further requires about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof and claim 28 further requires the use of enalapril maleate.  These limitations were well known in the art.  The Epaned Kit when reconstituted contains 1 mg/ml enalapril maleate.  *See* Epaned Kit at 10-11.  Other prior ort references also teach 1 mg/ml enalapril maleate liquid formulations.  *See* Boulton at 152, Allen at 1915-1916, Nahata 1998 at 1156; Sosnowska at 321-322; '747 patent at Example 2. Therefore, for these reasons and those discussed above, claims 28 and 29 is invalid under 35 U.S.C. § 103 as obvious in light of the teachings of the prior art and the knowledge of a POSA based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of one or more of the '747 patent; Epaned Kit; Boulton; Allen; Sosnowska; and/or Nahata 1998 (to the extent such reference(s) is not already part of the previously enumerated combination).

### G.    The Asserted Claims of the '476 Patent

As described above and in more detail below, there is no difference between what was known in the prior art and the asserted claims of the '476 patent.

1.      **Claim 1 of the '476 patent**

Claim 1 of the '476 patent is directed to a stable enalapril oral liquid formulation, consisting essentially of:

> (i) about 1.0 mg/ml of enalapril maleate;
> (ii) a buffer comprising citric acid and disodium hydro-genphosphate, wherein the buffer is present in the oral liquid formulation at a concentration of between about 5 mM and about 20 mM;
> (iii) about 1 mg/ml of a preservative that is sodium benzoate;
> (iv) a sweetener, wherein the sweetener is sucralose and is present at about 0.7 mg/ml in the oral liquid formulation;
> (v) a flavoring agent; and
> (vi) water;
> wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C.

As discussed above in the context of the '868 patent, the Epaned Kit was the only available liquid enalapril product consisting of "a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution." Epaned Kit at 10. Other prior ort references also teach 1 mg/ml enalapril maleate liquid formulations. Boulton at 152, Allen at 1915-1916, Nahata 1998 at 1156; Sosnowska at 321-322; '747 patent at Example 2. As discussed, a POSA would have been motivated to prepare a ready-to-use formulation that offered the same dosing as the existing Epaned Kit that eliminated the hassles and downsides of the need to preparation the solution for administration. Thus, a POSA would have pursued a solution containing 1 mg/mL enalapril.

With respect to buffers, a POSA would have known the need to include buffers in order to maintain the stability of enalapril during the shelf life of the product. *See* FDA Stability

Guidance at 10. First, the prior art taught the use of a buffer to control the pH of enalapril. *See* Epaned Kit at 11 (disclosing a citric acid and sodium citrate buffer); Boulton at 123-124 (disclosing use of isotonic citrate buffer and phosphate buffer); Sosnowska at 325 (disclosing use of citrate buffer); Nahata 1998 at 1156 (disclosing use of citrate buffer); the '747 patent at 7:11-41 (disclosing non-limiting examples of buffering agents including disodium hydrogenphosphate). Second, the prior art disclosed several "widely used" buffering agents "to adjust the pH of solutions" such as citric acid monohydrate (concentration of 0.1- 2.0%), sodium citrate (concentration of 0.3-2.0%) and disodium hydrogen phosphate. Handbook at 181, 640-41, 656. Third, the prior art also taught that "[c]haracteristic of buffered solutions, which undergo small changes of pH on addition of acid or base, is the presence either of a weak acid and a salt of the weak acid, or a weak base and a salt of the weak base." Remington 1995 at 225-26. Therefore, a POSA would know that the choice of buffering agent could include combinations of weak acids and weak bases that were known in the prior art. Thus, a POSA would have pursued a citrate/phosphate buffer. Such combination was well know in the art. *See, e.g.,* '225 Publication at [0035] (describing use of sodium citrate, and disodium hydrogenphosphate); '378 Publication at [0077, 0082, 0083, 0087] (same); '563 Publication at [0015] (same); '247 Publication at [0044] (same). These agents are used to perform the same function for which a POSA would have considered them obvious to use to provide a formulation that behaves as expected. Notably, the '476 patent purports to identify dozens of buffers that can be used in the invention to allegedly provide the claimed stability, confirming the alleged inventors did not consider the selection of buffering agents difficult or unpredictable.

Further, a POSA would have also understood the need to include sufficient buffer agent(s) to provide adequate buffer capacity to maintain the pH of the solution. A POSA would

have determined the suitability of the claimed concentrations of buffer through routine experimentation and/or basic calculations. *E.g.*, Remington 1995 at 226. Such efforts would include common quantitative chemical calculations, the known acidity/basicity of the buffering agent, and/or experiments aimed at assessing the stability of the drug at different concentrations of buffer over the shelf life of the product.

A POSA also would have understood the need to include a preservative in the liquid oral formulation to protect against microbial contamination. *See* Boukarim at 14; FDA Stability Guidance at 9; FDA Pharmaceutical Development Guidance at 8. The prior art also taught that sodium benzoate was one of the most commonly used preservatives for liquid formulations and it was known to have maximum preservative efficacy around pH 2-5, the claimed pH of the enalapril liquid oral formulation. Boukarim at 14; Handbook at 627; *see also* '225 Publication at [0035]; '378 Publication at [0092]; '563 Publication at [0018]; '247 Publication at [0053]. The claimed concentration of sodium benzoate (1 mg/mL) would have also been obvious because was known to be used in a narrow concentration range, and would have been determined by routine practice because the FDA requires such tests.

The prior art taught that inclusion of flavoring agents and sweetener in pediatric formulations was important to providing a palatable composition that will be tolerated by patients and support compliance. Dawson at 171-172; Handbook at 701-702; '225 Publication at [0026], [0029]; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0051], [0052]. This is also common sense, since a POSA would appreciate that patients are less likely to take medications that do not have a favorable taste profile. Sucralose was long known to be used as a sweetening agent in beverages, foods, and pharmaceutical applications. Handbook at 702; '225 Publication at [0026], [0029]; '378 Publication at [0096]; '563

Publication at [0013]; '247 Publication at [0051], [0052].  The claimed amount of sucralose (0.7 mg/mL) would have also been obvious because was known to be used in a narrow concentration range and would have been determined through routine optimization efforts to arrive at a reasonable taste profile.  Handbook at 702 (noting sucralose concentration in pharmaceutical of 0.03-0.24%).

Finally, a POSA would have been motivated to produce a product with a two-year shelf life and so would have invariably selected a formulation that satisfied the stability requirements as claimed.   The prior art taught that enalapril oral liquid compositions are stable in various storage conditions including refrigerated and ambient conditions, including 5° C±3° C for at least 36 weeks, and having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period.  '747 patent at 13:7-10, 13:29-48.  Additionally, the claimed stability requirements are a part of routine testing conducted by pharmaceutical companies as required by the FDA.  *See* FDA Stability Guidance at 4-5 (noting that "storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use.")  Therefore, stability testing at 5±3° C. for at least 12 months would be a matter of routine FDA-mandated testing.  The 12-month stability duration was the minimum required for FDA submissions, and the 24-month duration is most commonly pursued for commercial reasons.  Furthermore, the claimed percentage requirements ("95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances") corresponds to a standard stability guidance threshold.  *See* FDA Stability Guidance at 7.

Thus, in view of the prior art, a POSA prior to the filing date of the '476 patent would have been motivated to develop a ready-to-use enalapril oral liquid formulation containing a citrate/phosphate buffer at a concentration of 5-20 mM, and about 1 mg/mL sodium benzoate as

a preservative.  Further, a POSA would have had a reasonable expectation of success in formulating a stable enalapril oral liquid formulation.  For at least these reasons, claim 1 is invalid under 35 U.S.C. § 103 as obvious.

Exemplary combinations of references that demonstrate the obviousness of the claimed invention include:

- '747 patent alone or in view of one or more of Allen, Handbook, and/or Dawson

- Epaned Kit alone or in view of one or more of Allen, Handbook, '747 patent, and/or Dawson

- Allen alone or in view of one or more of Handbook, '747 patent, and/or Dawson

- One of '747, Epaned Kit, or Allen in view of one or more of Handbook and/or Dawson, and further in view of Nahata 1999 or WHO Report and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- Epaned Kit in view of one or more of Ip & Brenner; '747 patent, Boukarim; and/or Handbook and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- '747 patent in view of one or more of Ip & Brenner; Boukarim; and/or Handbook and optionally in view of one or more of '225 Publication; '378 Publication; '563 Publication; and/or '247 Publication

- Epaned Kit in view of one or more of Ip & Brenner; Dawson; and/or '747 patent

- Epaned Kit in view of one or more of Allen, Ip & Brenner; Boukarim; Dawson; and/or '747 patent

- '747 in view of one or more of Ip & Brenner; Dawson; and/or Epaned kit

- '747 in view of one or more of Allen, Ip & Brenner; Boukarim; Dawson; and/or Epaned kit

### 2.    Claim 2 of the '476 patent

Claim 2 of the '476 patent further requires that the flavoring agent has strawberry flavor. As discussed above in the context of the '868 patent, the prior art taught that inclusion of flavoring agents or sweetener in pediatric formulations was preferable.  Dawson at 171-172;

67

Handbook at 701-702.  As noted in Dawson, "children generally prefer sweet, fruity flavors," Dawson at 173.  The prior art taught that strawberry was a suitable flavor in oral liquid formulations, including enalapril formulations.  *See* '747 patent at 8:57-67; '225 Publication at [0029]; '378 Publication at [0096]; '563 Publication at [0013]; '247 Publication at [0052]. Therefore, including a fruit flavor such as strawberry would be obvious to a POSA.  For these reasons and those discussed above, claim 2 is invalid under 35 U.S.C. § 103 as obvious based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of '747 patent and/or Dawson and/or '225 Publication and/or '378 Publication and/or '563 Publication and/or'247 Publication (to the extent such reference(s) is not already part of the previously enumerated combination).

### 3.       Claims 3 and 4 of the '476 patent

Claim 3 of the '476 patent further requires that the citric acid is anhydrous, and claim 4 requires citric acid to be present at about 1.82 mg/mL in the oral liquid formulation.  First, the prior art taught the use of a buffer to control the pH of enalapril.  *See* Epaned Kit at 11 (disclosing a citric acid and sodium citrate buffer); Boulton at 123-124 (disclosing use of isotonic citrate buffer and phosphate buffer); Sosnowska at 325 (disclosing use of citric acid); Nahata 1998 at 1156 (disclosing use of citrate buffer).  Further, the prior art teaches that "[c]itric acid (as either the monohydrate or anhydrous material) is widely used in pharmaceutical formulations and food products, primarily to adjust the pH of solutions."  Handbook at 181.  It also teaches concentration of citric acid as a buffer of 0.1–2.0%.  *Id.*  1.82 mg/ml of citric acid amounts to 0.18%.  Determining the amount of citric acid would have required mere routine experimentation by a POSA.  Such efforts would include common quantitative chemical calculations, the known acidity/basicity of the buffering agent, and/or experiments aimed at assessing the stability of the

drug at different concentrations of buffer over the shelf life of the product.  For these reasons and those discussed above, claims 3 and 4 are invalid under 35 U.S.C. § 103 as obvious For these reasons and those discussed above, claim 2 is invalid under 35 U.S.C. § 103 as obvious based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of the Handbook and/or Epaned Kit and/or Boulton and/or Sosnowska and/or Nahata 1998 (to the extent such reference(s) is not already part of the previously enumerated combination).

### 4.      Claims 5-7 of the '476 patent

Claim 5 of the '476 patent further requires the buffer concentration in the formulation to be "between about 10 mM and about 20 mM."  Claim 6 requires a concentration of "about 10mM," and claim 7 requires a concentration of "about 11mM."  As discussed above in the context of the '868 patent, a POSA would have also understood the need to include sufficient buffer agents to provide adequate buffer capacity to maintain the pH of the solution and prevent degradation of the active ingredient.  A POSA would have determined the suitability of the claimed concentrations of buffer through routine experimentation.  Such efforts would include common quantitative chemical calculations, the known acidity/basicity of the buffering agent, and/or experiments aimed at assessing the stability of the drug at different concentrations of buffer over the shelf life of the product.  *See* Remington 1995 at 226-227.  For these reasons and those discussed above, claims 5-7 are invalid under 35 U.S.C. § 103 as obvious based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of Remington 1995 (to the extent such reference(s) is not already part of the previously enumerated combination).

### 5. Claims 8-10 of the '476 patent

Claim 8 of the '476 patent further requires the oral liquid formulation to be "below 4.5." Claim 9 further requires the pH of the oral liquid formulation to be "between about 3 and about 4." Claim 10 further requires the pH of the oral liquid formulation to be "at about 3.3." These narrower pH values are not novel, and were well known to be within the target pH range for providing stabile liquid formulations of enalapril. *See* Ip & Brenner at 236; Allen at 1917; Boulton at 155, Merck Index. Therefore, a POSA would fully expect success in using a buffer to obtain and maintain a pH of about the known stable pH of enalapril by conducting routine lab work. For these reasons and those discussed above, claims 8-10 are invalid under 35 U.S.C. § 103 as obvious based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of the Ip & Brenner and/or Allen and/or Boulton and/or Merck Index (to the extent such reference(s) is not already part of the previously enumerated combination).

### 6. Claim 11 of the '476 patent

Claim 11 of the '476 patent further requires the pH of the oral liquid formulation to be "adjusted by HCl, NaOH, or both." The prior art taught that that hydrochloric acid is used as an acidifying agent in a variety of pharmaceutical and food preparations. Handbook at 308-09. It also teaches that sodium hydroxide is an alkalizing agent, and "is widely used in pharmaceutical formulations to adjust the pH of solutions." *Id*. at 648. These are among the most, if not the most, common pH adjusting agents in the world. *See* '378 Publication at [0083]-[0084] (disclosing use of citrate buffer combinations with one or more of the following compounds chosen from "disodium hydrogenphosphate, potassium dihydrogenphosphate, sodium hydrogenphthalate, trisodium citrate dihydrate, disodium hydrogen tartrate dihydrate, and disodium formate," and in addition using bases (such as NaOH) and acids (such as HCl) to

"adjust the pH of the buffer system").  Therefore, a POSA would inevitably use a acidifying

agent, HCl and/or a known alkalizing agent, NaOH to adjust pH of solution to achieve target pH.

This would be a task routinely performed by a POSA.  For these reasons and those discussed

above, claim 11 is invalid under 35 U.S.C. § 103 as obvious based on the same exemplary

combinations as set forth with respect to claim 1, optionally in further view of the Handbook

and/or '378 Publication (to the extent such reference(s) is not already part of the previously

enumerated combination).

### 7.    Claims 12-14 of the '476 patent

Claim 12 of the '476 patent further requires that the oral liquid "maintains about 95%

w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months

at about 5±3° C."  Claim 13 further requires that the oral liquid "maintains about 95% w/w or

greater of the initial enalapril amount at the end of a storage period of at least 24 months at about

5±3° C."  Claim 14 further requires that the oral liquid "maintains about 95% w/w or greater of

the initial enalapril amount at the end of a storage period of at least 6 months at about 25±5° C."

As discussed in the context of the '868 patent, the claimed stability requirements are a

part of routine testing conducted by pharmaceutical companies as required by the FDA.  *See*

FDA Stability Guidance at 4-5 (noting that "storage conditions and the lengths of studies chosen

should be sufficient to cover storage, shipment, and subsequent use.")  Not only does the FDA

motivate POSAs to maximize stability, market pressures and commercial incentives motivate the

POSA to develop products with long shelf lives.  Therefore, stability testing at 5±3° C. for at

least 12 months, 18 months and 24 months, would be a matter of routine FDA-mandated testing.

For drug products intended for storage in a refrigerator, the FDA Guidance discloses the

following conditions for stability testing:

| Study | Storage condition | Minimum time period covered by data at submission |
|-------|------------------|---------------------------------------------------|
| Long-term | 5°C ± 3°C | 12 months |
| Accelerated | 25°C ± 2°C/60% RH ± 5% RH | 6 months |

*Id.* at 13. The 6-month and 12-month stability duration was the minimum required for FDA submissions, and the 24-month duration is most commonly pursued for commercial reasons. Furthermore, the claimed percentage requirements ("95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances") corresponds to a standard stability guidance threshold. *See* FDA Stability Guidance at 11. This was taught by the '747 patent which disclosed that enalapril oral liquid compositions are stable in various storage conditions including refrigerated and ambient conditions, including 5° C±3° C for at least 36 weeks, and having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period. '747 patent at 13:7-10, 13:29-48. For these reasons and those discussed above, claims 12-14 are invalid under 35 U.S.C. § 103 as obvious based on the same exemplary combinations as set forth with respect to claim 1, optionally in further view of the '747 patent and/or the FDA Stability Guidance (to the extent such reference(s) is not already part of the previously enumerated combination).

## H.    Secondary Considerations

Azurity bears the burden of offering evidence of secondary considerations to overcome the strong showing of obviousness. Azurity is yet to assert any secondary considerations of nonobviousness.

The Applicant claimed during prosecution of the application that issued as the '868 patent that their invention was not obvious because the prior art did not teach "e.g., the stability

element, that is 'the formulation is stable at $5 \pm 3$ °C for at least 12 months,'" and further that, the "claimed stable enalapril liquid formulations are dramatically much more stable than extemporaneously prepared enalapril formulations."  Applicant's Arguments and Remarks dated August 1, 2019.  The prior art shows, however, that none of these results were unexpected or surprising.  First, the evidence of stability the applicants offered during prosecution did not bear any resemblance to the claims, which, for example, are directed to a far broader set of (in the case of the '868 patent) or different (in the case of the '476 patent) buffer(s), but was limited to citric acid/sodium citrate buffer.  Second, there was nothing surprising about adding a buffer to control the pH of the oral liquid formulation or that it improved stability.  That is precisely why a POSA would have added and optimized the buffer at a pH below 5, and ideally about 3—to improve stability.  Further, determining stability over at least 12 months would be a matter of routine FDA-mandated testing.  Thus, the stability profile of the claims is what a POSA would have expected.

Annora reserves the right to directly respond to any alleged secondary consideration Plaintiffs may assert in this lawsuit.

## VII.   THE ASSERTED CLAIMS OF THE PATENTS IN SUIT ARE INVALID UNDER 35 U.S.C. § 112

### A.   The '868 Patent

### 1.   Lack of Adequate Written Description

Claims 1-8, 11-12, 13-18, 21, 24-25, 28-30 of the '868 patent are invalid for lack of written description under 35 U.S.C. § 112, ¶ 1 because the patent lacks a sufficiently detailed written description from which a POSA would conclude that the inventors possessed a stable oral liquid formulation of enalapril as required by the claims.  The specification must support the claimed invention as whole, and it is improper to cobble together disparate teachings within a

patent to support a claim that combines such disparate teachings.  That is what the applicants have done with respect to the claims of the '868 patent:  cobbled together disparate teachings (and even some elements for which there is no teaching at all) to prepare a combination of elements that is never disclosed as a cohesive embodiment.[3]  As a result, the specification would not have conveyed to one of ordinary skill in the art that the inventors were in possession of the invention(s) to which the asserted claims are directed.

The following discussion focuses on specific elements of the claims, but throughout this discussion Annora is not referring to these elements in a vacuum but in the context of the other elements required by the claims as a whole.

        **a.**       **The patent specification fails to show the inventors possessed a stable enalapril formulation using any buffer "to maintain the pH…" as a general proposition, and also at the claimed concentrations**

All of the asserted claims require a stable oral liquid formulation containing a buffer to maintain the pH.  The specification provides a lengthy list of non-limiting examples of buffers to be used in the claimed invention:

---

[3] By way of example, the claims are limited to sodium benzoate as a preservative at a concentration of 1 mg/mL while the written description describes many other preservatives that could be used and many other concentrations for the use of the preservative.  '868 patent at 10:24-32; 10:61-12:29.  It is improper to pluck one of these values for each of these parameters and combine it with a random choice of other variables required by the claims.  Similarly, claims 14 of the '868 patent requires, inter alia, about 10% to about 25% enalapril (w/w of solids) and about 19% (w/w solids) sodium benzoate, but the written description only describes each of these variables as one of dozens of options.  The written description identifies many other options for weight percent of enalapril, many other options for other preservatives, and many other options for the concentrations of those preservatives.  The written description never describes a combination of these discrete options.  This picking and choosing of variables from the written description to assemble a collection of elements that are never described in the specification renders the claims invalid.  Again, these are just examples of the written description issues addressed herein.

> formulation. Non-limiting examples of buffering agents
> include, but are not limited to sodium bicarbonate, potas-
> sium bicarbonate, magnesium hydroxide, magnesium lac-
> tate, magnesium glucomate, aluminum hydroxide, alumi-
> num hydroxide/sodium bicarbonate co-precipitate, mixture
> of an amino acid and a buffer, a mixture of aluminum
> glycinate and a buffer, a mixture of an acid salt of an amino
> acid and a buffer, and a mixture of an alkali salt of an amino
> acid and a buffer. Additional buffering agents include citric
> acid, sodium citrate, sodium tartarate, sodium acetate,
> sodium carbonate, sodium polyphosphate, potassium poly-
> phosphate, sodium pyrophosphate, potassium pyrophos-
> phate, disodium hydrogenphosphate, dipotassium hydrogen-
> phosphate, trisodium phosphate, tripotassium phosphate,
> sodium acetate, potassium metaphosphate, magnesium
> oxide, magnesium hydroxide, magnesium carbonate, mag-
> nesium silicate, calcium acetate, calcium glycerophosphate,
> calcium chloride, calcium hydroxide, calcium lactate, cal-
> cium carbonate, calcium bicarbonate, and other calcium
> salts. Some buffering agents also impart effervescent quali-

*Id*. at 13:24-43.  But these are merely "non-limiting examples of buffering agents."  *Id*. at 13:24.

Thus, specification lists a wide range of potential buffers, explicitly not limited to those disclosed

in the specification, which may be used in the claimed stable enalapril oral liquid formulation.

Similarly, the claims do not identify any particular buffers to be used in the formulation.  Yet the

data supporting the alleged stability of the claimed formulation is limited to a very specific

buffer combination:  citric acid and sodium citrate dihydrate.  *See* Examples A-F.  Similarly, the

inventor declarations submitted during prosecution are also limited to that specific buffer

combination.  *See* Declaration of Gerald L. Mosher dated February 2, 2017 at 4; *see also*

Declaration of Gerald L. Mosher dated May 14, 2020 at 4.  To the extent the claims are not

obvious to a POSA, a POSA would not have considered the inventors to be in possession of the

full scope of the claims, which do not require any particular buffers.[4]

---

[4] Claim 30 limits the buffers to a slightly smaller group, but still lacks any nexus to the data
underlying the claims.  This, to the extent a POSA would not have considered the selection of
these excipients for use in an enalapril liquid formulation to have been obvious, a POSA would

Further, the specification discloses a broad range of potential buffer concentrations:

> In some embodiments, the buffer concentration is between about 5 mM and about 20 mM. In some embodiments, the buffer concentration is about 5 mM, about 6 mM, about 7 mM, about 8 mM, about 9 mM, about 10 mM, about 11 mM, about 12 mM, about 13 mM, about 14 mM, about 15 mM, about 16 mM, about 17 mM, about 18 mM, about 19 mM, or about 20 mM. In some embodiments, the buffer concentration is about 5 mM. In some embodiments, the buffer concentration is about 10 mM. In some embodiments, the buffer concentration is about 20 mM.

*Id*. at 14:51-60.

Additionally, the examples in the specification do nothing to show a POSA that the inventors were in possession of stable enalapril oral liquid formulations having a pH of about 4.5 at buffer concentrations of about 5 mM to about 20 mM.  Example A, which is a study titled "[e]ffect of pH on the [f]ormation of [d]egradants in [e]nalapril [f]ormulations at 60° C," discloses enalapril formulations with varying citrate buffer concentrations (A1 – 51.62 mM; A2 – 53.4 mM; A3 – 55.12 mM; A4 – 53.4 mM; A5 – 53.4 mM; A6 – 26.57 mM), and varying pH (A1 – 3.4; A2 – 4.4; A3 – 5.2; A4 – 4.4; A5 – 4.5; A6 – 4.4).  *Id*. at 31:19-28, Table A-1.  Example A would suggest that buffer concentrations of over 20mM are required achieve a pH of 4.5±0.1.  Further, Example C, which is a study titled "[s]tability of [e]nalapril [m]aleate [f]ormulations [c]ontaining [p]araben [p]reservatives," discloses enalapril formulations with varying citrate buffer concentrations (C1 – 19.86 mM; C2 – 19.74 mM; C3 – 20.08 mM; C4 – 20.37 mM; C5 – 20.37 mM), and varying pH (C1 – 4.4; C2 – 3.8; C3 – 3.7; C4 – 4.4; C5 – 4.6).  *Id*. at 33:42-66, Table C-1.  The examples in the specification also do nothing to show a POSA that the inventors were in possession of stable enalapril oral liquid formulations having a pH of

---

not have considered the inventors to have been in possession of a stable liquid oral formulation made using any of these claimed buffers (which are themselves sizeable genera of potential buffers).

between about 3 and about 4 or about 3.3 at buffer concentrations of about 5 mM to about 20 mM.  Examples D and E, discloses enalapril formulations with citrate buffer concentrations being only 20mM±0.1 or 10mM±0.1, and no other buffer concentrations which would support the full scope of the broadly claimed range of "about 5 mM to about 20 mM."

The claims encompass an extraordinary number of potential permutations of buffers, as well as buffer concentrations, in the enalapril oral liquid formulations.[5]  As such, the specifications of the patents-in-suit would not have indicated to a POSA that the inventors were in possession of the full scope of the asserted claims.[6]  For at least this reason, all of the asserted claims of the '868 patent are invalid for lack of written description under § 112.

### b. The patent specification fails to show the inventors possessed a stable enalapril oral liquid formulation at pH about 4.5 with stability of at least 12 months

Each of the asserted claims 1-5, 8, 11-18, 21, 24-25, 28-30 of the '868 patent require "a stable oral liquid formulation" consisting essentially of "a buffer to maintain the pH about 4.5 or below … wherein the formulation is stable at about 5±3° C. for at least 12 months."  *See, e.g.,* claims 1, 13 and 14 of the '868 patent.  The specification, however, does not identify any "stable oral liquid formulation" of enalapril containing a buffer which maintains the pH of the formulation at "about 4.5."  Instead, the specifically is entirely focused on formulations having a pH of about 3.5 or lower (or general references to pH levels below 4).  *See, e.g.,* '868 patent at 2:21-29; 3:1; 3:4-18; 3:25-31; 3:46-47; 3:57-58; 4:20; 4:35; 4:48-49; 10:47-50; 14:32-46.  The

---

[5] Annora contends that the lack of any limitations to the particular buffer is, by itself, sufficient to invalidate the claims for lack of written description.  The breadth of the concentration limit merely exacerbates the lack of written description support for this element.

[6] Claims 8 and 21 narrow the range of permitted buffer concentrations to about 10 mM to about 20 mM.  This does not overcome the massive breadth of permissible buffers (see note 6, *supra*), and remains a large range of potential concentrations, such that this claim also fails the written description requirement for the reasons specified for the other claims.

specification never mentions liquid oral formulations having a pH of 4.5.  The only instance where the specification refers to a formulation having a pH even in the vicinity of 4.5 is when the applicants provide data showing that their product has better stability than solutions having pH values of 4.4 and 4.6.  *See* Example A; Tables A-1, A-2, Figs. 1-2.[7]  And improved stability was what the applicants entirely relied upon to secure the claims.  *See* Declaration of Gerald L. Mosher dated February 2, 2017 at 2-3; *see also* Declaration of Gerald L. Mosher dated May 14, 2020.  And these declarations were focused on oral liquid formulations "at a pH of less than 3.5." *Id*.  For at least these reasons, the specification lacks a sufficient written description of the claimed invention, and asserted claims 1-8, 13-18, 21, 28-30 of the '868 patent are therefore invalid 35 U.S.C. § 112.

> **c.**     **The specification fails to support the claim element "wherein the formulation is stable at about 5±3° C. for at least 12 months" in view of the other elements of the asserted claims**

The claims require the enalapril oral liquid formulations having a buffer to maintain the pH at about 4.5 to be "stable at about 5±3° C. for at least 12 months."  However, nothing in the specification would demonstrate to a POSA that the inventors were in possession of stable enalapril formulations with a pH of about 4.5 having been stored for the particular claimed duration at the particular claimed storage temperature.

---

[7] In addition, the formulations disclosed in Example C with a pH above 4 either contain paraben preservatives (sodium methyl paraben and sodium propylparaben) alone or in addition to sodium benzoate, which is the ***only*** preservative required (or permitted) by all asserted claims; and/or do not have the claimed buffer concentrations.  Further, Example C analyzes stability at 0, 4 and 8 weeks.  For each of these reasons, Example C also fails to show stability of compositions for the claimed duration (at least 12 months).

First, as discussed above, the specification does not disclose the claimed enalapril oral liquid formulations with the buffer maintaining the formulations at about pH 4.5 while offering such stability.

Second, the specification fails to support the breadth of the claimed buffer agents and concentrations thereof as discussed above while offering such stability.

Therefore, for the reasons as stated herein and above, the specification fails to reasonably convey to a POSA that the inventors had possession of the claimed enalapril oral liquid formulations having a pH of about 4.5 with buffer concentrations of about 5 mM to about 20 mM (or about 10mM to about 20 mM), which were stable at about 5±3° C. for at least 12 months. Asserted claims 1-5, 8, 13-18, 21, 28-30 of the '868 patent are therefore broader than the written description supports and are invalid under § 112.

### d. The patent specification fails to show the inventors possessed a stable enalapril oral liquid formulation at pH about 4.5 with stability of at least 18 or 24 months

Asserted claims 11-12 and 24-25 of the '868 patent are invalid for lack of written description under 35 U.S.C. § 112 for an additional reason. Each of the asserted claims 11-12 and 24-25 of the '868 patent require the claimed stable oral liquid formulation to be stable at about 5±3° C. for at least "12 months," or "18 months." For the same reasons, as stated above, the specification fails to reasonably convey to a POSA that the inventors had possession of the claimed enalapril oral liquid formulations having a pH of about 4.5 with buffer concentrations of about 5 mM to about 20 mM, remained stable at about 5±3° C. for at least 18 or 24 months. Therefore, for the reasons as stated herein and above, asserted claims 11-12 and 24-25 of the '868 patent lack written description support and are invalid under § 112.

      **e.**      **The claims fail to convey to a POSA that the inventors were in possession of an invention with an indefinite storage period**

The claims require the formulation to contain "about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances *at the end of the given storage period*".  The claims indicate that the storage period is "at least 12 months," confirming that the claims cover storage periods of greater than 12 months.  However, for a POSA, upon reading the specification would not believe the inventors were in possession of such an open-ended storage period.   The longest stability data reported in the specification is about 62 weeks (about 14 months), and notes that "[a]t refrigerated condition, the enalapril oral liquid formulations described herein are stable for at least 1 month, at least 2 months, at least 3 months, at least 6 months, at least 9 months, at least 12 months, at least 15 months, at least 18 months, at least 24 months, at least 30 months and at least 36 months."  *Id*. at 37:46-38:27 (Table E-2); 18:64-19:2.  The broad range of storage periods do not demonstrate that the specification reasonably conveys to a POSA that the inventors had discovered or possessed formulations that were stable indefinitely.  Further, the stability data in the specification shows an increase in the percentage weight of degradants over time, with no evidence that degradation would cease over longer periods of time.  Therefore, the asserted claims are invalid under § 112 for this additional reason.

      **f.**      **The patent specification fails to show the inventors possessed a stable enalapril oral liquid formulation at pH between about 3 and about 4, or at about 3.3 as required by claims**

Claims 9 and 22 require the formulation to have a pH of about 3 to about 4, while claims 10 and 23 require the formulation to have a pH of about 3.3.[8]  The patent lacks a sufficiently

---

[8] To be sure, these claims are also invalid for lack of written description support as explained in sections (b)-(d).

detailed written description from which a POSA would conclude that the inventors possessed a stable enalapril oral liquid formulation having a pH between about 3 and about 4, or at about 3.3 that were stable for the claimed storage periods without regard to the buffers selected, and that specifically contains sodium benzoate as opposed to the many other disclosed preservatives (which include an "exemplary" list of ascorbic acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its salts, erythorbic acid, fumaric acid, malic acid, propyl gallate, sodium ascorbate, sodium bisulfate, sodium metabisulfite, sodium sulfite, parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts), benzoic acid, sodium benzoate, potassium sorbate, vanillin, and the like") at the specifically claimed concentration rather than the other concentrations disclosed in the patent.  '868 patent at 10:24-32; 10:61-12:29.  Further, as described above, the claims encompass an extraordinary number of potential permutations of buffers and buffer concentrations, and the specification would not have indicated to a POSA that the inventors were in possession of the full scope of the asserted claims.  Therefore, for the additional reasons as stated herein and above, asserted claims 9-10 and 22-23 lack written description support and are invalid under § 112.

### 2.    Lack of Enablement

In the alternative, if the asserted claims 1-5, 8-18, 21-25, and 28-30 of the '868 patent are not obvious over the prior art, then they are invalid for lack of enablement under 35 U.S.C. § 112 ¶ 1 because the patent does not sufficiently describe the claimed invention so as to teach a POSA how to make and use the invention without undue experimentation.

Each of asserted claims 1-5, 8-13, and 29-30 require enalapril to be present at "about 0.6 mg/ml to about 1.2 mg/ml," and asserted claims 14-18, 21-25 require enalapril to be present at "about 10% to about 25% (w/w of solids)."  The specification, including the limited number of

examples, provide very little information and guidance in view of the broad scope of the claims. Each of the examples disclose enalapril oral liquid formulations contains 1 mg/ml enalapril only.

Further, each asserted claim requires a stable enalapril oral liquid formulation consisting essentially of a buffer to maintain the pH of the formulation.  As described above, the specification discloses a wide range of non-limiting buffering agents present in a broad range of concentrations and a wide range of adjustable pH values.  '868 patent at 13:23-63, 14:51-17:33. The specification also discloses a wide range of sweeteners and flavoring agents that could potentially be included in the formulations.  *Id*. at 8:35-10:22.  The examples also provide very little information and guidance as to these excipients in view of the broad scope of the claims, instead focusing on specific amounts of sodium citrate and citric acid. *Id*. at 14:61-17:33.

The specification of the '868 patent is insufficient to instruct a POSA to make a stable enalapril oral liquid formulation to encompass the claimed broad ranges of enalapril.  Coupled with the fact, that the specification similarly contains no guidance on the specific excipients, and their concentrations, to the extent this would not have been a matter of routine optimization, the specification fails to provide sufficient direction and guidance to enable a POSA to practice the full scope of the claims without undue experimentation.

For at least these reasons, the asserted claims 1-5, 8-18, 21-25, and 28-30 of the '868 patent are invalid under 35 U.S.C. § 112 for a lack of enablement.

**B.      The '476 Patent**

**1.      Lack of Adequate Written Description**

The asserted claims of the '476 patent are invalid for lack of written description under 35 U.S.C. § 112, ¶ 1 because the patent lacks a sufficiently detailed written description from which a POSA would conclude that the inventors possessed the claimed stable oral liquid formulation of enalapril.

Each of the asserted claims are directed to a very specifically claimed "stable oral liquid formulation" of enalapril that is never described in the specification.  The specification must support the claimed invention as whole, and it is improper to cobble together disparate teachings within a patent to support a claim that combines such disparate teachings.  That is what the applicants have done with respect to the claims of the '476 patent:  cobbled together disparate teachings to arrive at a combination of elements that is never disclosed as a cohesive embodiment.  As a result, the specification would not have conveyed to one of ordinary skill in the art that the inventors were in possession of the invention(s) to which the asserted claims are directed.

For example, the claims require a composition consisting essentially of "a buffer comprising citric acid and disodium hydrogenphosphate, wherein the buffer is present in the oral liquid formulation at a concentration of between about 5mM and about 20 mM."  *See*, claim 1. The specification however discloses a wide-range of non-limiting examples of buffering agents:

> formulation. Non-limiting examples of buffering agents include, but are not limited to sodium bicarbonate, potassium bicarbonate, magnesium hydroxide, magnesium lactate, magnesium glucomate, aluminum hydroxide, aluminum hydroxide/sodium bicarbonate co-precipitate, mixture of an amino acid and a buffer, a mixture of aluminum glycinate and a buffer, a mixture of an acid salt of an amino acid and a buffer, and a mixture of an alkali salt of an amino acid and a buffer. Additional buffering agents include citric acid, sodium citrate, sodium tartarate, sodium acetate, sodium carbonate, sodium polyphosphate, potassium polyphosphate, sodium pyrophosphate, potassium pyrophosphate, disodium hydrogenphosphate, dipotassium hydrogenphosphate, trisodium phosphate, tripotassium phosphate, sodium acetate, potassium metaphosphate, magnesium oxide, magnesium hydroxide, magnesium carbonate, magnesium silicate, calcium acetate, calcium glycerophosphate, calcium chloride, calcium hydroxide, calcium lactate, calcium carbonate, calcium bicarbonate, and other calcium salts. Some buffering agents also impart effervescent qualities when a powder is reconstituted in a solution. In some embodiments, the buffering agent is not sodium bicarbonate.

'476 patent at 13:24-45.  The specification describes embodiments wherein the buffer comprises either citric acid or phosphoric acid:

> In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid. In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid and sodium citrate. In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid and sodium citrate dihydrate or an equivalent molar amount of sodium citrate anhydrous. In some embodiments, the sodium citrate is monosodium citrate. In some embodiments, the sodium citrate is disodium citrate. In some embodiments, the sodium citrate is trisodium citrate.
>
> In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises phosphoric acid. In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises sodium phosphate.

*Id.* at 13:48-63.

The above quoted disclosures would not have demonstrated to a POSA that the inventors possessed the claimed invention wherein the buffer comprises the specific combination of citric acid and disodium hydrogenphosphate, relative to the wide range of potential buffering agents individual disclosed in the specification.  The separate disclosure of citric acid and  disodium hydrogenphosphate buried within in a list of countless other buffering agents does nothing to show a POSA that the inventors were in possession of the claimed combination. The specification does not provide "blaze-marks" to guide a POSA to where support for the claimed invention may be found.  The specification provides no indication that the claimed combination is preferred or critical in order to formulate the claims stable oral liquid enalapril formulation.

Further, the specification does not teach how to evaluate the concentration of the claimed buffer concentration that would enhance the stability of the claimed oral liquid enalapril formulation, nor does it teach that the specific combination of citric acid and disodium

hydrogenphosphate in the specific concentrations, as claimed, would be effective in stabilizing the claimed oral liquid enalapril formulation.  Worsening the matter, the combination is described by reference to a single concentration, making it how much of each separate buffer agent should be (or can be) present.  Of course, the specification never provides any guidance on this issue either.  And a POSA would consider it illogical to refer to a single concentration for both buffer agents, further informing the POSA that the inventors were not in possession of all the random/arbitrary combinations of concentrations of the two buffers that fall within the claimed range.

There are no examples in which compositions containing the claimed buffer combination were prepared, let alone any stability studies carried out with the claimed buffer combination. Each of the examples provided in the specification only use citric acid and sodium citrate anhydrous as the buffering agent.  *See* Examples A-E.  Similarly, during prosecution of the application for the '476 patent, the Applicant did not demonstrate that the claimed buffer combination was critical to the stability of the enalapril oral liquid formulations.  *See* Declarations of Mosher Declarations dated 2nd February, 2017; 14th and 15th May, 2020.

Nor is there discussion of the use of the particular buffer combination with the specific preservative required by the claims, sodium benzoate, or the specific concentrations of that preservative required by the claims.  Instead, the specification describes a large number of preservatives and different concentrations that can be used.  '476 patent at 10:24-32; 10:61-12:29.  For this additional reason the claims are not supported by the written description.

Nor is there any discussion of the claimed buffer combination, and the claimed buffer concentration, with the claimed preservative at the claimed concentration, with any particular sweetener.  Yet even the broadest claim, claim 1, require the use of sucralose at a specific

concentration.  Meanwhile, the specification describes countless sweeteners that could be used, and a wide range of concentrations at which they can be used.  *Id*. at 8:35-9:3; 9:13-10:22.  The specification explains that these sweeteners can be "used single or in combinations of two or more."  *Id.* at 9:3-4.  A POSA would have no idea the inventors were in possession of the specifically claimed sweetener at the specifically claimed concentration in combination with the other elements required by the asserted claims.

Nor does the specification describe the aforementioned elements in combination with a flavoring agent.

Nor does the specification contain any data or examples to indicate the claimed combination would provide the claimed stability.  And yet it was the surprising discovery that the claims provided such stability that the claims were ultimately allowed.

Accordingly, the asserted claims of the '476 patent are invalid because the patent fails to provide a sufficient written description for the specific combinations of excipients and concentrations thereof required by the claims.

The dependent claims require yet more elements that are never described in combination with the elements required by claim 1.  These claims are invalid for failing to satisfy the written description for the same reasons discussed with respect to claim 1, but in addition the written description would not have conveyed to POSAs that the inventors were in possession of the invention of claim 1 with the additional elements required by these claims, including strawberry flavoring agent (claim 2), anhydrous citric acid buffer agent (claim 3), 1.82 mg citric acid (claim 4), a buffer concentration of about 10 mM to about 20 mM (claim 5) or 10 mM (claim 6) or 11

86

mM (claim 7), a pH below 4.5 (claim 8)[9], a pH between about 3 and about 4 (claim 9), a pH of

about 3.3 (claim 10),  the use of NaOH and/or HCl to adjusting pH (claim 11), or the claimed

storage periods and storage conditions of claims 12-14.[10]

### 2.    Lack of Enablement

In the alternative, if the asserted claims of the '476 patent are not obvious over the prior

art, then they are invalid for lack of enablement under 35 U.S.C. § 112 ¶ 1 because the patent

does not sufficiently describe the claimed invention so as to teach a POSA how to make and use

the invention without undue experimentation.  The same evidence discussed above with respect

to the lack of written description, also supports the lack of enablement of the asserted claims.

The patent simply provides no guidance or working examples about the claimed formulation to

enable a POSA to prepare such a solution having the claimed stability, at least to the extent these

claims would not have been obvious to a POSA.  For at least this reason, if asserted claims of the

'476 patent are not obvious, then they are invalid for lack of enablement.

## VIII.  CONCLUSION

Based upon the information presently available to Annora, and based upon Annora's

initial understanding of the scope and construction of the asserted claims of the '868 and '476

patents, the asserted claims of the patents-in-suit are invalid at least on the grounds set forth

above and in the claim chart attached as **Exhibit A**.  Discovery and Annora's investigation are

ongoing, and Annora reserves the right to modify and/or supplement its Invalidity Contentions as

discovery progresses, after claim construction, or otherwise as appropriate.

---

[9] Annora also incorporates by reference its discussion with respect to the '868 patent and the claim element requiring the referenced pH values of the '868 patent claims.

[10] Annora also incorporates by reference its discussion with respect to the '868 patent and the claim elements requiring stability under various storage lengths and conditions, including condition beyond the length of time required by the claims.

Date:  August 11, 2021

*/s/ Ronald P. Golden III*

Stephen B. Brauerman (No. 4952)
Ronald P. Golden III (No. 6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
Phone: (302) 655-5000
sbauerman@bayardlaw.com
rgolden@bayardlaw.com

Of Counsel:
Todd S. Werner
Saukshmya Trichi
Carlson, Caspers, Vandenburgh & Lindquist, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Phone: (612) 436-9600
twerner@carlsoncaspers.com
strichi@carlsoncaspers.com

*Attorneys for Annora Pharma Private Limited*

# EXHIBIT C

Attorney Docket No.: 43060-707.201

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | Art Unit:  1629 |
| Inventors:     Gerold L. Mosher, *et al.* | Examiner:  Stephanie K. Springer |
| Serial No.:     15/081,603 | Confirmation No.:  3892 |
| Filed:          March 25, 2016 | Customer No.:  021971 |
| Title:          ENALAPRIL FORMULATIONS | |

Mail Stop Amendment
Commissioner of Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### DECLARATION OF GEROLD MOSHER UNDER 37 C.F.R. § 1.132

I, **Gerold Mosher,** do hereby declare as follows:

1.      I am currently employed at Silvergate Pharmaceuticals, Inc.

2.      I received my Bachelor's degree in Pharmacy from the University of Kansas in 1979. I also received a Master and a Doctor of Philosophy in Pharmaceutical Chemistry in 1984 and 1986, respectively, from the University of Kansas.

3.      I have been employed at Silvergate Pharmaceuticals since 2013, as Vice President of Drug Development.  As part of my job duties, I develop oral solutions for pediatric use.  I have a small laboratory where I develop, characterize and move formulations through the steps required for FDA approval and eventual sale.

4.      Early in my career, I practiced pharmacy for two years from 1979 to 1981. Subsequently, I worked in large pharmaceutical companies (Eli Lilly and Merck) for about ten years where I focused primarily on pre-formulation and early phase formulations of new drug products.  After leaving these companies and prior to Silvergate Pharmaceuticals, I have also

1

been employed by small startup companies to develop new solubilizing technology for oral, injectable and inhalation formulations.

5.     In total, I have been in the field of pharmaceutical chemistry for almost 38 years, and have extensive experience in developing pharmaceutical formulations. My Curriculum Vitae is attached as Exhibit A.

6.     I am familiar with the subject matter claimed in patent application 15/081,603, and am a named inventor on this application.  Silvergate Pharmaceuticals is also the Assignee of the '603 application.

7.     I am aware of the Non-Final Office Action mailed in this matter on January 17, 2017. I am also aware that the oral enalapril liquid formulation claims stand rejected under 35 U.S.C. § 103 as allegedly being unpatentable over US 8,568,747, Nahata et al. (Stability of Enalapril Maleate in three Extemporaneously Prepared Oral Liquids) ("Nahata"), Product Information of Bicitra (Sodium Citrate and Citric Acid Oral Solution) ("Bicitra"), Product Information of Ora-Sweet ("Ora-sweet"), and Rippley at al. (Pharmacokinetics Assessment of an Oral Enalapril Suspension for Use in Children) ("Rippley").  I have reviewed these cited references in the Non-Final Office Action.

8.     I am submitting this declaration to address the comments made in the Office Action.

9.     The '603 application relates to enalapril oral liquid formulations that are stable for least 12 months at 5±3 °C.  The present oral liquid formulations contain enalapril, sucralose, a citric acid buffer, sodium benzoate and water at a pH of less than 3.5.  Development of this described enalapril formulation was oriented on preparing a safe, stable, soluble oral liquid with minimal degradation and having acceptable taste for pediatric patients.

10.     The currently approved methods of delivering enalapril to pediatric patients requires (1) administering a solid enalapril tablet or portion thereof to the patient, (2) extemporaneously preparing an oral liquid suspension from enalapril tablets and a diluent, such as the method described in "Nahata" and subsequently administering the suspension to the

patient, or (3) reconstituting a powder in a liquid carrier, such as the described enalapril powder in US 8,568,747.

11.     All of these methods are undesirable and have limitations.  For tablets, it is well known that children have difficulty in swallowing oral dosage forms.  For the second method, extemporaneously prepared oral liquids present additional challenges and issues with respect to dosing accuracy and stability, as well as can introduce compounding errors and cross-contamination.  Similarly, reconstituting powders into a liquid carrier also requires an extra step and could introduce variability, solubility and contamination issues during the reconstitution.

12.     As compared to these currently available methods, the enalapril oral liquid formulations claimed in the '603 application provides several advantages:

- Improved ease of administration.  It is easier for many patients to swallow a liquid than to swallow a tablet,
- Patient Compliance.  Patients are more likely to take a dose that is not difficult to swallow, or difficult to prepare,
- Accuracy of dosing. The prescribing information for enalapril tablets provides dosing guidelines based on the weight of the child. When one only has fixed 2.5, 5 or 10 mg tablets available, it is difficult if not impossible to break the tablets in such a way to get an exact dose if the dose is something other than the tablet strength. In addition, if tablets are compounded into a suspension, the tablets are crushed in a mortar and then mixed with a liquid. There is no guarantee that the drug dissolves in, or is dispersed evenly in the liquid (thus leading to potential dosing errors. Moreover, there is always the chance of contamination of the resulting liquid by residual drugs or substances in the mortar. Similarly, in reconstitutable powders, there is also no guarantee that the powder dissolves or disperses evenly in the diluent.

13.     It should be appreciated that the oral enalapril liquid formulations of the present claims are stable at $5\pm3$ ºC for 12 months or longer with minimal degradation.  The stability is an important aspect of the present formulations.  It contributes to the consistency and uniformity of the formulations as well as allows for accuracy of dosing to patients.

Attorney Docket No.: 43060-707.201

14.     Evidence of this stability is found in exemplary formulations E7 and E8 which show minimal degradation as compared to current formulations.  In this study, exemplary formulations E7 and E8 were stored at either refrigerated condition (5 °C) or at ambient condition (25 °C).  Formulations details for E7 and E8 are as follows:

| Composition of Enalapril Maleate Formulations | | |
| --- | --- | --- |
| Component | E7 | E8 |
| Enalapril maleate | 1.00 | 1.00 |
| Citric acid anhydrous | 1.80 | 1.82 |
| Sodium citrate anhydrous | 0.16 | 0.15 |
| Sodium benzoate | 1.00 | 1.00 |
| Sucralose | 0.70 | 0.70 |
| Mixed berry flavor | 0.50 | 0.50 |
| Water | qs | qs |
| pH (measured) | 3.3 | 3.3 |

qs = sufficient quantity

15.     In my review of the references cited in the Office Action, none of the references describe this stability of at least 12 months at 5±3 °C or any means of achieving this stability for enalapril formulations.

16.     I have reviewed Nahata which describes the extemporaneous preparation of oral liquid enalapril formulations by crushing enalapril tablets with a mortar and pestle and suspending the resulting ground tablets in water, citrate buffer, or Ora-Plus/Ora-Sweet.  On stability, Nahata states that the "compounded oral liquids [were] stable for 91 days at 4 and 25 °C" defining stable as  "concentration after storage was ≥90% of the initial concentration.  Table 1 of Nahata shows that the enalapril extemporaneous formulations exhibited about 5% loss of enalapril after about 56 days at 4 °C and about 5% loss of enalapril after about 91 days at 25 °C.

17.     I have also reviewed US 8,568,747 which describes an oral liquid enalapril formulation obtained by reconstituting an enalapril powder in a liquid.  The table in example 6 of US 8,568,747 shows that the resulting oral liquid formulation exhibited about 5% loss of enalapril after about 8 weeks at 25 °C.

18.     I additionally reviewed Bicitra, Ora-sweet, and Rippley and they do not provide any stability of enalapril formulations whatsoever.

Attorney Docket No.: 43060-707.201

19.     To compare the stability of the enalapril extemporaneous preparations as described in Nahata and the reconstituted liquid formulation of US 8,568,747, I submit the following data which depicts the enalapril content of formulations E7 at 5°C and 25 °C and E8 at 5 °C in Table A and Table B:

### Table A: Enalapril content in formulations after storage at 5 °C[1]

| | Nahata | | | | |
|---|---|---|---|---|---|
| Days | water | Citrate Buffer pH 5.0 | 1:1 Ora-Plus/Ora-Sweet | E7 | E8 |
| 0 | 100 | 100 | 100 | 100 | 100 |
| 7 | 98.6 | 98.7 | 99.4 | | |
| 14 | 98.1 | 99.1 | 98.6 | | |
| 28 | 97.6 | 98.7 | 98.4 | | |
| 40 | | | | 100.9 | |
| 42 | 97.1 | 98.5 | 97.9 | | 100.3 |
| 56 | 96.5 | 97.3 | 96.9 | | |
| 70 | 95.2 | 96.3 | 96.1 | | |
| 91 | 94.8 | 95.9 | 95.8 | | |
| 99 | | | | 104.7 | |
| 205 | | | | 101.1 | |
| 290 | | | | 101.0 | |
| 383 | | | | 99.7 | |
| 581 | | | | 99.1 | |

### Table B: Enalapril content in formulations after storage at 25 °C

| | Nahata | | | US 8,568,747 | |
|---|---|---|---|---|---|
| Days | water | Citrate Buffer pH 5.0 | 1:1 Ora-Plus/Ora-Sweet | Example 6 | E7 |
| 0 | 100 | 100 | 100 | 100 | 100 |
| 7 | 98.3 | 98.2 | 99.7 | | |
| 14 | 96.4 | 97 | 98.1 | 99.4 | |
| 28 | 94.1 | 95.8 | 96.2 | 99.5 | |
| 30 | | | | | 100.1 |
| 42 | 92.4 | 95.3 | 96.2 | | |
| 56 | 90.1 | 94.9 | 95.7 | 97.9 | |
| 61 | | | | | 99.8 |

---

[1] I note that US 8,568,747 does not provide stability data of the reconstituted liquid formulation at 5 °C.

Attorney Docket No.: 43060-707.201

| 70 | 87.6 | 93.9 | 94.4 | | |
|-----|------|------|------|------|-------|
| 84 | | | | 96.2 | |
| 89 | | | | | 102.4 |
| 91 | 84.1 | 92.7 | 93.8 | | |
| 183 | | | | | 95.8 |

20.    To further describe the contrast in stability, the enalapril concentrations published by Nahata, the US 8,568,747 enalapril concentrations, and the concentrations from E7 and E8 are plotted graphically (Fig. 1: 5 °C and Fig. 2: 25 °C) with linear regression of the data for extrapolation.



6

Attorney Docket No.: 43060-707.201



Fig 2. Enalapril Maleate Content after Storage at 25°C

21.    Table A and Fig. 1 show that E7 exhibits excellent stability for at least 18 months (581 days) at 5 °C with essentially no loss of enalapril content in contrast to the extemporaneous preparations of Nahata (stability is defined as no more than 5% formation of degradants and 5% loss of enalapril). While Nahata does not disclose stability at 5 °C for more than 90 days, the extrapolated lines show that at about 100 days, the extemporaneous preparations are unstable with respect to the enalapril content in the preparation.

22.     Table B and Fig. 2 show that E7 also exhibits better stability for at least 6 months (183 days) at 25 °C in contrast to the Nahata preparations and the reconstituted formulation of US 8,568,747.

23.     The additional enalapril content data submitted for E7 and E8 shows that the formulations of the present application are significantly more stable, which in my opinion reflects the superior results and advantages, obtained with the oral liquid enalapril formulation of the present claims.

24. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under 18 U.S.C. 1001.

Respectfully submitted on this 2nd day of February, 2017

Gerold L. Mosher, Ph.D.

**Curriculum Vitae**                                    **GEROLD L. MOSHER, Ph.D.**

## ADDRESSES

Silvergate Pharmaceuticals, Inc.                Home
7300 West 110th Street, Suite 950              12215 Avila Drive
Overland Park, KS 66210                         Kansas City, MO 64145
(913) 424-9294                                  Mobile (913) 424-9294
Jerry.mosher@silvergatepharma.com               jerry@coweemosher.com

## EDUCATION

Ph.D., Pharmaceutical Chemistry    (1986)  University of Kansas, Lawrence, KS
MS, Pharmaceutical Chemistry       (1984)  University of Kansas, Lawrence, KS
BS, Pharmacy                       (1979)  University of Kansas, Lawrence, KS

## PROFESSIONAL EXPERIENCE

SILVERGATE PHARMACEUTICALS, INC (2013-Present)
Vice President of Drug Development

VERROW PHARMACEUTICALS, INC., Lenexa, KS (2008-present)
Scientific Advisor (2013-present)
Chief Scientific Officer and Vice President of Product Development (2008-2013)

CYDEX PHARMACEUTICALS, INC., Overland Park, KS (1998-2008)
Sr. Director, Product Development

UNIVERSITY OF MISSOURI-KANSAS CITY, Kansas City, MO (1996-1998)
Research Associate Professor, Division of Pharmaceutical Science (1996-1998)
Associate Director of the Center for Pharmaceutical Technology (1996-1998)

MIDWEST RESEARCH INSTITUTE, Kansas City, MO (1995-1996)
Manager, Pharmaceutical Product Development Section (1996)
Senior Chemist, Formulations Group Leader (1995)

INTERx DIVISION OF MERCK & COMPANY, Lawrence, KS (1992-1995)
Research Fellow

ELI LILLY & COMPANY, Indianapolis, IN (1986-1992)
Research Scientist (1990-1992)
Senior Pharmaceutical Chemist (1986-1990)

ST. JOSEPH HOSPITAL, Concordia, Kansas (1979-1981)
Staff Pharmacist

## MEMBERSHIPS

American Association of Pharmaceutical Scientists (AAPS)
Phi Lambda Upsilon Honorary Chemical Society
Sigma XI

## PATENTS (US only)

GL Mosher and DW Miles, Unpublished patent application, filed 2015, Patent Pending

GL Mosher and DW Miles, Unpublished patent application, filed 2015, Patent Pending

GL Mosher, RL Wedel, KT Johnson, SG Machatha, JA Cowee and DJ Cushing, Formulations containing clopidogrel and sulfoalkyl ether cyclodextrin and methods of use. Publication 2016/0058786, Patent Pending.

JD Pipkin, GL Mosher and DB Hecker, Sulfoalkyl Ether Cyclodextrin Compositions and Methods of Preparation Thereof. Publication 2015/0050355, Patent Pending.

GL Mosher, RL Wedel, KT Johnson, SG Machatha, JA Cowee and DJ Cushing, Formulations containing clopidogrel and sulfoalkyl ether cyclodextrin and methods of use. US Patent 9,125,945 (2015).

GL Mosher, SG Machatha and DJ Cushing, Pharmaceutical Compositions Comprising Prasugrel and Cyclodextrin Derivatives and Methods of Making and Using the Same. Publication 2015/0005341, Patent Pending.

GL Mosher, Stabilized Formulation Containing Iodinated Contrast Agents and Cyclodextrins. Publication 2014/0377185, Patent Pending.

GL Mosher, Stabilized Formulation Containing Iodinated Contrast Agents and Cyclodextrins. Publication 2013/0323181, Patent Pending.

JD Pipkin, RO Zimmerer, DO Thompson and GL Mosher, Inhalant Formulation Containing Sulfoalkyl Ether Cyclodextrin and Corticosteroid. Publication 2013/0303498, Patent Pending.

JD Pipkin, RO Zimmerer, DO Thompson and GL Mosher, Inhalant Formulation Containing Sulfoalkyl Ether Cyclodextrin and Corticosteroid. Publication 2013/0059826, Patent Pending.

GL Mosher, RL Wedel, KT Johnson, SG Machatha, JA Cowee and DJ Cushing, Formulations containing clopidogrel and sulfoalkyl ether cyclodextrin and methods of use. US Patent 8,853,236 (2014).

GL Mosher, JD Pipkin and DB Hecker, Sulfoalkyl Ether Cyclodextrin Compositions and Methods of Preparation Thereof. US Patent 8,846,901 (2014).

GL Mosher, SG Machatha and DJ Cushing, Pharmaceutical Compositions Comprising Prasugrel and Cyclodextrin Derivatives and Methods of Making and Using the Same. US Patent 8,835,407 (2014).

JD Pipkin, GL Mosher and DB Hecker, Sulfoalkyl Ether Cyclodextrin Compositions and Methods of Preparation Thereof. US Patent 8,829,182 (2014).

JD Pipkin, GL Mosher and DB Hecker, DPI Formulation Containing Sulfoalkyl Ether Cyclodextrin. Publication 2013/0197105, Patent Pending.

GL Mosher, RL Wedel, KT Johnson, SG Machatha, JA Cowee and DJ Cushing, Formulations containing clopidogrel and sulfoalkyl ether cyclodextrin and methods of use. US Patent 8,343,995 (2013).

JD Pipkin, GL Mosher and DB Hecker, DPI Formulation Containing Sulfoalkyl Ether Cyclodextrin. Publication 2012/0164184, Patent Pending.

GL Mosher, SG Machatha and DJ Cushing, Pharmaceutical Compositions Comprising Prasugrel and Cyclodextrin Derivatives and Methods of Making and Using the Same. US Patent 8,236,782 (2012).

JD Pipkin, GL Mosher and DB Hecker, DPI Formulation Containing Sulfoalkyl Ether Cyclodextrin. US Patent 8,114,438 (2012).

GL Mosher, JD Pipkin and DB Hecker, Sulfoalkyl Ether Cyclodextrin Compositions and Methods of Preparation Thereof. US Patent 8,049,003 (2011).

JD Pipkin, GL Mosher and DB Hecker, Sulfoalkyl Ether Cyclodextrin Compositions and Methods of Preparation Thereof. US Patent 7,629,331 (2009).

DO Thompson and GL Mosher, Formulations Containing Propofol and a Sulfoalkyl Ether Cyclodextrin.  US Patent 7,034,013 (2006).

GL Mosher, KT Johnson, AA Gayed, and DO Thompson, Formulations Containing Amiodarone and a Sulfoalkyl Ether Cyclodextrin.  US Patent 6,869,939 (2005).

VJ Stella, RA Rajewski, MR Venkatramana, JW McGinity, and GL Mosher, Sulfoalkyl Ether

Cyclodextrin Based Controlled Release Solid Pharmaceutical Formulations.  US Patent 6,046,177 (2000).

GL Mosher,  Absorption Enhancer/Solubilizer Combination for Improved Bioavailability of a Zwitterionic Compound.  US Patent 5,525,596 (1996).

GL Mosher and MV Mullen, R-Forms of Cefuroxime Axetil.  US Patent 5,063,224 (1991).

PUBLICATIONS

Elizabeth S. Rowe, Vernon D. Rowe, Sangita Biswas, Gerold Mosher, Lovella Insisienmay, Marlies K.Ozias, Michael R. Gralinski, John Hunter, James S Barnett, (2016) Preclinical Studies of Kidney Safe Iodinated Contrast Agent, J. Neuroimaging, May 12, 2016 online.

D Cushing, P Souney, W Cooper, G Mosher, M Adams, S Machatha, B Zhang, and P Kowey, Assessment of the pharmacokinetics and platelet aggregation inhibitory effects of a novel intravenous formulation of clopidogrel in humans, Clin. Exp. Pharm. Physiol., 39: 3-8 (2012).

GL Mosher, VD Antle, and JD Pipkin, Sulfobutylether β-Cyclodextrin, in Handbook of Pharmaceutical Excipients, 7th Edition by Rowe, R.C., Sheskey, P.J. Cook, W.G., and Fenton, M.E., Eds, London:Pharmaceutical Press, 823-826 (2012).

GL Mosher and SG Machatha, Complexation: Cyclodextrins, in Encyclopedia of Pharmaceutical Science and Technology, 4th Edition by Swarbrick, J., New York: Informa Healthcare USA Inc., (2013).

GL Mosher and JD Pipkin, Sulfobutyl Ether β-Cyclodextrin, in Handbook of Pharmaceutical Excipients, 6th Edition by Rowe, R.C., Sheskey, P.J. and Quinn, M.E, Eds, London: Pharmaceutical Press, 714-717 (2009).

GL Mosher and JD Pipkin, Sulfobutyl Ether β-Cyclodextrin, in Handbook of Pharmaceutical Excipients, 5th Edition by Rowe, R.C., Sheskey, P.J. and Owen S.C, Eds, London: Pharmaceutical Press, 754-757 (2006).

G Mosher and DO Thompson, Complexation: Cyclodextrins, in Encyclopedia of Pharmaceutical Technology: Third Edition by Swarbrick, J., New York: Informa Healthcare USA Inc., Volume 2, 671-696 (2006).

GL Mosher and JD Pipkin, Sulfobutyl Ether β-Cyclodextrin, in Pharmaceutical Excipients 2004 by Rowe, R.C., Sheskey, P.J. and Owen S.C, Eds, London: Pharmaceutical Press (2004).

SF Lockwood, S O'Malley and GL Mosher, Improved aqueous solubility of crystalline astaxanthin (3,3'-dihydroxy- β, β-carotene-4,4'-dione) by Captisol® (sulfobutyl ether β-cyclodextrin),  J. Pharm. Sci., 92(4): 922-926 (2003).

GL Mosher and DO Thompson, Complexation and Cyclodextrins, in Encyclopedia of Pharmaceutical Technology by Swarbrick, J. and Boylan, J.C., New York: Marcel Dekker, Inc., Volume 19, 49-88 (2000).

GL Mosher, The determination of interfacial transfer constants using side-by-side diffusion cells, Pharm. Res., 11(9): 1325-1329 (1994).

GL Mosher, J McBee and DB Shaw, Esterase activity towards the diastereomers of cefuroxime axetil in the rat and dog, Pharm. Res., 19(5): 687-689 (1992).

GL Mosher and J McBee, Photoreactivity of LY277359 maleate, a 5-HT3 receptor antagonist, in solution, Pharm. Res., 8(10): 1215-1222 (1991).

GL Mosher, H Bundgaard, E Falch, C Larsen, and T Mikkelson, Ocular bioavailability of pilocarpic acid mono- and diester prodrugs as assessed by miotic activity in the rabbit, Int. J. Pharm., 39: 113-120 (1987).

H Bundgaard, E Falch, C Larsen, GL Mosher and T Mikkelson,  Pilocarpine prodrugs.  II. Synthesis, stability, bioconversion, and physicochemical properties of sequentially labile pilocarpic acid diesters, J. Pharm. Sci., 75: 775-783 (1986).

GL Mosher, Theoretical and Experimental Evaluation of Pilocarpine Prodrugs for Ocular Delivery, Dissertation for Doctor of Philosophy, (1986).

GL Mosher, Diethylpropion, a monograph in Chemical Stability of Pharmaceuticals by Connors, Amidon, Kennon and Stella, 2nd Edition, New York: John Wiley and Sons, (1986).

H Bundgaard, E Falch, C Larsen GL Mosher and T Mikkelson, Pilocarpic acid esters as novel sequentially labile pilocarpine prodrugs for improved ocular delivery, J. Med. Chem., 28: 979-781 (1985).

GL Mosher and TJ Mikkelson, Permeability of the n-alkyl p-aminobenzoate esters across the isolated corneal membrane of the rabbit, Int. J. Pharm., 2: 239 (1979).

ABSTRACTS/PRESENTATIONS

S Biswas, ES Rowe, G Mosher, MK Ozias, MR Gralinski, and VD Rowe, Veropaque, A Novel Contrast Formulation, Mitigates Contrast Induced Acute Kidney Injury, 24th Annual Transcatheter Cardiovascular Therapeutics Meeting, Miami, FL (Nov 22-26, 2012). Abstract in J Am Coll Cardiol 60(17) Suppl. B :B40 (2012).

JD Pipkin, SG Machatha, GL Mosher, and Q He, Bioequivalence of a Captisol-Enabled® fosphenytoin sodium injection formulation to the marketed reference listed product via IV and IM administration in healthy volunteers, 64th Annual Meeting of the American Epilepsy Society, San Antonio, TX (Dec 3-7, 2010).

SG Machatha, C Fulk, GL Mosher and JD Pipkin, The effects of Captisol® on the solubilization and stabilization of antiepileptic drugs, 2010 AAPS Annual Meeting and Exposition, New Orleans, LA (Nov 14-18, 2010).

S Biswas, ES Rowe, G Mosher, L Tejada, MK Ozias, and VD Rowe, Nephroprotective effects of substituted cyclodextrins, 15th International Cyclodextrin Symposium, Vienna Austria, (May 9-12, 2010).

SG Machatha, GL Mosher and DJ Cushing, Effects of modified cyclodextrin derivatives on the solubility and stability of prasugrel in aqueous formulations, 2009 AAPS Annual Meeting and Exposition, Los Angeles, CA (Nov 8-12, 2009).

PF Souney, J Cowee, DJ Cushing, G Mosher, and P Holmes, Stability of a cyclodextrin-based IV formulation of amiodarone when diluted with 5 percent dextrose or 0.9 percent sodium chloride injections in both PVC and polyolefin intravenous bags over 7 days, 2009 ASHP Summer Meeting, Rosemont, IL (June 14-17, 2009).

D Cushing, R Lipicky, P Kowey, C Cannon, M Adams, W Cooper and G Mosher, Assessment of the pharmacokinetic and pharmacodynamic effects of intravenous clopidogrel in humans, American College of Cardiology 58th Annual Scientific Session, Orlando, Fl (Mar 28-31, 2009).

PF Souney, J Cowee, G Mosher and DJ Cushing, Stability of intravenous amiodarone formulations in glass, polyolefin and polyvinylchloride containers over 72 hours, ASHP Midyear Clinical Meeting, Orlando, FL (Dec 7-11, 2008).

SG Machatha, RL Wedel, KT Johnson and GL Mosher, Effects of modified cyclodextrin derivatives on the solubility and stability of clopidogrel bisulfate in aqueous formulations, 2007 AAPS Annual Meeting and Exposition, San Diego, CA (Nov 10-15, 2007).

PW Holmes, SG Machatha, CF Fulk and GL Mosher, The common ion effect and its impact on the development of a stable Captisol-Enabled® fosphenytoin sodium injection formulation, 2007 AAPS

Annual Meeting and Exposition, San Diego, CA (Nov 10-15, 2007).

DJ Cushing, WD Cooper, GL Mosher, MR Gralinski and BW Massey, Pharmacokinetic and pharmacodynamic effects of a novel intravenous formulation of clopidogrel bisulfate, 2007 AAPS Annual Meeting and Exposition, San Diego, CA (Nov 10-15, 2007).

G Mosher, Clinical pharmacokinetics and taste assessment comparison of an aqueous sulfobutylether-β-cyclodextrin based oral formulation of sertraline HCl to Zoloft oral concentrate, 2004 AAPS Annual Meeting and Exposition, Baltimore, MD (Nov 7-11, 2004).

KT Johnson and G Mosher, Investigation of atypical bi-phasic complexation curves observed when charged cyclodextrins solubilize charged drug compounds, 2004 AAPS Annual Meeting and Exposition, Baltimore, MD (Nov 7-11, 2004).

R Wedel, A Gayed and GL Mosher, Development of an aqueous-based oral solution formulation of sertraline HCl using sulfobutylether-β-cyclodextrin, 2004 AAPS Annual Meeting and Exposition, Baltimore, MD (Nov 7-11, 2004).

CF Fulk, A Gayed, B Lund, GL Mosher, DO Thompson and R Wedel, Preserved formulations containing Captisol® brand of sulfobutylether-β-cyclodextrin, 2004 AAPS Annual Meeting and Exposition, Baltimore, MD (Nov 7-11, 2004).

SJ Carter, DA Robaugh, RO Zimmerer, GL Mosher and NJ Cogburn, Overcoming unique challenges in developing a method for the quantitation of sulfobutyl ether ß-cyclodextrin in rat and dog plasma by LC/MS, 2004 AAPS Annual Meeting and Exposition, Baltimore, MD (Nov 7-11, 2004).

S Katpally, MK Ghorab, D Thompson, G Mosher, JD Madura and MC Adeyeye, Characterization of bile salt / SBE7-β-cyclodextrin interactions using isothermal titration calorimetry, 2002 AAPS Annual Meeting and Exposition, Montreal Canada (Nov 10-14, 2002).

ML Sirna, CF Fulk, abd GL Mosher, Captisol-Enabled™ Propofol:  Formulation approaches to reduce oxidation, 2002 AAPS Annual Meeting and Exposition, Montreal Canada (Nov 10-14, 2002).

A Vargas-Perex, S Katpally, A Jain, G Mosher, D Thompson and MC Adeyeye, Complexation characteristics of sulfobutylether 7-β-cyclodextrin (SBE7-CD) with chenodeoxycholic acid, 2001 AAPS Annual Meeting and Exposition, Denver, CO (Oct 21-25, 2001).

S Katpally, A Vargas-Perez, D Thompson, G Mosher and MC Adeyeye, Complexation characteristics of sulfobutylether-β-cyclodextrin (SBE7-CD) with bile acids, 2001 AAPS Annual Meeting and Exposition, Denver, CO (Oct 21-25, 2001).

KT Johnson and G Mosher. Development and qualification of a fluorescence method for the determination of sulfobutylether-7-β-cyclodextrin delivered in an aerosol inhalation safety study, 2001 AAPS Annual Meeting and Exposition, Denver, CO (Oct 21-25, 2001).

G Mosher, and C Fulk, Co-solvent effects on the rate and extent of solubilization of drugs by Captisol® brand of sulfobutyl ether ß-cyclodextrin, 2001 AAPS Annual Meeting and Exposition, Denver, CO (Oct 21-25, 2001).

CA Vasquez, NA Neilan and GL Mosher, In vitro evaluation of biocompatibility of a dose formulation, 40th Annual Meeting of the Society of Toxicology, San Francisco, CA, (Mar 25-29, 2001).

C Fulk, SM Ghate, GL Mosher and DO Thompson, Preparation of the ammonium salt of sulfobutyl ether ß-cyclodextrin (Captisol®) for use in controlled release formulations, 27th International Symposium on Controlled Release of Bioactive Materials, Paris, (July 7-13, 2000).

GL Mosher, Cyclodextrins, they`re not just for breakfast any more, Kansas City Discussion Group of Pharmaceutical and Allied Scientists, (Jan 2000).

GL Mosher, S Bradley and E Evans, Continuous IV infusion studies in dogs, Kansas City Discussion Group of Pharmaceutical and Allied Scientists, (1996).

**Curriculum Vitae**                                                          **GEROLD L. MOSHER, Ph.D.**

GL Mosher, K Trubitt-Johnson and RC Wood, Absorption enhancer solubilizer combination for improved bioavailability of a zwitterionic compound, 9th Annual AAPS National Meeting, (1994).

SA Sweetana and GL Mosher, Bile salt-insulin interactions. Optical spectroscopy studies. 6th Annual AAPS National Meeting, (1991).

J McBee and GL Mosher, Hydrolysis of four dihydrolysergic acid derivatives using in vitro enzyme systems from the rat and dog, 3rd Annual AAPS National Meeting, (1989).

GL Mosher and T Mikkelson, An implicit method for modeling the simultaneous transport and metabolism of pilocarpine prodrugs across the excised rabbit cornea, Lilly Modeling Conference, (1987).

GL Mosher, H Bundgaard, E Falch and C Larsen, Effects of drug-protein binding on the precorneal loss of pilocarpine prodrugs, 1st Annual AAPS National Meeting, (1986).

GL Mosher, T Mikkelson, H Bundgaard, E Falch and C Larsen, Prodrug-to-drug ocular bioconversion of pilocarpic acid diesters, 39th Annual APS Meeting, (1985).

GL Mosher, T Mikkelson, H Bundgaard, E Falch and C Larsen, Pilocarpine prodrugs. II. Comparative miotic activities of pilocarpic acid esters in the rabbit following topical instillation, 37th Annual APS Meeting, (1984).

H Bundgaard, E Falch, C Larsen, GL Mosher and T Mikkelson,S Pilocarpine prodrugs. I. Synthesis, physicochemical properties and kinetics of lactonization of pilocarpic acid esters, 37th Annual APS Meeting, (1984).

GL Mosher, Pharmacokinetics - principles and application, Pharmacy Continuing Education Fall Seminar Circuit, University of Kansas, (1984).

GL Mosher, T Mikkelson and K Himmelstein, Diffusion of a series of homogenous compounds across single and laminated polymeric membranes. 15th Annual Graduate Student Pharmaceutical Research Meeting, (1983).

GL Mosher and T Mikkelson, Corneal uptake of the n-alkyl p-aminobenzoate homologs, 27th Annual APS National Meeting, (1979)

GL Mosher and T Mikkelson, Transport across the isolated corneal membrane and physicochemical drug properties, 125th Annual APhA National Meeting, Montreal, Canada (1978).

# EXHIBIT D

Attorney Docket No. 43060-707.305

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | Group Art Unit:    1629 |
| Inventors:    Gerold L. Mosher, *et al.* | Confirmation No.: 1032 |
| Serial No.:    16/242,898 | Examiner:    SPRINGER, Stephanie K |
| Filed:    January 8, 2019 | Customer No.:    21971 |
| Title:    ENALAPRIL FORMULATIONS | |
| | Certificate of Electronic Filing<br>I hereby certify that the attached Response and all accompanying papers is being deposited by Electronic Filing on May 14, 2020, by using the EFS – Web patent filing system and addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.<br><br>By:_____/Paula Derby/_____ |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF GEROLD MOSHER UNDER 37 C.F.R. § 1.132

I, **Gerold Mosher**, state and declare as follows:

1.      I am currently employed at Azurity Pharmaceuticals, Inc., a company formed in May 2019 by the acquisition of Silvergate Pharmaceuticals, Inc. by CutisPharma, Inc.

2.      I received my Bachelor's degree in Pharmacy from the University of Kansas in 1979. I also received a Master and a Doctor of Philosophy in Pharmaceutical Chemistry in 1984 and 1986, respectively, from the University of Kansas.

3.      I have been employed at Silvergate Pharmaceuticals and now Azurity Pharmaceuticals since 2013, and my current position is Vice President of Product Development. As part of my job duties, I develop oral formulations for pediatric use. I have a small laboratory where I

develop, characterize and move formulations through the steps required for FDA approval and eventual sale.

4.      Early in my career, I practiced pharmacy for two years from 1979 to 1981. Subsequently, I worked in large pharmaceutical companies (Eli Lilly and Merck) for about ten years where I focused primarily on pre-formulation and early phase formulations of new drug products. After leaving these companies and prior to Silvergate Pharmaceuticals, I have also been employed by small startup companies to develop new solubilizing technology for oral, injectable, and inhalation formulations.

5.      In total, I have been in the field of pharmaceutical chemistry for about 40 years, and have extensive experience in developing pharmaceutical formulations. My *Curriculum Vitae* is attached as Exhibit A.

6.      I am familiar with the subject matter claimed in U.S. Pat. App. Ser. No. 16/242,898 ("the '898 application"), and I am a named inventor on this application. Silvergate Pharmaceuticals, Inc. is the assignee of all rights in the invention of the pending '898 application.

7.      I am aware of the Final Office Action mailed in this matter on November 19, 2019. I am also aware that the pending claims stand rejected as allegedly being obvious under 35 U.S.C. 103 over Nahata et al., "Stability of enalapril maleate in three extemporaneously prepared oral liquids," Am. J. Health-Syst. Pharm., 1998, vol. 55, pages 1155-1157 ("Nahata") in view of Sosnowska et al., "Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric Use Prepared From Commercially Available Tablets," Acta Poloniae Pharmaceutica - Drug Research, 2009, vol. 66, no. 3, pages 321-326 ("Sosnowska") in view of Boukarim et al., "Preservatives in Liquid Pharmaceutical Preparations", J. Appl. Res., 2009, vol. 9, no. 1&2, pages 14-17 ("Boukarim"). I have reviewed these cited references in the Final Office Action.

8.      I am submitting this declaration to address the comments made in the Office Action.

9.      The '898 application relates to enalapril oral liquid formulations that are stable at about 5±3 ºC for at least 12 months. The development of this described enalapril formulation was oriented on preparing a safe, stable, uniform oral liquid with minimal degradation and having an acceptable taste for pediatric patients.

10.    Traditionally, approved methods of delivering enalapril to pediatric patients requires (1) administering a solid enalapril tablet or portion thereof to the patient, (2) extemporaneously preparing an oral liquid suspension from enalapril tablets and a diluent, such as the method described in "Nahata" and subsequently administering the suspension to the patient, or (3) reconstituting a powder in a liquid carrier. All of these methods are undesirable and have limitations. For tablets, it is well known that children have difficulty swallowing solid oral dosage forms. For the second method, extemporaneously prepared oral liquids present additional challenges and issues with respect to dosing accuracy and stability, as well as can introduce compounding errors and cross-contamination.

11.    As compared to these currently available methods, the enalapril oral liquid formulation claimed in the '898 application provides several advantages:

- Improved ease of administration.  It is easier for many patients to swallow a liquid than to swallow a tablet,

- Patient Compliance.  Patients are more likely to take a dose that is not difficult to swallow, or difficult to prepare,

- Accuracy of dosing. The prescribing information for enalapril tablets provides dosing guidelines based on the weight of the child. When one only has fixed 2.5, 5 or 10 mg tablets available, it is difficult if not impossible to break the tablets in such a way to get an exact dose if the dose is something other than the tablet strength. In addition, if tablets are compounded into a suspension, the tablets are crushed in a mortar and then mixed with a liquid. There is no guarantee that the drug dissolves in, or is dispersed evenly in the liquid (thus leading to potential dosing errors. Moreover, there is always the chance of contamination of the resulting liquid by residual drugs or substances in the mortar. Similarly, in reconstitutable powders, there is also no guarantee that the powder dissolves or disperses evenly in the diluent.

12.    The oral enalapril liquid formulations of the '898 application have superior stability—they are stable at $5\pm3$ °C for 12 months or longer with minimal degradation.  The stability is an important aspect of the present formulations.  It contributes to the consistency and uniformity of the formulations as well as allows for accuracy of dosing to patients.

13.     Evidence of the superior stability of the formulations disclosed in the '898 application can be found in exemplary formulations H1 to H9. Formulations H1 to H9 were prepared according to the compositions in Table 1 and titrated if needed to the target pH with 5N hydrochloric acid or 5N sodium hydroxide. The formulations were placed into HDPE containers and sealed with screw caps and induction sealing. The formulations were stored at 5 °C and 25 °C and sampled at various times. Samples were analyzed by HPLC for enalapril maleate and enalapril related substances. The results of the analyses are presented in Table 2.

14.     As shown in Table 1 below, formulations H1- H9 were prepared with a variety of buffers, including sodium citrate, citric acid, phosphate, citrate/phosphate, acetate, glycine, and tartrate. Formulations H1 and H7-H9 contain citrate-based buffers. Specifically, formulation H1 was prepared with citric acid and sodium citrate, and formulations H7-H9 were prepared with citric acid only (no sodium citrate) with the pH being adjusted with HCl or NaOH. Formulations H2-H6 were prepared with phosphate, citrate/phosphate, acetate, glycine, and tartrate buffer, respectively. The pH values of formulations H1 to H9 vary from about 3.3 to about 4.5. The initial pH values of formulations H1 to H7 are about 3.3, and the initial pH values of formulations H8 and H9 are about 4.0 and 4.5, respectively.

15.     The enalapril maleate assay results in Table 2 show that all the formulations have greater than 98% of the initial enalapril maleate content remaining after 52 weeks at 5 °C. The total impurity content is also less than 2% for the same period showing comparable stability between the formulations, irrespective of the type of buffers used.

**Table 1**

| | H1 | H2 | H3 | H4 | H5 | H6 | H7 | H8 | H9 |
|---|---|---|---|---|---|---|---|---|---|
| Ingredients | Citrate | Phosphate | Citrate/ Phosphate | Acetate | Glycine | Tartrate | Citrate | Citrate | Citrate |
| Acetic acid, glacial | - | - | - | 0.58 | - | - | - | - | - |
| Sodium Acetate | - | - | - | 0.04 | - | - | - | - | - |
| Citric acid, anhydrous | 1.82 | - | 1.07 | - | - | - | 1.92 | 1.92 | 1.92 |
| Sodium citrate, dihydrate | 0.15 | - | - | - | - | - | - | - | - |
| Glycine | - | - | - | - | 0.75 | - | - | - | - |
| Sodium dihydrogen phosphate, anhydrous | - | 1.2 | - | - | - | - | - | - | - |
| Disodium hydrogen | - | - | 0.63 | - | - | - | - | - | - |

*Compositions (mg/mL) for Stability Testing at 5 °C and 25 °C*

| | H1 | H2 | H3 | H4 | H5 | H6 | H7 | H8 | H9 |
|---|---|---|---|---|---|---|---|---|---|
| phosphate, anhydrous | | | | | | | | | |
| L-(+)-tartaric acid | - | - | - | - | - | 0.75 | - | - | - |
| Sodium tartrate diabasic, dihydrate | - | - | - | - | - | 1.15 | - | - | - |
| Sodium benzoate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Sucralose NF | 0.70 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Enalapril Maleate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Purified water | qs | qs | qs | qs | qs | qs | qs | qs | qs |
| pH | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 4.0 | 4.5 |

**Table 2**

| Assay and Total Degradant Content After Storage | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Storage | | Formulation | | | | | | | | |
| | °C | Weeks | H1 | H2 | H3 | H4 | H5 | H6 | H7 | H8 | H9 |
| Enalapril Maleate | 5 | 0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| (% initial) | | 2 | 100.1 | 100.1 | 99.7 | 100.0 | 99.5 | 98.2 | 100.7 | 100.4 | 100.3 |
| | | 4 | 100.2 | 100.3 | 99.6 | 100.4 | 100.0 | 98.9 | 99.8 | 100.0 | 99.6 |
| | | 8 | 100.0 | 100.0 | 99.7 | 100.0 | 99.5 | 98.5 | 99.6 | 100.9 | 100.7 |
| | | 24 | 99.8 | 100.0 | 99.6 | 100.2 | 99.4 | 98.6 | 100.4 | 100.1 | 99.8 |
| | | 28 | 99.8 | 99.9 | 99.6 | 100.1 | 99.3 | 98.4 | 99.7 | - | - |
| | | 36 | - | - | - | - | - | - | - | 99.9 | 99.4 |
| | | 52 | 99.9 | 99.9 | 99.7 | 99.7 | 98.9 | 98.1 | 99.8 | 99.5 | 99.2 |
| | 25 | 0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | 2 | 100.1 | 99.2 | 99.7 | 100.0 | 99.5 | 98.4 | 99.8 | 99.9 | 99.5 |
| | | 4 | 99.7 | 99.1 | 99.4 | 99.9 | 99.4 | 98.5 | 99.1 | 99.0 | 98.1 |
| | | 8 | 98.8 | 98.0 | 98.5 | 99.0 | 98.3 | 97.4 | 98.3 | 99.3 | 97.7 |
| | | 24 | 98.0 | 97.2 | 97.7 | 98.4 | 98.1 | 96.9 | 98.4 | 97.5 | 95.3 |
| | | 28 | 95.8 | 95.1 | 95.5 | 96.5 | 96.1 | 94.7 | 95.6 | - | - |
| | | 36 | - | - | - | - | - | - | - | 93.7 | 89.4 |
| | | 52 | 93.9 | 93.3 | 93.5 | 94.3 | 93.9 | 92.4 | 93.6 | 91.7 | 86.0 |
| Total Impurities | 5 | 0 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.09 | 0.10 |
| (% w/w of | | 2 | 0.07 | 0.07 | 0.07 | 0.06 | 0.06 | 0.06 | 0.07 | 0.14 | 0.16 |
| enalapril maleate) | | 4 | 0.09 | 0.11 | 0.10 | 0.11 | 0.11 | 0.12 | 0.10 | 0.20 | 0.26 |
| | | 8 | 0.18 | 0.20 | 0.18 | 0.16 | 0.16 | 0.18 | 0.18 | 0.31 | 0.41 |
| | | 24 | 0.25 | 0.29 | 0.26 | 0.24 | 0.22 | 0.25 | 0.27 | 0.43 | 0.60 |
| | | 28 | 0.44 | 0.47 | 0.47 | 0.42 | 0.41 | 0.44 | 0.46 | - | - |
| | | 36 | - | - | - | - | - | - | - | 0.91 | 1.20 |
| | | 52 | 0.68 | 0.71 | 0.71 | 0.64 | 0.66 | 0.68 | 0.65 | 1.18 | 1.53 |
| | 25 | 0 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.09 | 0.10 |
| | | 2 | 0.46 | 0.47 | 0.47 | 0.39 | 0.39 | 0.41 | 0.51 | 0.63 | 0.95 |
| | | 4 | 0.86 | 0.91 | 0.89 | 0.83 | 0.81 | 0.88 | 0.89 | 1.16 | 1.84 |
| | | 8 | 1.71 | 1.79 | 1.76 | 1.53 | 1.51 | 1.64 | 1.70 | 2.21 | 3.49 |
| | | 24 | 2.52 | 2.65 | 2.60 | 2.24 | 2.21 | 2.40 | 2.49 | 3.28 | 5.27 |
| | | 28 | 4.91 | 5.18 | 5.08 | 4.49 | 4.43 | 4.81 | 4.94 | - | - |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 36 | - | - | - | - | - | - | - | 7.32 | 11.60 |
| 52 | 7.22 | 7.64 | 7.45 | 6.67 | 6.60 | 7.16 | 7.25 | 9.55 | 14.95 |

16.     Further evidence of the superior stability of the formulations disclosed in the '898 application can be found in exemplary formulations in Table 3. Formulations in Table 3 were prepared using fumarate, tartrate, malate, aspartate, glycinate, lactate, formate, phthalate, acetate, succinate, gluconate, glutamate, citrate, phosphate, and citrate/phosphate buffers, respectively. Specifically, these formulations were prepared according to the compositions in Table 3 and titrated if needed to pH 3 and 4 with 5N hydrochloric acid or 5N sodium hydroxide. The formulations were placed into amber glass screw-capped vial with Teflon lined caps. The vials were capped, stored at 60 °C and sampled at various times over 7 days. Samples were analyzed by HPLC for enalapril. The results of the analyses are presented in Table 4.

17.     The citrate and phosphate 10mM formulations were included in Table 3 as a control since citrate and phosphate buffers were included in the previous study in Tables 1 and 2 and demonstrated superior stability. The enalapril maleate assay results in Table 4 show that all the formulations have stability comparable to the citrate formulations at 60 °C.

**Table 3**

| Compositions (mg/mL) for Stability Testing at 60 °C | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fumarate | | Tartrate | | Malate | | Aspartate | | Glycinate | | Lactate | |
| Formula | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM |
| Fumaric acid | 2.32 | 1.16 | - | - | - | - | - | - | - | - | - | - |
| Tartaric acid | - | - | 3.00 | 1.50 | - | - | - | - | - | - | - | - |
| DL-Malic acid | - | - | - | - | 2.68 | 1.34 | - | - | - | - | - | - |
| L-Aspartic acid | - | - | - | - | - | - | 2.66 | 1.33 | - | - | - | - |
| Glycine | - | - | - | - | - | - | - | - | 1.50 | 0.75 | - | - |
| Lactic acid | - | - | - | - | - | - | - | - | - | - | 180 | 90 |
| Sodium benzoate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Enalapril Maleate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Purified water | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs |
| 5N HCl/5N NaOH to pH | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 |

| | Formate | | Phthalate | | Acetate | | Succinate | | Gluconate | | Glutamate | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Formula | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM | 20mM | 10mM |
| Formic acid | 0.92 | 0.46 | - | - | - | - | - | - | - | - | - | - |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Potassium hydrogen phthalate | - | - | 4.08 | 2.04 | - | - | - | - | - | - | - | - |
| Acetic acid, glacial | - | - | - | - | 1.20 | 0.60 | - | - | - | - | - | - |
| Succinic acid | - | - | - | - | - | - | 2.36 | 1.18 | - | - | - | - |
| Sodium gluconate | - | - | - | - | - | - | - | - | 4.36 | 2.18 | - | - |
| L-Glutamic acid | - | - | - | - | - | - | - | - | - | - | 2.94 | 1.47 |
| Sodium benzoate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Enalapril Maleate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Purified water | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs | Qs |
| 5N HCl/5N NaOH to pH | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 |

| | Citrate | | Phosphate | | Citrate/Phosphate |
|---|---|---|---|---|---|
| Formula | 20mM | 10mM | 20mM | 10mM | 10mM each |
| Citric acid, anhydrous | 3.84 | 1.92 | - | - | 1.92 |
| Phosphoric acid | - | - | 196 | 98 | 98 |
| Sodium benzoate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Enalapril Maleate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Purified water | Qs | Qs | Qs | Qs | Qs |
| 5N HCl/5N NaOH to pH | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 | 3.0/4.0 |

**TABLE 4**

| Assay Results After Storage of Formulations at 60 °C | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Enalapril Maleate, pH 3 (% initial) | | | | Enalapril Maleate, pH 4 (% initial) | | | |
| Buffer | mM | 0 Days | 2 Days | 4 Days | 7 Days | 0 Days | 2 Days | 4 Days | 7 Days |
| Citrate | 10 | 100.0 | 97.1 | 97.2 | 95.5 | 100.0 | 97.2 | 96.6 | 94.6 |
| | 20 | 100.0 | 97.1 | 96.8 | 95.2 | 100.0 | 96.8 | 96.4 | 94.4 |
| Phosphate | 10 | 100.0 | 97.1 | 97.1 | 95.3 | 100.0 | 96.3 | 96.2 | 94.5 |
| | 20 | 100.0 | 97.1 | 96.7 | 95.2 | 100.0 | 96.3 | 96.0 | 94.2 |
| Citrate/Phosphate | 20 | 100.0 | 96.8 | 97.3 | 95.2 | 100.0 | 96.8 | 96.2 | 94.9 |
| Tartrate | 10 | 100.0 | 97.4 | 97.6 | 95.9 | 100.0 | 96.9 | 97.0 | 95.2 |
| | 20 | 100.0 | 97.2 | 97.6 | 95.6 | 100.0 | 97.1 | 96.4 | 94.0 |
| Glycinate | 10 | 100.0 | 98.7 | 96.4 | 95.4 | 100.0 | 96.8 | 96.6 | 95.3 |
| | 20 | 100.0 | 98.3 | 96.9 | 95.7 | 100.0 | 96.7 | 97.3 | 96.0 |
| Acetate | 10 | 100.0 | 97.5 | 97.4 | 95.1 | 100.0 | 96.7 | 96.8 | 95.3 |
| | 20 | 100.0 | 97.4 | 98.2 | 95.2 | 100.0 | 97.1 | 96.8 | 94.9 |
| Malate | 10 | 100.0 | 97.2 | 97.1 | 96.0 | 100.0 | 97.0 | 96.8 | 95.2 |
| | 20 | 100.0 | 97.2 | 97.1 | 95.9 | 100.0 | 96.7 | 96.5 | 95.0 |
| Fumarate | 10 | 100.0 | 96.6 | 96.8 | 95.2 | 100.0 | 95.9 | 96.1 | 94.4 |
| | 20 | 100.0 | 96.6 | 96.6 | 94.7 | 100.0 | 95.8 | 95.8 | 93.6 |
| Succinate | 10 | 100.0 | 98.1 | 96.2 | 95.3 | 100.0 | 96.6 | 96.8 | 94.5 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 20 | 100.0 | 96.9 | 97.3 | 95.1 | 100.0 | 96.2 | 96.9 | 94.6 |
| Aspartate | 10 | 100.0 | 97.3 | 97.1 | 96.1 | 100.0 | 96.5 | 98.1 | 96.4 |
| | 20 | 100.0 | 97.0 | 97.4 | 95.8 | 100.0 | 96.6 | 97.0 | 95.3 |
| Formate | 10 | 100.0 | 97.0 | 97.1 | 95.6 | 100.0 | 96.6 | 97.1 | 93.8 |
| | 20 | 100.0 | 96.9 | 96.5 | 95.3 | 100.0 | 96.1 | 98.1 | 93.3 |
| Gluconate | 10 | 100.0 | 97.2 | 97.9 | 95.2 | 100.0 | 96.3 | 96.2 | 93.4 |
| | 20 | 100.0 | 97.0 | 98.9 | 94.2 | 100.0 | 96.2 | 95.8 | 94.2 |
| Glutamate | 10 | 100.0 | 97.2 | 96.9 | 95.9 | 100.0 | 96.9 | 96.4 | 95.3 |
| | 20 | 100.0 | 97.3 | 97.1 | 95.2 | 100.0 | 96.7 | 97.5 | 93.7 |
| Lactate | 10 | 100.0 | 97.3 | 97.1 | 96.4 | 100.0 | 96.5 | 98.3 | 96.3 |
| | 20 | 100.0 | 97.3 | 97.2 | 97.2 | 100.0 | 96.9 | 96.3 | 95.2 |
| Phthalate | 10 | 100.0 | 97.3 | 96.9 | 95.8 | 100.0 | 96.2 | 96.2 | 94.7 |
| | 20 | 100.0 | 97.0 | 96.8 | 95.5 | 100.0 | 96.2 | 97.8 | 93.3 |

18.     As presented above, Tables 1-4 show that the formulations of the '898 application can be prepared using a variety of buffers (e.g., citrate, phosphate, citrate/phosphate, acetate, glycinate, fumarate, tartrate, malate, aspartate, lactate, formate, phthalate, acetate, succinate, gluconate, and glutamate buffers) and the pH values of the formulations can vary, e.g., at least from about 3 to about 4.5. All the formulations in Tables 1 and 3 demonstrated superior stability—retaining greater than 98% of the initial enalapril maleate content and having less than 2% w/w total impurity after 52 weeks at 5 °C, or having comparable stability when tested under an accelerated condition of 60 °C.

19.     In my review of the references cited in the Office Action, none of the references describe this stability of at least 12 months at 5±3 °C or any means of achieving this stability for enalapril formulations.

20.     I have reviewed Nahata which describes the extemporaneous preparation of oral liquid enalapril formulations by crushing enalapril tablets with a mortar and pestle and suspending the resulting ground tablets in water, citrate buffer, or Ora-Plus/Ora-Sweet.  On stability, Nahata states that the "compounded oral liquids [were] stable for 91 days at 4 and 25 °C" defining stable as "concentration after storage was ≥90% of the initial concentration.  Table 1 of Nahata shows that the enalapril extemporaneous formulations exhibited about 5% loss of enalapril after about 56 days at 4 °C and about 5% loss of enalapril after about 91 days at 25 °C.

21.    I have reviewed Sosnowska, which similarly describes extemporaneous enalapril suspensions.  The suspensions disclosed in Sosnowska were obtained by grinding tablets and suspending the resultant powder in a hydroxyethylcellulose solution or in a mixture that contains raspberry syrup and hydroxyethylcellulose solution. Based on the 30-day stability data shown in Table 1 of Sosnowska, these extemporaneous formulations have comparable stabilities to the formulations of Nahata, which is retaining about 98% of initial enalapril concentration after stored at refrigerated condition for 30 days. As noted in Sosnowska, "in the absence of microbiological data, the shelf-life given to extemporaneous products containing preservatives is usually 30 days." Page 325 of Sosnowska.

22.    I have also reviewed Boukarim, which does not provide the stabilities of liquid enalapril formulations.

23.    To compare the stability of the enalapril oral liquid formulations of the instant application with the extemporaneous preparations, such as those described in Nahata, the enalapril content of the Nahata formulations and that of formulations H1-H9 (stored at 5 °C) are provided in Table 5.

**Table 5: Enalapril content in formulations after storage at 5 °C**

| Days | Nahata | | | Formulations of Instant Application | | | | | | | | |
|------|-------|------------------------|----------------------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
|      | water | Citrate Buffer pH 5.0 | 1:1 Ora-Plus/Ora-Sweet | H1 | H2 | H3 | H4 | H5 | H6 | H7 | H8 | H9 |
| 0 | 100 | 100 | 100 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 7 | 98.6 | 98.7 | 99.4 | | | | | | | | | |
| 14 | 98.1 | 99.1 | 98.6 | 100.1 | 100.1 | 99.7 | 100.0 | 99.5 | 98.2 | 100.7 | 100.4 | 100.3 |
| 28 | 97.6 | 98.7 | 98.4 | 100.2 | 100.3 | 99.6 | 100.4 | 100.0 | 98.9 | 99.8 | 100.0 | 99.6 |
| 42 | 97.1 | 98.5 | 97.9 | | | | | | | | | |
| 56 | 96.5 | 97.3 | 96.9 | 100.0 | 100.0 | 99.7 | 100.0 | 99.5 | 98.5 | 99.6 | 100.9 | 100.7 |
| 70 | 95.2 | 96.3 | 96.1 | | | | | | | | | |
| 84 | | | | 98.6 | 99.3 | 99.0 | 99.5 | 99.1 | 99.4 | 99.8 | 99.6 | 99.4 |
| 91 | 94.8 | 95.9 | 95.8 | | | | | | | | | |
| 168 | | | | 99.8 | 100.0 | 99.6 | 100.2 | 99.4 | 98.6 | 100.4 | 100.1 | 99.8 |
| 196 | | | | 99.8 | 99.9 | 99.6 | 100.1 | 99.3 | 98.4 | 99.7 | | |
| 252 | | | | | | | | | | | 99.9 | 99.4 |
| 364 | | | | 99.9 | 99.9 | 99.7 | 99.7 | 98.9 | 98.1 | 99.8 | 99.5 | 99.2 |

24.    To further describe the contrast in stability, the enalapril concentrations published by Nahata, and the concentrations from H1-H9 are plotted graphically in Figure 1 with linear regression of the data for extrapolation.



25.    Table 5 and Figure 1 show that formulations H1 to H9 exhibit excellent stability for at least 12 months (52 weeks) at 5 °C with essentially no or little loss of enalapril content, in contrast to the extemporaneous preparations of Nahata (stability is defined as no more than 5% formation of degradants and 5% loss of enalapril). While Nahata does not disclose stability at about 5 °C for more

than 90 days, the extrapolated lines show that at about 100 days, the extemporaneous preparations are unstable with respect to the enalapril content in the preparation.

26.     The enalapril content and total impurity data submitted in Tables 1-5 and Figure 1 show that the formulations of the present application are significantly more stable than the extemporaneously prepared formulations. Further, as shown by the stability of formulations H1-H9 and formulations of Table 3, a variety of buffers, which are capable of maintaining the pH values of the formulations at about or below 4.5, can be used in the formulations of the present application.

27.     I declare that all statements made herein are true to the best of my knowledge, or if made upon information and belief, are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Respectfully submitted on this 14th day of May, 2020

_Gerold L Mosher_

Gerold L. Mosher, Ph.D.

# EXHIBIT E

Attorney Docket No. 43060-707.304

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the Application of: | Group Art Unit: 1629 |
| Inventors: Gerold L. Mosher, *et al.* | Confirmation No.: 3572 |
| Serial No.: 16/177,159 | Examiner: SPRINGER, Stephanie K |
| Filed: October 31, 2018 | Customer No.: 21971 |
| Title: ENALAPRIL FORMULATIONS | <u>Certificate of Electronic Filing</u><br>I hereby certify that the attached Response and all accompanying papers is being deposited by Electronic Filing on May 15, 2020, by using the EFS – Web patent filing system and addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.<br><br>By:____ /Paula Derby/_____ |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## <u>DECLARATION OF GEROLD MOSHER UNDER 37 C.F.R. § 1.132</u>

I, **Gerold Mosher**, state and declare as follows:

1.      I am currently employed at Azurity Pharmaceuticals, Inc., a company formed in May 2019 by the acquisition of Silvergate Pharmaceuticals, Inc. by CutisPharma, Inc.

2.      I received my Bachelor's degree in Pharmacy from the University of Kansas in 1979. I also received a Master and a Doctor of Philosophy in Pharmaceutical Chemistry in 1984 and 1986, respectively, from the University of Kansas.

3.      I have been employed at Silvergate Pharmaceuticals and now Azurity Pharmaceuticals since 2013, and my current position is Vice President of Product Development. As part of my job duties, I develop oral formulations for pediatric use. I have a small laboratory where I

develop, characterize and move formulations through the steps required for FDA approval and eventual sale.

4.      Early in my career, I practiced pharmacy for two years from 1979 to 1981. Subsequently, I worked in large pharmaceutical companies (Eli Lilly and Merck) for about ten years where I focused primarily on pre-formulation and early phase formulations of new drug products. After leaving these companies and prior to Silvergate Pharmaceuticals, I have also been employed by small startup companies to develop new solubilizing technology for oral, injectable, and inhalation formulations.

5.      In total, I have been in the field of pharmaceutical chemistry for about 40 years, and have extensive experience in developing pharmaceutical formulations. My *Curriculum Vitae* is attached as Exhibit A.

6.      I am familiar with the subject matter claimed in U.S. Pat. App. Ser. No. 16/177,159 ("the '159 application"), and I am a named inventor on this application. Silvergate Pharmaceuticals, Inc. is the assignee of all rights in the invention of the pending '159 application.

7.      I am aware of the Non-Final Office Action mailed in this matter on January 7, 2020. I am also aware that the pending claims were rejected under 35 U.S.C. 112(b) and 35 U.S.C. 112(a).

8.      I am submitting this declaration to address some of the comments made in the Office Action,.

9.      The '159 application relates to enalapril oral liquid formulations that are stable at about 5±3 ℃ for at least 12 months. The development of this described enalapril formulation was oriented on preparing a safe, stable, uniform oral liquid with minimal degradation and having an acceptable taste for pediatric patients.

10.     Traditionally, approved methods of delivering enalapril to pediatric patients requires (1) administering a solid enalapril tablet or portion thereof to the patient, (2) extemporaneously preparing an oral liquid suspension from enalapril tablets and a diluent, such as the method described in "Nahata" and subsequently administering the suspension to the patient, or (3) reconstituting a powder in a liquid carrier. All of these methods are undesirable and have limitations. For tablets, it is well known that children have difficulty swallowing solid oral dosage forms. For the second method,

extemporaneously prepared oral liquids present additional challenges and issues with respect to dosing accuracy and stability, as well as can introduce compounding errors and cross-contamination.

11. Compared to these currently available methods, the enalapril oral liquid formulation claimed in the '159 application provides several advantages:

- <u>Improved ease of administration</u>. It is easier for many patients to swallow a liquid than to swallow a tablet,

- <u>Patient Compliance</u>. Patients are more likely to take a dose that is not difficult to swallow, or difficult to prepare,

- <u>Accuracy of dosing</u>. The prescribing information for enalapril tablets provides dosing guidelines based on the weight of the child. When one only has fixed 2.5, 5 or 10 mg tablets available, it is difficult if not impossible to break the tablets in such a way to get an exact dose if the dose is something other than the tablet strength. In addition, if tablets are compounded into a suspension, the tablets are crushed in a mortar and then mixed with a liquid. There is no guarantee that the drug dissolves in, or is dispersed evenly in the liquid (thus leading to potential dosing errors. Moreover, there is always the chance of contamination of the resulting liquid by residual drugs or substances in the mortar. Similarly, in reconstitutable powders, there is also no guarantee that the powder dissolves or disperses evenly in the diluent.

12. The oral enalapril liquid formulations of the '159 application have superior stability—they are stable at 5±3 ºC for 12 months or longer with minimal degradation. The stability is an important aspect of the present formulations. It contributes to the consistency and uniformity of the formulations as well as allows for accuracy of dosing to patients.

13. The '159 application describes that stable oral enalapril liquid formulations can be prepared with suitable buffers including citrate buffers at varying concentrations. Formulations containing a mixture of citric acid and sodium citrate at various amounts as buffers are exemplified in the '159 application, for example, formulations B1-B3 in Example B and formulations E1-E6 in Example E. The buffer concentrations of formulations E1 to E6 are the following:

| Buffer Concentration | E1 | E2 | E3 | E4 | E5 | E6 |
|---|---|---|---|---|---|---|

| Citric acid (mg/mL) | 3.29 | 3.29 | 3.29 | 3.29 | 1.65 | 0.82 |
|---|---|---|---|---|---|---|
| Sodium citrate (mg/mL) | 0.75 | 0.75 | 0.75 | 0.75 | 0.38 | 0.19 |
| Citrate concentration (mM) | 20 | 20 | 20 | 20 | 10 | 5 |

14.     The storage stability of formulations E1-E6 is summarized in Table E-2, partially copied below for the stability results at 5 $^{o}$C. After storing at about 5 $^{o}$C for a period of 52 or 62 weeks, the combined amount of two primary degradants, Enalaprilat and diketopiperazine, remained less than 1 % w/w, demonstrating excellent formulation stability. As shown in Table E-2, the formulations prepared with 5 mM, 10 mM or 20 mM of a mixture of citric acid and sodium citrate as a buffer have comparable stability over 52 weeks at about 5 $^{o}$C.

**TABLE E-2**

| Degradant Content After Storage (% w/w of enalapril maleate) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Storage | | | Formulation | | | | | |
| | °C | Weeks | E1 | E2 | E3 | E4 | E5 | E6 |
| Diketopiperazine | 5 | 0 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 |
| | | 4 | 0.04 | 0.04 | 0.05 | 0.04 | 0.03 | 0.03 |
| | | 8 | 0.04 | 0.04 | 0.04 | 0.04 | 0.03 | 0.03 |
| | | 12 | 0.05 | 0.05 | 0.04 | 0.05 | 0.04 | 0.04 |
| | | 26 | 0.07 | 0.06 | 0.05 | 0.06 | 0.05 | 0.05 |
| | | 52 | | | | | 0.15 | 0.14 |
| | | 62 | 0.18 | 0.18 | 0.16 | 0.14 | | |
| Enalaprilat | 5 | 0 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 |
| | | 4 | 0.07 | 0.09 | 0.10 | 0.11 | 0.07 | 0.08 |
| | | 8 | 0.12 | 0.14 | 0.10 | 0.13 | 0.09 | 0.08 |
| | | 12 | 0.16 | 0.15 | 0.15 | 0.17 | 0.14 | 0.11 |
| | | 26 | 0.31 | 0.30 | 0.29 | 0.31 | 0.27 | 0.24 |
| | | 52 | | | | | 0.54 | 0.46 |
| | | 62 | 0.75 | 0.75 | 0.74 | 0.71 | | |

15.     Further evidence of the superior stability of the citrate buffer-based formulations disclosed in the '159 application can be found in exemplary formulations H1 and H7-H13 presented below in Table 1, which all contain a mixture of citric acid and sodium citrate.

16.     Formulations H1 and H7-H13 were prepared according to the compositions in Table 1 and titrated if needed to the target pH with 5N hydrochloric acid or 5N sodium hydroxide. Formulations H1 and H7-H9 were placed into HDPE containers and sealed with screw caps and induction sealing and stored at 5 °C. Formulations H10-H13 were placed into glass containers, sealed with Teflon lined screw caps and stored at 60 °C. The formulations were sampled at various

-4-

times during storage. Samples were analyzed by HPLC for enalapril maleate and enalapril related substances. The results of the analyses are presented in Table 2 and Table 3.

17.     The enalapril maleate assay results in Table 2 show that formulations H1 and H7-H9 retain greater than 98% of the initial enalapril maleate content and have less than 2% of total impurity after 52 weeks at 5 °C. Formulations H1 and H7-H9 demonstrated excellent stability. Further, by comparing the amounts of the two primary degradants (i.e., Diketopiperazine and Enalaprilat) in Table 2 and Table E-2, it can be expected that formulations E1-E6 have comparable stability to formulations H1 and H7-H9.

18.     In Table 3, the stability of formulations prepared with a mixture of citric acid and sodium citrate as a buffer at two different concentrations and pH values were compared under an accelerated condition at 60 °C. The results in Table 3 show that a citrate buffer concentration of about 10 mM or 20 mM, at least when adjusted to a pH value of about 3-4, are suitable to be used in formulations of the '159 application and yield similar stability.

**Table 1**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Compositions (mg/mL) for Stability Testing | | | | | | | | |
| | H1 | H7 | H8 | H9 | H10 | H11 | H12 | H13 |
| Ingredients | Citrate | Citrate | Citrate | Citrate | Citrate | Citrate | Citrate | Citrate |
| Citric acid, anhydrous | 1.82 | 1.92 | 1.92 | 1.92 | 1.92 | 1.92 | 3.84 | 3.84 |
| Sodium citrate, dihydrate | 0.15 | - | - | - | | | | |
| Citrate concentration (mM) | 10 | 10 | 10 | 10 | 10 | 10 | 20 | 20 |
| Sodium benzoate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Sucralose NF | 0.70 | 0.70 | 0.70 | 0.70 | | | | |
| Enalapril Maleate | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Purified water | qs | qs | qs | qs | qs | qs | qs | qs |
| pH | 3.3 | 3.3 | 4.0 | 4.5 | 3 | 4 | 3 | 4 |

**Table 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| | Assay and Total Degradant Content After Storage | | | | | |
| | Storage | | Formulation | | | |
| | °C | Weeks | H1 | H7 | H8 | H9 |
| Enalapril Maleate | 5 | 0 | 100.0 | 100.0 | 100.0 | 100.0 |
| (% initial) | | 2 | 100.1 | 100.7 | 100.4 | 100.3 |
| | | 4 | 100.2 | 99.8 | 100.0 | 99.6 |
| | | 8 | 100.0 | 99.6 | 100.9 | 100.7 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 24 | 99.8 | 100.4 | 100.1 | 99.8 |
| | | 28 | 99.8 | 99.7 | - | - |
| | | 36 | - | - | 99.9 | 99.4 |
| | | 52 | 99.9 | 99.8 | 99.5 | 99.2 |
| Diketopiperazine (% w/w of enalapril maleate) | 5 | 0 | <0.05 | <0.05 | <0.05 | <0.05 |
| | | 2 | <0.05 | <0.05 | <0.05 | <0.05 |
| | | 4 | <0.05 | <0.05 | <0.05 | <0.05 |
| | | 8 | <0.05 | <0.05 | <0.05 | <0.05 |
| | | 24 | 0.06 | 0.07 | <0.05 | <0.05 |
| | | 28 | 0.09 | 0.10 | - | - |
| | | 36 | - | - | 0.06 | <0.05 |
| | | 52 | 0.14 | 0.12 | 0.07 | <0.05 |
| Enalaprilat (% w/w of enalapril maleate) | 5 | 0 | <0.05 | <0.05 | 0.09 | 0.10 |
| | | 2 | 0.06 | 0.07 | 0.13 | 0.16 |
| | | 4 | 0.08 | 0.08 | 0.17 | 0.24 |
| | | 8 | 0.15 | 0.14 | 0.27 | 0.37 |
| | | 24 | 0.19 | 0.20 | 0.41 | 0.58 |
| | | 28 | 0.35 | 0.36 | - | - |
| | | 36 | - | - | 0.85 | 1.17 |
| | | 52 | 0.53 | 0.52 | 1.10 | 1.49 |
| Total Impurities (% w/w of enalapril maleate) | 5 | 0 | <0.05 | <0.05 | 0.09 | 0.10 |
| | | 2 | 0.07 | 0.07 | 0.14 | 0.16 |
| | | 4 | 0.09 | 0.10 | 0.20 | 0.26 |
| | | 8 | 0.18 | 0.18 | 0.31 | 0.41 |
| | | 24 | 0.25 | 0.27 | 0.43 | 0.60 |
| | | 28 | 0.44 | 0.46 | - | - |
| | | 36 | - | - | 0.91 | 1.20 |
| | | 52 | 0.68 | 0.65 | 1.18 | 1.53 |

**Table 3**
**Assay Results After Storage of Formulations at 60 °C**

| Buffer | mM | Enalapril Maleate, pH 3 (% initial) | | | | Enalapril Maleate, pH 4 (% initial) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 Days | 2 Days | 4 Days | 7 Days | 0 Days | 2 Days | 4 Days | 7 Days |
| Citrate | 10 | 100.0 | 97.1 | 97.2 | 95.5 | 100.0 | 97.2 | 96.6 | 94.6 |
| | 20 | 100.0 | 97.1 | 96.8 | 95.2 | 100.0 | 96.8 | 96.4 | 94.4 |

19.    As presented above, Table E-2 and Tables 1-3 show that formulations of the '159 application can be prepared using a mixture of citric acid and sodium citrate, and the amount of the total citrate can vary, at least between about 5 mM and about 20 mM. All the formulations in Table E-2 and Tables 1-3 demonstrated superior stability, e.g., retaining greater than about 98% of the

initial enalapril maleate content and having less than about 2% w/w total impurity after 52 weeks at 5 °C.

20.     Further, although formulations exemplified in the '159 application and in Tables 1-3 have a total citrate amount of about 5 mM, 10 mM or 20 mM, I would expect that similar formulations having a total citrate amount between about 5 mM and about 20 mM to have similar, superior stability as the exemplified formulations.

21.     I declare that all statements made herein are true to the best of my knowledge, or if made upon information and belief, are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Respectfully submitted on this 15th day of May, 2020

*Gerold L. Mosher*

Gerold L. Mosher, Ph.D.