████████████████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | C.A. No. 21-196 (LPS) |
| | ) | |
| v. | ) | **REDACTED -** |
| | ) | **PUBLIC VERSION** |
| ANNORA PHARMA PRIVATE LIMITED, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## <u>DECLARATION OF DR. GRAHAM BUCKTON IN SUPPORT OF PLAINTIFF AZURITY PHARMACEUTICALS, INC.'S MOTION FOR PRELIMINARY INJUNCTION</u>

Original Filing Date: December 17, 2021
Redacted Filing Date: January 11, 2022

████████████████████████████████████

I, Graham Buckton, Ph.D., declare as follows:

## I.   INTRODUCTION

1.     I have been retained on behalf of Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") to provide my opinions with respect to infringement and validity regarding U.S. Patent Nos. 10,772,868 (the "'868 patent") and 10,799,476 (the "'476 patent"") (collectively, "Asserted Patents") in litigation against Defendant Annora Pharma Private Limited ("Annora" or "Defendant").  I have personal knowledge of the facts set forth below or understand them to be true based on information provided by me by attorneys for Azurity.

2.     I understand from counsel that for purposes of this motion, Azurity alleges Annora infringes claims 11 and 12 of the '868 patent and claims 9, 10, 12, and 13 of the '476 (collectively, "PI Claims").[1]

### A.  QUALIFICATIONS AND COMPENSATION

3.     I was previously qualified by this Court as an expert in the field of pharmaceutical formulations and chemistry, i.e., the subject matter disclosed in U.S. Patent Nos. 9,669,008 (the "'008 patent"); 9,808,442; 10,039,745; and 10,154,987, which are in the same family of patents as the Asserted Patents.

4.     I am Emeritus Professor of Pharmaceutics at the UCL School of Pharmacy.  I have over thirty (30) years of experience in pharmaceutical research and development, including formulation development, salt selection, the physical form of materials, pharmaceutical processing, and drug delivery systems.

5.     I graduated in 1981 from Chelsea College, University of London, with a B. Pharm. degree with Honours, and I received my Ph.D. in Pharmaceutics in 1985 from King's College, University of London.  In 1997, I received a Doctor of Science from the University

---

[1] I understand Azurity has reserved its right to assert other claims later.  For the purposes of this declaration, I have only considered claims 11 and 12 of the '868 patent and claims 9, 10, 12, and 13 of the '476 patent.

of London, for research work in pharmaceutical materials science.

6.      I taught at the School of Pharmacy at the University of London (now UCL School of Pharmacy) from 1984 to 2015 and served as the head of the Department of Pharmaceutics at the University of London from 2001 to 2007.  I have taught courses in numerous aspects of pharmaceutics, including courses in salt selection, formulation development, and drug delivery systems.  My research group conducted projects primarily relating to materials science applied to pharmaceutical processing and drug delivery systems, notably those for inhalation and oral delivery.

7.      I have authored more than 180 publications, including books and full papers, in addition to more than 100 abstracts and book reviews.  I have received numerous awards and honours, including the 1992 Pfizer Award for excellence in published research and the 1993 British Pharmaceutical Conference Science Medal.  In 2000, I was the first recipient of the Academy of Pharmaceutical Sciences Medal for services to U.K. Pharmaceutical Sciences, and in 2003, served as the Science Chairman for the British Pharmaceutical Conference.

8.      In 1997, I was made a Fellow of the American Association of Pharmaceutical Scientists, the Royal Society of Chemistry, and the Royal Pharmaceutical Society of Great Britain.  In 2009, I was made a Fellow of the Academy of Pharmaceutical Sciences of Great Britain.  I served a ten (10) year term as an Editor of the *International Journal of Pharmaceutics* and have been an editorial board member of *Pharmaceutical Research*, the *AAPS Journal*, *AAPS PharmSciTech*, and retired as a board member for the *Handbook of Pharmaceutical Excipients in 2021*.  These are considered authoritative references in the field of pharmaceutical science.

9.      I founded Pharmaterials Ltd. ("Pharmaterials" or "Company"), and, from 2000 until 2012, I served as Chief Executive Officer.  From 2000 until 2008, I was also Chairman

2

of Pharmaterials Ltd.  Pharmaterials Ltd. was a spinoff company from the School of

Pharmacy, University of London, which provided contract service provision in salt selection,

polymorph screening, physical characterisation, formulation and clinical manufacture of

pharmaceuticals.  While at Pharmaterials, I worked on many types of drug delivery systems.

Pharmaterials won the Queen's Award for Enterprise in 2008.  The U.S. company

Pharmaceutics International Incorporated acquired the majority shareholding of Pharmaterials

in 2008 (at which time the School of Pharmacy exited from the Company) and acquired the

remainder in 2012 (at which time I exited from the Company).[2]

10.     I have, for many years, served on the Chemistry, Pharmacy and Standards

subcommittee of the Committee on Safety of Medicines ("CSM") (now known as the

Commission on Human Medicines) and for some time chaired this sub-committee and was a

member of CSM.  This is the body that grants (and revokes) product approvals in the United

Kingdom (equivalent to the Food and Drug Administration in the United States).  I served as

a member of the British Pharmacopoeia Commission from 2004 to 2012 and served on a

European Pharmacopoeia working party.  I was also a member of the United States

Pharmacopoeia Expert Group on Physical Methods.

11.     Throughout my career, I have also consulted for pharmaceutical companies in

the United States, Europe, and Asia.

12.     A copy of my *curriculum vitae*, including a list of my prior testimony for the

past four years at deposition or trial, is attached as Exhibit B-1.

13.     I am being compensated at my customary rate of £500 per hour for time spent

working on this matter.  My compensation does not depend on the outcome of this litigation.

**B. MATERIALS CONSIDERED**

14.     In formulating my opinions herein, I reviewed the materials listed in Exhibit B-

_____

[2] Pharmaterials Ltd. was acquired by Quotient Sciences in 2017.

████████████████████████████████

2.   In identifying potential invalidity arguments Annora may raise, I reviewed Annora's Invalidity Contentions and respond to certain arguments made therein.  I understand that these contentions are not binding and that Annora may raise different or additional arguments in the response to Azurity's Preliminary Injunction Motion.  I reserve the right to respond to any additional arguments raised by Annora or further elaborate on my opinions here.

### C. SUMMARY OF OPINIONS

15.     It is my opinion that each of the PI Claims are infringed by the product described in Annora's ANDA No. 214467 (the "ANDA Product").

16.     With respect to obviousness, it is my opinion that the PI Claims would not be obvious to a person of ordinary skill in the art at the relevant time.

17.     Similarly, it is my opinion that a person of ordinary skill in the art would find the written description sufficient to support all PI Claims.

18.     Finally, it is my opinion that a person of ordinary skill in the art would find that the PI Claims are enabled.

## II.   LEGAL PRINCIPLES OF INFRINGEMENT AND VALIDITY

19.     In preparation for forming my opinions, I have been informed by counsel regarding the applicable legal principles concerning infringement and validity.  I used my understanding of those principles in forming my opinions herein.  My understanding of those principles is summarised below.

### A. INFRINGEMENT

20.     I understand infringement involves a two-step analysis that begins by determining the proper meaning and scope of the asserted claim.  The second step is to compare the asserted claims as construed to the accused device to determine whether it satisfies the claim elements.  To find infringement, I understand the Court must find that the accused products meet each element of the asserted claims, either literally or under the

doctrine of equivalents.  A claim element is met literally if it is found in the accused device.

### B.  VALIDITY

#### 1.  Presumption of Validity

21.     For the purposes of forming my opinion, I have been informed by counsel of the legal framework applicable to various aspects of validity, including the presumption of validity for issued patents.  Counsel has informed me that the standard for proving that a patent claim is invalid on any ground is clear and convincing evidence.

#### 2.  Obviousness

22.     Counsel has advised me that under U.S. patent law, a patent claim is not obvious unless the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious to a person of ordinary skill in the art ("POSA") at the time the claimed invention was made.  Counsel has told me that a determination of obviousness requires factual inquiries into the scope and content of the art when the claimed invention was made, the differences between the art and the claims at issue, the level of ordinary skill in the pertinent art when the claimed invention was made, and, to the extent they exist, secondary considerations of non-obviousness.

23.     Counsel has explained that the obviousness inquiry takes place at the time of the invention such that hindsight must not be used when comparing the prior art to the claimed invention.  A conclusion of obviousness must be firmly based on the knowledge and skill of the POSA at the time the claimed invention was made, without the use of post-filing knowledge.

24.     I understand that to find a claim obvious in view of a combination of prior art references, there must be a suggestion or motivation to combine the cited references.  A patent claim composed of several elements is not obvious merely by demonstrating that each of its elements was, independently, known in the prior art.

25.     I understand that a reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention.  Counsel has explained that this requires the reference to be in the field of the inventor's endeavour or that a POSA would reasonably have consulted the reference and applied its teachings in seeking a solution to the problem the inventor was attempting to solve.

26.     Counsel has informed me that in determining the obviousness or nonobviousness of a claimed method, one must also examine any secondary considerations of nonobviousness such as commercial success of a product due to the merits of the claimed invention, long-felt but unsatisfied need for the claimed invention, failure of others to find the solution provided by the claimed invention, deliberate copying of the claimed invention by others, praise of the claimed invention by others, and unexpected results achieved by the claimed invention.  I understand that secondary considerations are relevant where there is a nexus between the evidence and the claimed invention.

### 3.      Written Description

27.     Counsel has informed me that a patent meets the written description requirement where the description describes the claimed invention in sufficient detail that a POSA can reasonably conclude that the inventor had possession of the claimed invention at the time of the filing.  I understand this requires an objective inquiry into the four corners of the specification from the perspective of a POSA.  Counsel has informed me that while the inquiry is limited to the specification, the claims may still rely on information that is well-known in the art to satisfy the written description requirement.

28.     I understand that where the claims recite a group of pharmaceutical formulations, the specification does not need to provide working examples of every single possible formulation for there to be adequate written description.  Counsel has informed me that claims to a group of formulations will have adequate written description where the

specification discloses a representative number of formulations falling within the claim and/or structural features common to the formulations of the claim so that one of skill in the art can visualise or recognise the formulations of the claim.

### 4. Enablement

29.     Counsel has informed me that a claim is enabled where the patent disclosure is such that a POSA could practice the claimed invention without undue experimentation.  I understand that routine experimentation is not undue.

30.     I understand from counsel that I should consider several factors when determining whether undue experimentation is required, including: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

## III.     LEVEL OF ORDINARY SKILL IN THE ART

31.     I have been advised by counsel that certain issues are to be evaluated from the perspective of a person of ordinary skill in the art ("POSA") to which the patent pertains at the time of the alleged invention.  I have been further advised that the POSA is a hypothetical person who is deemed to have knowledge of all publications, references, and prior art in the field at the time of the alleged invention.  I have been advised that the relevant date is March 18, 2016.

32.     By virtue of my education, experience, and training, I am familiar with the level of skill in the art of the Asserted Patents as of March 18, 2016.

33.     In my opinion, a POSA in the relevant field as of March 18, 2016 would be a person that has: (i) a Ph.D. in formulation relevant pharmaceutical science, chemistry, or a similar subject, with minimal post-degree experience in formulating pharmaceutical products;

or (ii) at a minimum a bachelor's degree in pharmacy, pharmaceutical science, chemistry or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products.  A POSA would also have experience with pharmaceutical excipients as applied to their selection and use in drug formulations.

## IV.      TECHNOLOGY OF THE ASSERTED PATENTS

34.      I understand from counsel that the '008 patent issued on June 6, 2017 and was the first patent to issue in this family of patents.  I understand that provisional application 62/310,198 was filed on March 18, 2016.  I further understand and that the '868 and '476 patents are continuations in the '008 patent family.  The '008, '868, and '476 patents all share a common specification, but have different claims.  As a general matter, I will refer to excerpts of the specification of the '868 patent, but such reference includes all citations to equivalent portions of the '476 patent, as well as any patents within this family.

35.      The Asserted Patents are directed to stable ready-to-use ("RTU") enalapril oral liquid formulations.  '868 patent at Abstract.  Enalapril is a prodrug belonging to the angiotensin-converting enzyme ("ACE") inhibitor category of medications.  '868 patent at 1:49-50.

36.      A prodrug undergoes chemical conversion within the body into a pharmacologically active drug.  Enalapril is used as a prodrug because it has good absorption from the gastrointestinal ("GI") tract compared to its active metabolite, enalaprilat.  Enalapril breaks down into enalaprilat when it is combined with water by a hydrolysis reaction.  However, enalapril's degradation in water, or hydrolysis, makes creating a stable oral liquid enalapril formulation difficult, a challenge recognised in the prior art.  *See, e.g.*, Ex. B-3, Boulton, et al., "The Stability of an Enalapril Maleate Oral Solution Prepared from Tablets," Aus. J. Hospital Pharm., 24(2):151-156 (1994) ("Boulton") (ANNENAL00005329-5337), at ANNENAL00005332.

37.     Since 1985, enalapril has been available as solid oral tablets, e.g., Vasotec®.  '868 patent at 2:12-13.  While tablets are an acceptable form of dosing for many patients, certain segments of the population have difficulty swallowing tablets and/or are at an increased risk of choking.  '868 patent at 5:24-32.  For nearly three decades, administration of this important drug posed a problem to doctors for patients who could not swallow a tablet.

38.     One work-around was compounding by a pharmacist, who would typically crush a tablet into powder using a mortar and pestle, and disperse or dissolve the resulting powder in a liquid to make administration possible for children.  '868 patent at 5:41-44.  However, this extemporaneous compounding of enalapril tablets resulted in significant issues related to inaccurate dosing, the risk of contamination during handling, incomplete solubilising of the enalapril tablet in liquid, rapid instability, and inconsistent formulation methods based on the compounding pharmacy.  '868 patent at 5:33-40, 5:45-53.

39.     In order to reduce the issues associated with grinding and compounding enalapril tablets, enalapril became available as Epaned® Kit, which is a powder composition for reconstitution as an oral liquid, and offered a better alternative to compounding enalapril tablets into a solution form.  '868 patent at 2:12-14; 5:54-56.  Despite significant benefits, the Epaned® Kit still had deficiencies, for instance it still required a step of mixing the powder with a liquid diluent, and such reconstitution in a pharmacy inevitably carried a risk of incorrect dosage and contamination.  '868 patent at 5:58-60.  Indeed, the complexities and strict control of cleaning, environment and processes, which form part of commercial Good Manufacturing Practice (GMP), are designed to ensure product safety and quality by removing risks of contamination and unchecked manipulations.  It is therefore a significant risk to manipulate outside of GMP, and much better to manufacture within the strict controls.  Further, once reconstituted, liquid formulations of the Epaned® Kit had a limited shelf life of

only 60 days.

40.    The claimed invention provided an oral liquid enalapril formulation that was stable for years, well beyond the limited shelf life of the reconstituted Epaned® Kit and other prior art; this allowed manufacture in a controlled and regulated GMP facility.  The inventors discovered that despite the expectation of enalapril's instability in water, control of pH, along with selection of suitable excipients, could produce sufficient enalapril stability for a much longer storage period.  The result was the long sought-after solution to a decades-old problem of administering a reliable, consistent enalapril formulation to those patients who could not swallow tablets.

41.    The ready-to-use enalapril oral liquid formulations also contain fewer excipients than required by the Epaned® Kit, and minimising excipients in paediatric dosage forms is preferred.  '868 patent at 5:56-58, 63-65.

42.    The Asserted Patents describe "stable" enalapril oral liquid formulations having about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period.  '868 patent at 18:41-45.  Stability is assessed by high-performance liquid chromatography ("HPLC").  '868 patent at 18:47.  At refrigerated conditions, the enalapril oral liquid formulations claimed by the Asserted Patents are stable for at least 12 months, at least 18 months, and at least 24 months.  '868 patent at 18:64-19:2.

## V.    THE PI CLAIMS

43.    Claims 11 and 12 of the '868 patent are dependent on claim 1, which recites:

A stable oral liquid formulation, consisting essentially of:

(i)    about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;

(ii)   a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

(iii)  about 1 mg/ml of a preservative that is sodium benzoate; and

     (iv)  water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;

wherein the formulation is stable at about 5±3° C. for a least 12 months; and

wherein the stable oral liquid formulation has about 95% w/w or greater of initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of a given storage period.

44.     Claim 11 of the '868 patent further requires "wherein the formulation is stable at about 5±3° C. for at least 18 months."

45.     Claim 12 of the '868 patent further requires "wherein the formulation is stable at about 5±3° C. for a least 24 months."

46.     Claims 9, 10, 12, and 13 of the '476 patent are dependent on claim 1, which recites:

A stable oral liquid formulation, consisting essentially of:

     (i)    about 1.0 mg/ml enalapril maleate;

     (ii)   a buffer comprising citric acid and disodium hydrogenphosphate, wherein the buffer concentration is present in the oral liquid formulation at a concentration of between about 5 mM to about 20 mM;

     (iii)  about 1 mg/ml of a preservative that is sodium benzoate;

     (iv)  a sweetener, wherein the sweetener is sucralose and is present at about 0.7 mg/ml in the oral liquid formulation;

     (v)   a flavoring agent; and

     (vi)  water;

wherein the oral liquid formulation maintains about 95% w/w or greater of initial enalapril amount at the end of a given storage period of at least 12 months at about 5±3° C.

47.     Claim 9 of the '476 patent further requires "wherein the pH of the oral liquid formulation is between about 3 and about 4."

48.     Claim 10 of the '476 patent further requires "wherein the pH of the oral liquid formulation is about 3.3."

49.     Claim 12 of the '476 patent further requires "wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at 5±3° C."

50.     Claim 13 of the '476 patent further requires "wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 24 months at 5±3° C."

## VI.   CLAIM CONSTRUCTION

51.     I understand from counsel that the claims of a patent are given their plain and ordinary meaning unless otherwise defined in the patent or by the Court.

52.     I understand that the parties agreed that the term "about" as used in the '868 patent and the '476 patent means "approximately."

53.     I also understand that a determination of whether an accused component meets a claim limitation reciting "about" should avoid a strict numerical boundary for the claimed parameter, but instead should involve a factual inquiry into the particular circumstances regarding whether the amount of the accused component captures the purpose of the claim limitation.

54.     I further understand that the court has defined the term "a buffer to maintain the pH" as "one or more buffers to maintain the pH."[3]

55.     I also understand that the court has determined in a related case regarding this patent family that the phrase "consisting essentially of" means "including the listed ingredients and open to unlisted ingredients that do not materially affect the basic and novel properties of the invention."

56.     I have adopted and applied these constructions for purposes of my analysis below.

---

[3] Counsel has informed me that the Court decided this construction in a separate suit against another defendant, Alkem Laboratories Ltd., but that Azurity and Annora both agreed to be bound by the decision in that case.

███████████████████████████████

## VII.   ANNORA'S ANDA PRODUCT LITERALLY MEETS ALL OF THE ELEMENTS OF CLAIMS 11 AND 12 OF THE '868 PATENT AND CLAIMS 9, 10, 12, AND 13 OF THE '476 PATENT

### A. CLAIM 11 OF THE '868 PATENT IS INFRINGED

#### 1.   <u>"A stable oral liquid formulation, consisting essentially of"</u>

57.     Annora's ANDA product literally meets the claim limitation "[a] stable oral liquid formulation."

58.     Annora's ANDA No. 214467 describes a stable oral liquid formulation.  The package label insert describes Annora's product as an ████████████████████ ████████████████████  Ex. B-4 at ANNENAL00000054.  The drug product specification describes the stability as ████████████████  Ex. B-5 at ANNENAL00000289.  The Product Development Report notes that the purpose was█ ████████████████████  Ex. B-6 at ANNENAL0000586.

59.     Upon reviewing the claims and Annora's ANDA, Annora's ANDA Product contains the listed ingredients in the claim and does not contain additional products that would affect the basic and novel properties of the invention.  I believe that the basic and novel property in this invention is the stability limitation, as defined in the claims.





Ex. B-5 at ANNENAL000000278-279.

### 2.  "(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof"

60.    Annora's ANDA product literally meets the claim limitation "about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof."

61.    Annora's ANDA No. 214467 describes the product as an ████████ ████████████████████████ Ex. B-4 at ANNENAL00000054.  In ██████████████████████████████████████████████ ████████████ the Drug Product section of the ANDA, Annora notes ██████████ ████████████████████████████████ Ex. B-5 at ANNENAL00000278.

### 3.  "(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM"

62.    Annora's ANDA product literally meets the claim limitation "a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM."

63.    Annora's ANDA No. 214467 describes ████████████████████ ████████████████████████████████████ Ex. B-5 at ANNENAL00000278.  Annora's ANDA product contains ██████████ ████████████████████████████████████████████████ ████████████████████████████ Ex. B-5 at

14

█████████████████████████████████████████

ANNENAL00000278.

64.    The molarity of ████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Therefore, Annora's ANDA Product contains a buffer present in the oral liquid formulation at

a concentration of between about 5 mM to about 20 mM.

65.    Annora's ANDA No. 214467 describes a stable oral liquid formulation ███████

██████████████████████████████████████████████████

████████ Ex. B-5 at ANNENAL00000307.  Additionally, Annora's ANDA No. 214467

█████████████████████████████████████████████████████

████████████████████ Ex. B-7 at ANNENAL00004820 █████████████

█████████████████████████████████████████████████████,

ANNENAL00004826 ███████████████████████████████████████

███████████████████████████, ANNENAL00004832 █████████

█████████████████████████████████████████████████

██████████████ .

**4.    "(iii) about 1 mg/ml of a preservative that is sodium benzoate"**

66.    Annora's ANDA product literally meets the claim limitation "about 1 mg/ml

of a preservative that is sodium benzoate."

67.    Annora's ANDA No. 214467 describes ███████████████████████████

█████████████████████████████████████████████████████

███████████ Ex. B-5 at ANNENAL00000278.

**5.    "(iv) water"**

68.    Annora's ANDA product literally meets the claim limitation "water."

69.    Annora's ANDA No. 214467 describes a ██████████████████████████

████████████████████████████████████████

████████████████████████████████ Ex. B-5 at ANNENAL00000279.  Annora's

ANDA drug product section of the ANDA notes that ███████████████████████

██████████████████████████████ Ex. B-5 at

ANNENAL00000279

### 6.   "wherein the formulation optionally comprises a sweetener, a flavoring agent, or both"

70.   Annora's ANDA product literally meets the claim limitation "wherein the

formulation optionally comprises a sweetener, a flavoring agent, or both."  Annora's ANDA

product ████████████████████████████████

71.   Annora's ANDA No. 214467 describes ████████████████████

██████████████████████████████ Ex. B-5 at

ANNENAL00000278.

72.   Annora's ANDA No. 214467 describes ████████████████████

███████████████████████████████████ Ex.

B-5 at ANNENAL00000278.

### 7.   "wherein the formulation is stable at about 5±3˚ C. for at least 18 months"
"wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period"

73.   Annora's ANDA product literally meets the limitation of claim 1 "wherein the

formulation is stable at about 5±3˚ C. for at least 12 months wherein the stable oral liquid

formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w

or less total impurity or related substances at the end of the given storage period."

74.   Annora's ANDA product also literally meets the limitation of claim 11

"wherein the formulation is stable at about 5±3˚ C. for at least 18 months."

75.   Annora's ANDA No. 214467 states ████████████████████████

███████████████████████████████████████████

████████████████████████████████████. Ex. B-5 at

ANNENAL00000289.  I understand from counsel this means a claim limitation restricting

the formulation to one with stability of at least 18 months is infringed as a matter of law by

this statement as a 24 month or more stable formulation is required to meet the approved

ANDA criteria.

76.     Annora's ANDA also states ████████████████████████████

████████████████████████████████████████████████████

Ex. B-5 at ANNENAL00000347.  As these too, include the claimed limitation, I understand

from counsel these limitations are infringed as a matter of law.

77.     Annora's ANDA No. 214467 contains █████████████████████

████████████████████████████████████████████████████

██████████████████████████ Ex. B-7 at ANNENAL00004821 ████████████████

████████████████████████████████████████████████████

██████████████████, ANNENAL00004822 ███████████████████████

██████████████████████████████████████████████████████,

ANNENAL00004827 ████████████████████████████████████

████████████████████████████████████████,

ANNENAL00004828 ██████████████████████████████████

████████████████████████████████, ANNENAL00004833

██████████████████████████████████████████████

██████████████████████████████, ANNENAL00004834 ████████

████████████████████████████████████████████████████

████████████████. In addition, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████ Annora's ANDA also concludes █████████████████████

██████████████████████████████████████████████████

████████ *See* Ex. B-5 at ANNENAL00000346.

78.    Additionally, Annora has █████████████████████████████

████████████████████████████████████████████ Ex. B-5 at

ANNENAL00000346.  I understand from counsel that Annora has received tentative

approval for its ANDA product from FDA and therefore Annora has provided FDA with

materials indicating its product meets the stability specifications as described in the long-term

stability protocol of not more than 5.0% w/w total impurities.  *See* Ex. B-9.

## B.  CLAIM 12 OF THE '868 PATENT IS INFRINGED

79.    Annora's ANDA product literally meets the claim limitation "wherein the

formulation is stable at about 5±3˚ C. for at least 24 months."

80.    Annora's ANDA No. 214467 states a████████████████████████

████████████████████████████████ Ex. B-5 at ANNENAL00000289.  I

understand from counsel this means a claim limitation restricting the formulation to one with

stability of at least 24 months is infringed as a matter of law by this statement as a 24 month

or more stable formulation is required to meet the approved ANDA criteria.

81.    Annora's ANDA No. 214467 ██████████████████████████

█████████████████████████████████████████████████

███████████████████████ Ex. B-7 at ANNENAL00004821 █████████████

█████████████████████████████████████████████████

████████████████████, ANNENAL00004822 █████████████████████

████████████████████████████████████████████████,

ANNENAL00004827 ████████████████████████████████████

██████████████████████████████████,

ANNENAL00004828 ████████████████████

████████████████████████, ANNENAL00004833

████████████████████████

████████████████, ANNENAL00004834 ████████

███████████████████████████

████████. In addition, ████████████████

███████████████████████████

███████████████████████████

████████ Annora's ANDA also concludes ████████

███████████████████████████

████████ *See* Ex. B-5 at ANNENAL00000346.

82.   Additionally, Annora has ████████████████

███████████████████████ Ex. B-5 at

ANNENAL00000346.  I understand from counsel that Annora has received tentative

approval for its ANDA product from FDA and therefore Annora has provided FDA with

materials indicating its product meets the stability specifications as described in the long-term

stability protocol of not more than 5.0% w/w total impurities.  *See* Ex. B-9.

### C.  CLAIM 9 OF THE '476 PATENT IS INFRINGED

#### 1.   <u>**"A stable oral liquid formulation, consisting essentially of"**</u>

83.   Annora's ANDA product literally meets the claim limitation "[a] stable oral

liquid formulation."

84.   Annora's ANDA No. 214467 describes a stable oral liquid formulation.  The

package label insert describes Annora's product as ████████████████████

████████████████ Ex. B-4 at ANNENAL00000054.  The drug

product specification describes ████████████████████ Ex. B-5 at

██████████████████████████████████

ANNENAL00000289.  The Product Development Report notes ████████████

████████████████████ Ex. B-6 at ANNENAL0000586.

85.     I understand from counsel that the court has determined the term "consisting essentially of" in a related case to mean "including the listed ingredients and open to unlisted ingredients that do not materially affect the basic and novel properties of the invention." Upon reviewing the claims and Annora's ANDA, Annora's ANDA Product ████████████

████████████████████████████████████

████████████████████. I believe that the basic and novel property in this invention is the stability limitation, as defined in the claims.



Ex. B-5 at ANNENAL000000278-279.

████████████████████████████████████████████

### 2. "(i) about 1.0 mg/ml enalapril maleate"

86. Annora's ANDA product literally meets the claim limitation "about 1.0 mg/ml enalapril maleate."

87. Annora's ANDA No. 214467 describes ████████████████████████████ ███████████████████████████████ Ex. B-4 at ANNENAL00000054. █████ ██████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ Ex. B-5 at ANNENAL00000278.

### 3. "(ii) a buffer comprising citric acid and disodium hydrogenphosphate, wherein the buffer is present in the oral liquid formulation at a concentration of between about 5 mM to about 20 mM"

88. Annora's ANDA product literally meets the claim limitation ████████ ████████████████████████████████████████████ ██████████████████████████████████████

89. Annora's ANDA No. 214467 describes ████████████████████ ████████████████████████████████ Ex. B-5 at ANNENAL00000278. Annora's ANDA product ████████████████████ ████████████████████████████████████████████ ██████████████████████████████ Ex. B-5 at ANNENAL00000278.

90. The molarity of ████████████████████████████ ████████████████████████████. The molarity of ████████████████ ████████████████████████████████████████████. Therefore, Annora's ANDA Product contains a buffer present in the oral liquid formulation at a concentration of between about 5 mM to about 20 mM.

████████████████████████████████████████████

#### 4.   <ins>"(iii) about 1 mg/ml of a preservative that is sodium benzoate"</ins>

91.    Annora's ANDA product literally meets the claim limitation "about 1 mg/ml of a preservative that is sodium benzoate."

92.    Annora's ANDA No. 214467 describes ████████████████████

████████████████████████████████████████

███████ Ex. B-5 at ANNENAL00000278.

#### 5.   <ins>"(iv) a sweetener, wherein the sweetener is sucralose and is present at about 0.7 mg/ml in the oral liquid formulation"</ins>

93.    Annora's ANDA product literally meets the claim limitation "a sweetener, wherein the sweetener is sucralose and is present at about 0.7 mg/ml in the oral liquid formulation."

94.    Annora's ANDA No. 214467 ████████████████████████

███████████████████████████████ Ex. B-5 at ANNENAL00000278.

#### 6.   <ins>"(v) a flavoring agent"</ins>

95.    Annora's ANDA product literally meets the claim limitation "a flavoring agent."

96.    Annora's ANDA No. 214467 describes ████████████████████

██████████████████████████████████████████ ANNENAL00000278.

#### 7.   <ins>"(vi) water"</ins>

97.    Annora's ANDA product literally meets the claim limitation "water."

98.    Annora's ANDA No. 214467 describes ████████████████████

█████████████████████████ Ex. B-5 at ANNENAL00000279.  Annora's ANDA drug product section of the ANDA notes ██████████████████████

████████████████████████████████ Ex. B-5 at



ANNENAL00000279

**8.      "wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C"**

99.     Annora's ANDA product literally meets the claim limitation "wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C."

100.     Annora's ANDA No. 214467 states ███████████████████████ ████████████████████ Ex. B-5 at ANNENAL00000289.

101.     Annora's ANDA states ███████████████████████ ████████████████████████ Ex. B-5 at ANNENAL00000347.  I understand from counsel these limitations are infringed as a matter of law.

102.     Annora's ANDA No. 214467 contains ████████████████ ████████████████ Ex. B-7 at ANNENAL00004821 ████████████████████████ ██████████████████████ ANNENAL00004827 ████████████████████████ ██████████████████████ ANNENAL00004833 ████████████████████████ ██████████████████████

**9.      "wherein the pH of the oral liquid formulation is between about 3 and about 4"**

103.     Annora's ANDA Product literally meets the claim limitation "[t]he formulation of claim 10, wherein the pH of the oral liquid formulation is between about 3 and about 4."

104.     The specification for Annora's ANDA product upon release requires ████

██████████████████████████████████████████

███████████████████████ Ex. B-10 at ANNENAL00004656.  The stability specification for Annora's ANDA product during storage requires ███████████████████ ███████████████ Ex. B-11 at ANNENAL0000418.

105.    Annora's ANDA No. 214467 also describes ████████████████████ ████████████████████████████████████████ ███████████ Ex. B-5 at ANNENAL00000307.

**D.  CLAIM 10 OF THE '476 PATENT IS INFRINGED**

106.    Annora's ANDA Product literally meets the claim limitation "[t]he formulation of claim 10, wherein the pH of the oral liquid formulation is about 3.3."

107.    The specification for Annora's ANDA product requires ███████████ ██████████████ Ex. B-10 at ANNENAL00004656.   The stability specification for Annora's ANDA product during storage requires ██████████████████ ████████ Ex. B-11 at ANNENAL0000418.

108.    Annora's ANDA No. 214467 also describes ████████████████ ████████████████████████████████████████ ██████████ Ex. B-5 at ANNENAL00000307.

**E.  CLAIM 12 OF THE '476 PATENT IS INFRINGED**

109.    Annora's ANDA Product literally meets the claim limitation "[t]he formulation of claim 1, wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at about 5±3˚ C."

110.    Annora's ANDA No. 214467 states ████████████████████ █████████████████████████████████ Ex. B-5 at ANNENAL00000289.  I understand from counsel this means a claim limitation restricting the formulation to one with stability of at least 18 months is infringed as a matter of law by

this statement as a 24 month or more stable formulation is required to meet the approved

ANDA criteria.

111.    Annora's ANDA states ███████████████████████████████

██████████████████████████████████████████ Ex. B-5

at ANNENAL00000347.  As these too include the claimed limitation, I understand from

counsel these limitations are infringed as a matter of law.

112.    Annora's ANDA No. 214467 contains ███████████████████

████████████████████████████████ Ex. B-7 at

ANNENAL00004821 ███████████████████████████████

███████████████████████████████,

ANNENAL00004827 ███████████████████████████████

██████████████████████████████

ANNENAL00004833 ███████████████████████████████

██████████████████████████████. In addition, the

sampling schedule for these same stability studies ████████████████████

(*see, e.g.*, Ex. B-8 at ANNENAL00001807 ███████████████)), indicating Annora's

expectation of acceptable product stability ████████████████████. Annora's

ANDA also concludes that the ANDA product ███████████████████████

██████████████████████ *See* Ex. B-5 at

ANNENAL00000346.

113.    Additionally, Annora has proposed ████████████████████

██████████████████████████████ Ex. B-5 at

ANNENAL00000346.  I understand from counsel that Annora has received tentative

approval for its ANDA product from FDA and therefore Annora has provided FDA with

materials indicating its product meets the stability specifications as described in the long-term

██████████████████████████████████████████████

stability protocol of not more than 5.0% w/w total impurities. *See* Ex. B-9.

### F.   CLAIM 13 OF THE '476 PATENT IS INFRINGED

114.    Annora's ANDA Product literally meets the claim limitation "[t]he formulation of claim 1, wherein the oral liquid formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 24 months at about 5±3˚ C."

115.    Annora's ANDA No. 214467 states███████████████████████████ █████████████████████████████████████ Ex. B-5 at ANNENAL00000289.  I understand from counsel this means a claim limitation restricting the formulation to one with stability of at least 24 months is infringed as a matter of law by this statement as a 24 month or more stable formulation would meet the approved ANDA criteria.

116.    Annora's ANDA states ████████████████████████████████████ █████████████████████████████████████ Ex. B-5 at ANNENAL00000347.  As these too include the claimed limitation, I understand from counsel these limitations are infringed as a matter of law.

117.    Annora's ANDA No. 214467 contains ████████████████████████



████████████████████████████████████ Ex. B-7 at
ANNENAL00004821 ██████████████████████████████████████████
████████████████████████████████████,
ANNENAL00004827 ████████████████████████████████████████
████████████████████████████████████,
ANNENAL00004833 ████████████████████████████████████████
████████████████████████████████████. In addition, the
sampling schedule for these same stability studies ████████████████████████



(*see, e.g.*, Ex. B-8 at ANNENAL00001807 ███████████████)), indicating ███████

██████████████████████████████████████████████ Annora's

ANDA also concludes that ███████████████████████████████████

███████████████████████████ *See* Ex. B-5 at

ANNENAL00000346.

118.    Additionally, Annora has proposed ████████████████████████

███████████████████████████████████████ Ex. B-5 at

ANNENAL00000346.  I understand from counsel that Annora has received tentative

approval for its ANDA product from FDA and therefore Annora has provided FDA with

materials indicating its product meets the stability specifications as described in the long-term

stability protocol of not more than 5.0% w/w total impurities.  *See* Ex. B-9.

## VIII.  THE PI CLAIMS OF THE PATENTS ARE VALID

119.    It is my opinion that the PI Claims are valid.  Specifically, the claims are not

obvious, have adequate written description, and are enabled.

### A.  ANNORA'S PRIOR ART REFERENCES

120.    As part of my analysis, I reviewed the prior art references cited in Annora's

Invalidity Contentions.  Below I provide a brief summary of several of the references, which

do not render the claimed invention obvious for a number of reasons.  To the extent that they

discuss enalapril, the formulations are all powder for reconstitution or compounding of

enalapril tablets.  None of these references discuss a ready-to-use oral liquid formulation of

enalapril.  Additionally, none of the references provide any data for at least a year of stability

for any liquid formulation (reconstituted or otherwise) of enalapril.

#### 1.  <u>Allen</u>

121.    Allen, et al., "Stability of alprazolam, chloroquine phosphate, cisapride,

enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral

liquids," Am. J. Health-Sys. Pharm., 55:1915-1920 (Sept. 15, 1998) ("Allen")
(ANNENAL00005315-5324) is a 1998 paper that does not disclose ready-to-use solution
formulations of enalapril.  Ex. B-12.  Allen recognises no ready-to-use oral liquid formulation
is commercially available.  Ex. B-12 at ANNENAL00005319

      122.    Allen describes the stability of extemporaneously prepared liquid formulations
containing enalapril as one of five different active pharmaceutical ingredients ("APIs").  Ex.
B-12 at ANNENAL00005319.  However, stability, as defined by Allen, was the "retention of
not less than 90% of the original drug concentration," not 95% as required by the PI Claims.
*See* Ex. B-12 at ANNENAL00005319.  Further, Allen only discloses stability data for the
solution for 60 days, not the 12 or 24 months required by the PI Claims.  *See* Ex. B-12 at
ANNENAL00005319.

### 2.    The Epaned® Kit Product and Label

      123.    Epaned® Kit was an enalapril powder for reconstitution product, not a ready-
to-use solution oral liquid formulation of enalapril.  The Epaned® Kit is discussed above in
the Technology of the Asserted Patents section of this report.  *Supra*, § IV.  The label for the
Epaned® Kit ("Epaned® Kit Label") (ANNENAL00005348-5362) provides a list of at least
12 ingredients in the reconstituted formulation but does not provide any guidance on their
amounts.  *See* Ex. B-13 at ANNENAL00005358.

### 3.    Boulton

      124.    Boulton, et al., "The Stability of an Enalapril Maleate Oral Solution Prepared
from Tablets," Aust. J. Hosp. Pharm., 24(2):151-6 (1994) ("Boulton")
(ANNENAL00005329-5337) is a 1994 paper that reports a study assessing the stability of an
enalapril maleate oral solution prepared from tablets at a pH of 5 over a period of 90 days.
Ex. B-3 at ANNENAL00005332 (Abstract).

      125.    Boulton, like the Allen reference, defines stability as having more than 90% of

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Y

the initial enalapril amount (10% decomposition).  Boulton only provides stability data for temperatures at 25 °C and 40 °C.  *See* Ex. B-3 at ANNENAL00005336 at Tables 2-3. Boulton indicates the decomposition of enalapril at 5 °C "was not significant over 90 days" but provides no data.  *See* Ex. B-3 at ANNENAL00005336.  Moreover, the only conclusion Boulton draws from the 5 °C study is that "the enalapril maleate oral solution . . . can be expected to maintain greater than 90% of original potency when stored in a refrigerator for up to **30 days**" which is much lower than the 12 or 24 months of the PI Claims.  Ex. B-3 at ANNENAL00005336 (emphasis added).

126.    Boulton does not disclose ready to use solutions of enalapril.  In fact, the expectation was that enalapril was unstable in solution and a ready-to-use oral solution would not have a viable shelf life.  Boulton cites Ip and Brenner stating that the optimum aqueous stability of enalapril is around pH 3[4], but that the "rate of decomposition to enalaprilat in solution of pH 5 and above suggest oral [liquid] formulations of enalapril would have limited shelf life".  *See* Ex. B-3 at ANNENAL00005332.  Boulton's conclusion, e.g., that a refrigerated oral enalapril maleate solution could only be expected to maintain 90% potency for 30 days, comport with this expectation.

127.    Accordingly, Boulton does not provide a POSA with any assurance as to whether a 1 mg/ml enalapril maleate solution could maintain 95% of the active for a year or more.  Furthermore, Boulton lacks guidance on developing a stable oral liquid formulation (including those reflected in the PI Claims) even if a POSA had any motivation to do so.

### 4.    Dawson

128.    Dawson, L. M. & M.C. Nahata, "Guidelines for Compounding Oral Medications for Pediatric Patients," J. Pharm. Tech, 7(5):168-175 (Sept./Oct.1991)

---

[4] Ip and Brenner do not provide any data for the statement that the optimum aqueous stability of enalapril is around pH 3.

("Dawson") (ANNENAL00005338-5347) is a 1991 paper that provides basic guidelines for compounding paediatric oral solutions and suspensions.  Ex. B-14.  Dawson does not teach enalapril.  Dawson also does not provide any specific guidance for formulating ready to use solutions for any drug with a known stability issue in solution, such as enalapril.

### 5.   Ip & Brenner

129.   Ip, D.P. & G. S. Brenner, "Enalapril Maleate," Analytical Profiles of Drug Substances, Vol. 16,pp. 207-243 (Klaus Florey ed., Academic Press, 1987) ("IP & Brenner") (ANNENAL00005388-5427) discusses the history and properties of enalapril maleate but does not disclose ready-to-use oral liquid formulations of enalapril.  Ex. B-15.

130.   The Ip & Brenner reference reports the time it takes for 10% of enalapril starting material to degrade in aqueous solution at pH between 2-7.  *See* Ex. B-15 at ANNENAL00005420-422.  The longest amount of time reported was 262 days and for a formulation at a pH of 2.  Ex. B-15 at ANNENAL00005422.  At a pH of 5, the enalapril degraded 10% in 114 days.  Ex. B-15 at ANNENAL00005422.  Ip & Brenner state that enalapril has a maximum solution stability at around pH 3 but do not provide data for this conclusion.  Ex. B-15 at ANNENAL00005420.

131.   As demonstrated by those working in the field, (see, e.g., Boulton stating that Ip & Brenner points to limited shelf life expectations), Ip & Brenner provides a POSA with no motivation to try to formulate a ready to use enalapril solution formulation given the low expectation of success of forming a stable formulation.

### 6.   Nahata

132.   Nahata, et al., "Stability of enalapril maleate in three extemporaneously prepared oral liquids," Am. J. Health-Sys. Pharm., 55:1155-57 (June 1, 1998) ("Nahata") (ANNENAL00005432-5435) is a 1998 paper that evaluated the stability of three extemporaneously prepared oral liquid formulations of enalapril maleate.  Ex. B-16.  Nahata

does not disclose ready-to-use oral liquid formulations of enalapril.

133.    Nahata described the stability of each formulation for 91 days at 4 °C and at 25 °C.  Ex. B-16 at ANNENAL0005434, Table 1.  The mean concentration of the enalapril maleate at 4 °C was > 94% of the initial concentration after 91 days, with at least one formulation falling below 95%.  Ex. B-16 at ANNENAL0005434, Table 1.  The Nahata reference does not disclose stability data for more than 91 days.  *See* B-16 at ANNENAL0005434, Table 1.

134.    Based on the stability data in Nahata, it would not be expected that an enalapril oral liquid formulation would retain 95% or more of the initial enalapril amount after 12 months at a storage temperature of 5±3°C.

### 7.    Sosnowska

135.    Sosnowska, et al., "Stability of Extemporaneous Enalapril Maleate Suspensions For Pediatric Use Prepared From Commercially Available Tablets," Acta Poloniae Pharmaceutica-Drug Research, 66(3):321-26 (2009) ("Sosnowska") (ANNENAL00005464-5469) is a 2009 paper that does not disclose read-to-use oral liquid formulations of enalapril.  Ex. B-17.  Sosnowska only discusses extemporaneously compounded enalapril suspensions prepared from commercially available tablets.  Ex. B-17 at ANNENAL00005464.  Sosnowska does not report the stability of the compounded suspensions for timeframes greater than 30 days.

### 8.    '747 Patent

136.    U.S. Patent No. 8,568,747 (the "'747 Patent") (ANNENAL00005470-5491) is titled "Enalapril Compositions" and describes enalapril powders for reconstitution.  Ex. B-18.  The '747 patent is listed in the Orange Book as covering the Epaned® Kit Product (discussed above).

137.    The '747 patent discloses exemplary enalapril powder compositions that are

stable for up to 36 months at refrigerated and ambient conditions, but discloses a maximum

stability for a reconstituted oral liquid formulation of only at least 36 weeks.  *See* Ex. B-18 at

11:7-12, 13:29-33, Examples.  The '747 patent does not describe any liquid formulation

(reconstituted or otherwise) which is shown to be stable at 5±3 °C for at least twelve months.

138.    In a preferred embodiment, the reconstituted oral liquid formulation is

homogenous and stable for only at least 12 weeks under ambient conditions.  Ex. B-18 at

2:11-14, Claim 1.  Further, the examples testing the stability of the reconstituted oral liquid

formulation do not exceed 12 weeks.  *See e.g.*, Ex. B-18 at 23:1-37, 29:20-28.  Thus, the '747

patent does not provide any teaching or guidance for formulating oral liquid formulations that

are stable at 5±3 °C for at least twelve months.

### B.  THE PI CLAIMS WOULD NOT HAVE BEEN OBVIOUS

139.    The prior art Annora cites would not have made the claimed formulation

obvious as of the date of the invention.

#### 1.    The Listed References Do Not Render the Claimed Invention Obvious

140.    Overall, none of the references Annora cites in its invalidity contentions

describe an enalapril oral liquid formulation with the claimed stability for the claimed storage

period.  The Epaned® Kit had a shelf-life of up to 60 days after reconstitution into liquid

form.  Ex. B-13 at ANNENAL00005351.  The '747 Patent has a stability threshold of 90%

(versus the claimed 95%) and only provides data for 12 week stability for the prepared liquid

solution.  Ex. B18 at ANNENAL5485-486.  In light of both the short stability periods and

different standards for stability, a POSA would not view these prior formulations to indicate a

stable oral liquid formulation of enalapril would be possible.  In fact, a POSA would

conclude the reason for the development of a reconstituted powder enalapril formulation is

because enalapril is unstable in aqueous solution.  The option of the Epaned® Kit gave a

shorter time for which the solution would need to exist, and offered a viable (albeit less

desirable) shelf-stable product.  *See* Ex. B-14 at ANNENAL00005340 (explaining how some existing drugs are unstable in an aqueous vehicle, such that commercial manufacturers must produce them in a powder for reconstitution formulation).  A POSA would not see this as motivation to consider a ready-to-use solution for an inherently unstable API.

141.    Annora also alleges in its invalidity contentions that a POSA would be aware of the need for a stable oral liquid enalapril formulation.  This, if anything, simply shows that the need for such a formulation existed, and indeed had existed for some time, but it is very clear that the solution to the problem was not obvious, otherwise it would have been done in this very long period of need.

142.    Ip & Brenner would provide little assistance to a POSA.  First, a POSA would be motivated to understand the basis for the stability statements in Ip & Benner and Allen.  Ip & Brenner only cites a personal communication for the statement that enalapril has maximum solution stability at "around pH 3," so this would not allow a POSA to seek clarification on the statement.  Ex. B-15 at ANNENAL00005420 (citing "L.L. Ng., Merck Sharp and Dohme Research Laboratories, personal communication).  Allen cites to the Merck Index for the statement that "[enalapril] has pKa values of 3 and 5.4 and is reported to have maximum stability at pH of ~3."  Ex. B-12 at ANNENAL00005321 (albeit, erroneously citing The Merck index, 12th ed., 3610 (1996), the monograph for enciprazine).  However, the correct enalapril monograph in the Merck Index (3605) is silent about stability and simply gives solubility and pKa data.  Ex. B-19 at ANNENAL00005430.  The only available information on maximum stability would seem to be the, undated, undocumented, unpublished, personal communication had between Ip & Brenner and L.L Ng at Merck Sharp and Dohme.

### 2.        There is No Motivation to Combine the Cited References

143.    A POSA would not have been motivated to combine Annora's cited references at least because: (1) the prior art spans three decades, and (2) it does not disclose any attempts

██████████████████████████████████████████Y

to create a ready-to-use oral liquid formulation at a pH which, according to Ip & Brenner, produces the maximum solution stability.  Rather than pointing a POSA towards a ready-to-use solution, it is clear that Ip & Brenner achieved the exact opposite.  I understand from counsel that this significant time between the references and refusal by later references to follow the alleged optimal pH shows a lack of motivation to combine.

### 3.  A POSA Would Not Have a Reasonable Expectation of Success in Achieving a Stable Formulation

144.    A POSA would know of both enalapril's instability in water and the presence of the Epaned® Kit on the market.  A POSA would also understand that the prior art was an acceptance that a long-term stable oral liquid formulation of enalapril was not obtainable, and thus it considered less satisfactory short-term goals.  Additionally, many of the references define stability as not less than 90% of the starting amount of enalapril; a POSA would understand that this large, permitted amount of degradation over a short period of storage is in keeping with the expectation that the solution would be unstable and could not have a long-term shelf-life.  A POSA would therefore conclude a formulation, with no more than 5% degradation over a long shelf-life, was not possible and would not have a reasonable expectation of success in achieving a stable ready-to-use liquid formulation of enalapril.

### C.  THE SPECIFICATION CONTAINS AN ADEQUATE WRITTEN DESCRIPTION

145.    As I explain in more detail below, it is my opinion that all claims of the '868 and '476 patents contain adequate written description support and that a person of ordinary skill in the art, upon reading the specification, would believe that the inventors possessed the invention embodied in the PI Claims.

### 1.  The Specification Describes Claims 11 and 12 of the '868 Patent

146.    A person of ordinary skill reviewing this claim would understand the specification discloses the importance of maintaining the pH in order to achieve the stability in the claimed formulations.  '868 patent at 13:64-14:46.  A POSA would also understand the

specification discloses the relevance of a buffer to maintaining the pH. '868 patent at 13:22-24. The specification further discloses examples of buffers that may be used in the claimed formulations. '868 patent at 13:24-63. Moreover, the specification discloses the relationship between stability and buffer concentration. '868 patent at 14:47-48.

147. A person of ordinary skill would understand that the inventors possessed a formulation which controlled the formation of degradants by using a buffer, including the buffers described in the specification, at the claimed concentrations and the claimed pH range.

148. Additionally, the specification describes the formulations as stable for at least 36 months, a full year longer than the claims provide. '868 patent at 18:64-19:2.

149. The specification provides several examples of formulations exhibiting stability at refrigerated conditions for up to 62 weeks. '868 patent at 38:36-39:20. It is my understanding that the inventors need not provide examples for every possible embodiment. Here, the inventors provided sufficient representative examples of formulations exhibiting stability to allow a person skilled in the art to conclude that the inventors possessed formulations with stability for up to 18 months and up to 24 months.

150. Example E provides for stability for more than a year, up to 62 weeks. '868 patent at 37:25-39:19. At 62 weeks, the formulations are well within the allowable stability. For example, formulation E2 shows 0.18% diketopiperazine content and 0.75% enalaprilat content (for a total degradant content of 0.93%) at 62 weeks. '868 patent at 37:25-39:20. This is well within the 5% level of degradants allowed by the claims. Based on this example, a person of ordinary skill could evaluate the rate of degradation of those formulations and conclude that they would remain stable for up to 18 months as required by claim 11, and up to 24 months as required by claim 12.

151. Based on the description in the specification and the examples, a person of

ordinary skill would believe the inventors to be in possession of a buffer-agnostic formulation with stability through 12 and 24 months.

### 2.   The Specification Adequately Describes Claims 9 and 10 of the '476 Patent

152.   The specification discloses buffering agents, including specifically citric acid and sodium phosphate.  '868 patent at 13:32-36; 13:61-63.  Additionally, a person of ordinary skill would recognise that the citrate-phosphate buffer, colloquially known as a McIlvaine buffer, is a common buffer type.  Furthermore, it would be routine for a person of ordinary skill, reviewing the stable examples from Example E, to determine an appropriate amount of citrate-phosphate buffer to create a stable formulation.

153.   The specification provides suitable support for stable oral liquid enalapril formulations with a pH between 3 and 4.  '868 patent at 14:33-46.  Additionally, the specification describes embodiments where the pH is at about 3.3.  '868 patent at 14:33-46. These express disclosures, combined with the descriptions discussed previously regarding the inventor's awareness of the optimum pH, would lead a person of ordinary skill in the art to understand that the inventors possessed formulations with pH's of about 3.3 and between about 3 and 4.

154.   Additionally,  the specification provides example formulations with a pH of about 3.3.  '868 patent at 37:25-39:20.

### 3.   The Specification Supports Claims 12 and 13 of the '476 Patent

155.   It is my opinion that the specification provides adequate written description support for Claims 12 and 13 of the '476 patent for the reasons described in relation to Claims 11 and 12 of the '868 patent in paragraphs 146-151.

### D.  A Person of Ordinary Skill in the Art Is Able to Make and Use the Claimed Invention

156.   It is my opinion that the PI Claims are enabled.  That is, the specification

would allow one skilled in the art to practice the claimed invention without undue experimentation.

### 1.     The Specification Enables Claims 11 and 12 of the '868 Patent

157.    It is my opinion that Claims 11 and 12 of the '868 patent are enabled. Specifically, once a person of ordinary skill had the benefit of Azurity's disclosure of a variety of stable, liquid formulations of enalapril whose stability could be maintained by the disclosed buffers in the specification, it would be routine experimentation for the person of ordinary skill to determine which amount of the buffers (and other components) would provide optimal stability.

158.    For example, the specification contains examples with 1 mg/mL of enalapril, and specifically directs a person of ordinary skill to develop enalapril formulations between about 0.6 mg/mL and about 1.2 mg/mL. '868 patent at 6:56-58.  Additionally, it would be routine for a POSA to develop a formulation with between 0.6 mg/mL and 1.2 mg/mL of enalapril given the disclosures in the specification.

159.    Furthermore, the specification discloses buffers that may be used to achieve the appropriate pH and also teaches that the pH may be adjusted by sodium hydroxide or hydrochloric acid.  '868 patent at 3:46-48, 13:23-63.  The specification also specifically describes the concentration of the buffer component between about 5 mM and about 20 mM. '868 patent at 14:51-52.  It would be routine for a person of ordinary skill to choose a buffer as described in the specification and determine the appropriate concentration of the chosen buffer to achieve the claimed stability limitation.

### 2.     The Specification Enables Claim(s) 9, 10, and 12, and 13 of the '476 Patent

160.    The '476 and '868 patents share a common specification.  Thus, the claims of the '476 patent are enabled for the same reasons that the claims of the '868 patent are enabled.

161.    Specifically, with regards to the citrate-phosphate buffer, it would be routine for a person of skill using the information disclosed in the specification to create a stable formulation with such a buffer.  Indeed, as discussed above paragraph 152, the specification specifically calls out buffering agents comprised of citric acid and sodium phosphate.  '868 patent at 13:32-36, 13:61-63.  A person of ordinary skill would have the means to adjust the pH of the formulation to the claimed "about 3 to 4" as required in claim 9 or "about 3.3" as required in claim 10.  Additionally, a person of ordinary skill reviewing the stable examples from Example E could routinely determine an appropriate amount of citrate-phosphate buffer to create a formulation achieving the claimed stability limitations.

****

162.    I reserve the right to supplement my opinion based on Annora's arguments in its responsive preliminary injunction brief.


I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed:

17 Dec 2021

Date                                                                Graham Buckton, Ph.D.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2021, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

December 17, 2021, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                          *VIA ELECTRONIC MAIL*
Ronald P. Golden III, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Defendant Annora Pharma*
*Private Limited*

Todd S. Werner, Esquire                                 *VIA ELECTRONIC MAIL*
Saukshmya Trichi, Esquire
CARLSON, CASPERS, VANDENBURGH,
   & LINDQUIST, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN  55402
 *Attorneys for Defendant Annora Pharma*
*Private Limited*


                                                   */s/ Megan E. Dellinger*
                                                   _____
                                                   Megan E. Dellinger (#5739)