Original Filing Date: December 17, 2021
Redacted Filing Date: January 11, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-196 (LPS) |
| v. | ) | |
| | ) | **REDACTED -** |
| ANNORA PHARMA PRIVATE LIMITED, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF JEFFERY A. STEC, Ph.D.**

i

# TABLE OF CONTENTS

I.      PURPOSE ................................................................................................................ 1

II.     PROFESSIONAL AND EDUCATIONAL BACKGROUND ................................. 2

III.    SUMMARY OF OPINIONS ................................................................................... 3

IV.     BACKGROUND ..................................................................................................... 6

  A.    Azurity Pharmaceuticals, Inc. / Silvergate Pharmaceuticals, Inc. .................... 6
  B.    Annora Pharma Private Ltd. ............................................................................... 7
  C.    Epaned® Product History ................................................................................... 7
  D.    Product-at-Issue ................................................................................................. 8
  E.    Hypertension ...................................................................................................... 9
    1.    Diuretics ................................................................................................ 11
    2.    Angiotensin-Converting Enzyme (ACE) Inhibitors ............................. 12
    3.    Angiotensin II Receptor Blocker (ARB) .............................................. 12
    4.    Calcium Channel Blockers .................................................................... 13
    5.    Alpha Blockers ...................................................................................... 13
    6.    Alpha-Beta Blockers ............................................................................. 13
    7.    Beta Blockers ........................................................................................ 14
    8.    Aldosterone Antagonists ....................................................................... 14
    9.    Renin Inhibitors .................................................................................... 14
    10.   Vasodilators .......................................................................................... 15
    11.   Central-Acting Agents .......................................................................... 15
  F.    Patents ............................................................................................................. 15
    1.    '868 Patent ............................................................................................ 16
    2.    '476 Patent ............................................................................................ 16

V.      THE FINANCIAL PERFORMANCE OF EPANED® ........................................ 17

  A.    Sales ................................................................................................................ 17
  B.    Market Share ................................................................................................... 19
  C.    ████████ ████████ ....................................................................... 23
  D.    Profitability of Epaned® Oral Solution ........................................................... 25
  E.    Return on Investment to Develop Epaned® Oral Solution .............................. 27
  F.    Epaned® Marketing Spending .......................................................................... 28
  G.    ████████████████ ............................................................................ 30

VI.     IRREPARABLE HARM ....................................................................................... 32

  A.    Potential Overall Business Impact to Azurity ................................................ 33
  B.    ████████████████████ .............................................................. 34
  C.    ███████████████████ ............................................................... 37
  D.    ██████████████████████ ........................................................ 40
  E.    ██████████████████████ ........................................................ 41
  F.    ████████████████ ......................................................................... 42
  G.    ██████████████ ............................................................................. 43

VII.    BALANCE OF HARDSHIPS .............................................................................. 45

A. Harm to Azurity .................................................................................................45
B. Harm to Annora .................................................................................................46
VIII. PUBLIC INTEREST ................................................................................................ 47

I, Jeffery A. Stec, declare as follows:

## I.     PURPOSE

1.      I have been retained as an expert by counsel on behalf of Azurity Pharmaceuticals, Inc. ("Azurity" or "Plaintiff").[1]  I understand that Azurity alleges that Annora Pharma Private Limited ("Annora" or "Defendant"), through Annora's ANDA No. 214467, will infringe its United States Patent Nos. 10,772,868 (the "'868 patent") and 10,799,476 (the "'476 patent") (collectively, the "Patents-in-Suit").  It is my understanding that the Patents-in-Suit cover the formulation of Epaned® Oral Solution (hereafter, "Epaned®"), which is "the first FDA-approved enalapril maleate oral solution."[2]

2.      I have been asked by counsel to offer my opinions, based on my knowledge, experience, and analysis of the information available in this case, about whether injunctive relief should be granted to Azurity to prevent the entry into the market of Annora's proposed generic competitor to Epaned®.  In determining whether to grant injunctive relief, I understand from counsel that courts consider four factors: (1) the likelihood of success on the merits; (2) the irreparable harm that would occur to the moving party without relief; (3) the balance of the hardships; and (4) the impact on the public interest.[3]  In this Declaration, I have been asked to address economic issues relating to factors two, three, and four.

3.      The following Declaration summarizes my current opinions.  To form my opinions, I reviewed and/or relied on the documents referenced in the text and footnotes of this

---

[1] I understand that Azurity has a subsidiary, Silvergate Pharmaceuticals, Inc. ("Silvergate"), that previously held and asserted related patents.  I will refer to both as Azurity. (See Section IV.A).
[2] https://epaned.com/patients/.
[3] I understand the United States Supreme Court has addressed these factors in *eBay v. Mercexchange*, 547 U.S. 388 (2006).

Declaration as well as information in Exhibit 3.  I have also relied on my education, professional judgment and expertise gathered from many years of estimating damages and applying economics, finance, and survey research to intellectual property matters.  The information in this Declaration is based upon the information currently available to me.  To the extent additional information is produced or becomes pertinent, I may supplement this Declaration if warranted.

## II.      PROFESSIONAL AND EDUCATIONAL BACKGROUND

4.       I am a Managing Director with Berkeley Research Group, LLC ("BRG").  I am also leader of its Intellectual Property practice and co-leader of its Economics and Damages community.  BRG is a leading global strategic advisory and expert consulting firm that provides independent advice, data analytics, valuation, authoritative studies, expert testimony, investigations, transaction advisory, restructuring services, and regulatory and dispute consulting to Fortune 500 corporations, financial institutions, government agencies, major law firms, and regulatory bodies around the world.

5.       I have served as a consultant to a wide variety of clients on matters involving economic, financial, and statistical analysis and modeling for the purpose of interpreting and projecting data and evaluating the impact of business decisions, transactions, and economic events.  I have also served as an expert witness or consultant in a wide range of litigation matters, including patent, copyright, and trademark infringement and trade secret misappropriation litigation.  While the issues have varied from case to case, most included an analysis and evaluation of company-specific as well as industry-wide data for the purpose of determining the financial impact of features and benefits of products as well the financial impact of alleged wrongdoing as it relates to economic damages.  As part of these analyses, I have often examined the commercial success of products and the drivers of that success.

6.      I received Ph.D. and Master's degrees in Economics from the Ohio State University.  I received Bachelor's degrees in Philosophy and Psychology from Cornell University and in Economics with a Math Minor from the University of Illinois-Chicago.  I am a member of various professional organizations, including the American Economic Association, the American Association of Public Opinion Research, and the Licensing Executives Society, among others.

7.      My curriculum vitae, which includes all publications and presentations I have authored, is provided in Exhibit 1.  A list of the cases in which I have testified is provided in Exhibit 2.  BRG is being compensated on a rate times hours basis for the work my staff and I perform.  My current rate is $695 per hour.  BRG's compensation does not depend in any way on the outcome of this litigation.

## III.    SUMMARY OF OPINIONS

8.      For purposes of the analyses and opinions contained in this Declaration, I have been asked to address economic issues relating to three of the factors considered by courts in determining whether injunctive relief should be granted.  These three factors are (1) the irreparable harm that would occur to the moving party without relief; (2) the balance of the hardships; and (3) the impact on the public interest.

9.      My analysis accounts for events that predate this action.  Specifically, a generic competitor to Epaned®, which is marketed and offered for sale by Bionpharma Inc. ("Bionpharma"), entered the market in August 2021.[4]  I understand that CoreRx, Inc. ("CoreRx")

---

[4] Exhibit 6.

manufactures the generic enalapril solution product that is, in turn, sold by Bionpharma.[5]  I also

understand that CoreRx has ceased supplying Bionpharma effective December 1, 2021.[6]

Bionpharma has represented that it will require at least nine months to locate an alternate

supplier.[7]  Bionpharma has also represented that it cannot secure an alternate supplier before it

exhausts its current inventory.[8]  Accordingly, if Bionpharma is not able to locate a new supplier,

then Bionpharma's ability to continue to sell its generic product in the market will terminate after

Bionpharma exhausts its existing inventory.

10.     Furthermore, it appears that Bionpharma's existing inventory is exhausted or will

be soon.  For example, Bionpharma has represented that unless CoreRx is "immediately" ordered

to supply Bionpharma, then Bionpharma's generic product will be removed from the

marketplace.[9]  Bionpharma has also represented that it had to turn down a customer purchase

order for its generic product because it was unable to fulfill the order.[10]

11.     I understand from counsel that the earliest Annora could launch its generic

product (given Bionpharma's 180-day exclusivity) is around February 13, 2022.  I also

understand from counsel that trial in this matter is scheduled for July 20, 2022.  Given

---

[5] Exhibit 7 (*Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Complaint (Dkt. 1), ¶ 6).
[6] Exhibit 8 (*Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Declaration of Venkat Krishnan in Support of Plaintiff Bionpharma Inc.'s Motion for Preliminary Injunction (Dkt. 10), ¶ 16).
[7] *Id.* ¶ 34.
[8] Exhibit 27 (*Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Exhibit 7 (Complaint (Dkt. 1), ¶ 29; *Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Plaintiff Bionpharma's Brief in Support of Motion for Preliminary Injunction (Dkt. 9), at p. 12).
[9] Exhibit 27 *Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Plaintiff Bionpharma's Brief in Support of Motion for Preliminary Injunction (Dkt. 9), at p. 2.
[10] Exhibit 27 *Bionpharma Inc. v. CoreRx, Inc.*, Case No. 1:21-cv-10656, S.D.N.Y., Exhibit 8 (Declaration of Venkat Krishnan in Support of Plaintiff Bionpharma Inc.'s Motion for Preliminary Injunction (Dkt. 10), ¶ 25).

███████████████████████████

Bionpharma's statements as to the current unavailability of its product and the length of time that it would require to secure a second supplier, it is likely that if Annora were to enter the market, in February 2022, that its product would be the only generic competitor to Epaned®. I evaluated irreparable harm, the balance of hardships, and the impact on the public interest under this economic scenario.

12.    My discussion of these factors can be found in Sections VI through VIII of my Declaration. A summary of my opinions as they relate to each of these factors follows below.

- For irreparable harm, if injunctive relief is not granted:



- For the balance of hardships, if injunctive relief is not granted, ████████████ ██████████████████████████.

- Granting of injunctive relief would not be adverse to the public interest.

## IV.   BACKGROUND

### A.   Azurity Pharmaceuticals, Inc. / Silvergate Pharmaceuticals, Inc.

13.     Silvergate Pharmaceuticals, Inc. was founded in 2010 and was acquired by

CutisPharma, Inc. in 2019.[11]  I understand that Silvergate is wholly owned by Azurity.[12]  I will

refer to both collectively as "Azurity" in my declaration.  Azurity's business "focuses on the

needs of patients, especially children and the elderly, requiring customized, user-friendly drug

formulations."[13]  Azurity's products include various oral solutions, which "have benefitted

millions of patients who are unable to swallow conventional oral dosage forms such as tablets

and capsules and whose needs are not served by other commercially available therapies."[14]  One

of the oral dosage forms sold by Azurity is Epaned®, the product-at-issue in this litigation.[15]

Other products offered by Azurity include EPRONTIA®, FIRVANQ®, Qbrelis®, Xatmep®,

Katerzia®, and various FIRST® Compounding Kits for omeprazole, lansoprazole, mouthwash

BLM, baclofen, metronidazole, and progesterone.[16]

---

[11] https://www.bizjournals.com/kansascity/news/2019/06/24/cutispharma-slivergate-pharmaceuticals-
azurity.html#:~:text=Silvergate%2C%20which%20develops%20pediatric%20medications,development%20facility%20in%20Overland%20Park.
[12] Patel Decl., ¶ 1.
[13] https://azurity.com/about-us/.
[14] https://azurity.com/about-us/.
[15] https://azurity.com/about-us/.
[16] https://azurity.com/medicalinformation/; https://azurity.com/compounding-kits/;
https://azurity.com/fda-approved-products/.

**B.      Annora Pharma Private Ltd.**

14.      Annora was established in 2016 and is based in India.[17]  Hetero Labs Limited is the holding company of Annora and owns 100% of Annora's stock.[18]  Annora's manufacturing facility, located near Hyderabad, India, specializes in manufacturing of tablets, capsules, pellets, liquid orals, suppositories and dry powder syrups targeting a diverse therapeutic range.[19]  It is my understanding that Annora is in the business of, among other things, developing, manufacturing, marketing, importing and selling generic copies of branded pharmaceutical productions for the United States market.[20]  Annora claims its manufacturing facility is designed to meet the standards of the U.S. Food Drug and Administration.[21]

**C.      Epaned® Product History**

15.      I understand that the active ingredient in Epaned® is enalapril.[22]  Enalapril "is used alone or together with other medicines to treat high blood pressure (hypertension)."[23]  I understand enalapril was originally available in tablet form and could be put in a liquid form through a process known as "compounding" in which "[t]he physicians would write the prescription for liquid enalapril [and] provide that to the pharmacist.  The pharmacist would then take tablets, count the number of tablets out and … typically crush them in a mortar and pestle … The powder would then be put into the bottle and some type of diluent [would be] added to

---

[17] http://www.annorapharma.com/.
[18] Exhibit 9, p. 1 (Defendant Annora Pharma Private Limited's Rule 7.1 Corporate Disclosure Statement).
[19] http://www.annorapharma.com/.
[20] Exhibit 10 at ¶ 6 (Complaint).
[21] http://www.annorapharma.com/.
[22] https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208686s002lbl.pdf.
[23] https://www.mayoclinic.org/drugs-supplements/enalapril-oral-route/side-effects/drg-20069221?p=1.

██████████████████████████████████

the bottle."[24]  I understand that there are drawbacks to compounding, because it depends on the accuracy of counting the tablets, the risk of contamination, and the accuracy in adding the powder to the bottle, adding the appropriate amount of diluent, and achieving a consistent particle size for the resulting powder.[25]

16.     Given the potential drawbacks of compounding, Azurity developed a version of enalapril that was easier to use.  This version, a powder form, was offered by Azurity through the Epaned® Kit.  The Epaned® Kit comprised one bottle of powdered enalapril and one bottle of a diluent, Ora-Sweet® SF, which was to be added to the powdered enalapril before administering.[26] Reconstituting the enalapril powder with 150 ml of the Ora-Sweet® diluent resulted in a 1 mg/mL enalapril oral solution.[27]  The Epaned® Kit was approved by the FDA in August 2013[28] and Azurity began selling the Epaned® Kit in October 2013.[29]

### D.     Product-at-Issue

17.     Subsequent to the FDA approval of the Epaned® Kit, Azurity began research and development efforts towards an oral, ready to use ("RTU") formulation.  ████████████

██████████████████████████████████

██████[30]  Azurity received FDA approval for its Epaned® Oral Solution in September 2016[31] and

---

[24] Exhibit 11, p. 80 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).

[25] *Id*. at pp. 80-81.

[26] https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/204308s000lbl.pdf.

[27] https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/204308s000lbl.pdf.

[28] https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No =204308#16169.

[29] Exhibit 12 (SLVGT-RTU-EPA_00105658).

[30] Exhibit 13 (SLVGT-RTU-EPA_00105661).

[31] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208686Orig1s000TOC.cfm.

began selling Epaned® Oral Solution in January 2017.[32]  As the name suggests, Epaned® Oral

Solution is an RTU solution that is taken orally.[33]  Epaned® Oral Solution "comes [in liquid

form] in a stable, ready-to-use formulation or single bottle that does not require constitution."[34]

When Azurity began selling Epaned® Oral Solution, it discontinued sales of the Epaned® Kit.[35]

18.    Epaned® is marketed as "the first FDA-approved enalapril maleate oral

solution."[36]  Epaned® "is an angiotensin-converting enzyme (ACE) inhibitor."[37]  Epaned® is

indicated for various uses including, (1) the "[t]reatment of hypertension in adults and children

older than 1 month, to lower blood pressure," (2) the "[t]reatment of symptomatic heart failure,

and (3) the "[t]reatment of asymptomatic left ventricular dysfunction, to decrease the rate of

development of overt heart failure and reduce hospitalization for heart failure."[38]  I understand

that the FDA found Epaned® Oral Solution to be bioequivalent to the Epaned® Kit.[39]  Epaned®

Oral Solution can be used by anyone needing this type of oral formulation.[40]

**E.    Hypertension**

19.    As discussed in the prior section, enalapril (the active ingredient in Epaned®) is

used to treat hypertension.  Azurity's Epaned® Kit and Epaned® Oral Solution are both used to

---

[32] Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx); Exhibit 15 (SLVGT-RTU-EPA_00105668).
[33] https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208686s002lbl.pdf.
[34] Exhibit 11, p. 86 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).
[35] *Id*. at pp. 119-120.
[36] https://epaned.com/.
[37] https://epaned.com/.
[38] https://epaned.com/.
[39] Exhibit 11, p. 117 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).
[40] *Id*. at p. 117.

treat hypertension.[41]  Hypertension (high blood pressure) "is a common condition in which the long-term force of the blood against your artery walls is high enough that it may eventually cause health problems, such as heart disease."[42]  In addition, "[u]ncontrolled high blood pressure increases your risk of serious health problems, including heart attack and stroke."[43]

20.     I understand there are different categories of blood pressure.  Blood pressure readings provide the systolic pressure over the diastolic pressure (e.g., 120/80).  Normal blood pressure is below 120/80 mm Hg.[44]  Elevated or prehypertension blood pressure "is a systolic pressure ranging from 120 to 129 mm Hg and a diastolic pressure below (not above) 80 mm Hg."[45]  The next category, "[s]tage 1 hypertension[,] is a systolic pressure ranging from 130 to 139 mm Hg or a diastolic pressure ranging from 80 to 89 mm Hg."[46]  The next category, "stage 2 hypertension[,] is a systolic pressure of 140 mm Hg or higher or a diastolic pressure of 90 mm Hg or higher."[47]  Finally, hypertensive crisis, is a "blood pressure measurement higher than 180/120 mm Hg."[48]

---

[41] Exhibit 11, p. 117 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).

[42] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410.

[43] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410.

[44] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[45] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[46] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[47] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[48] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

21.    Treatment options for hypertension include lifestyle changes such as eating a diet with less salt, regular physical activity, maintaining a healthy weight or losing weight, and limiting the amount of alcohol consumption.[49]  If lifestyle changes are insufficient, medication can assist in lowering blood pressure.[50]  The type of prescribed medication "for high blood pressure depends on your blood pressure measurements and overall health."[51]  Medications used to treat hypertension may include 1) diuretics, 2) angiotensin-converting enzyme (ACE) inhibitors, 3) angiotensin II receptor blockers (ARBs), 4) calcium channel blockers, 5) alpha blockers, 6) alpha-beta blockers, 7) beta blockers, 8) aldosterone antagonists, 9) renin inhibitors, 10) vasolidators, and 11) central-acting agents.[52]

### 1.    Diuretics

22.    Diuretics are sometimes referred to as "water pills," and "are medications that help your kidneys eliminate sodium and water from the body."[53]  Diuretics are often "the first medications tried to treat high blood pressure."[54]  Different classes of diuretics exist, which include thiazide, loop and potassium sparing.  Diuretics that are "commonly used to treat blood

---

[49] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[50] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[51] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[52] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[53] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[54] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

pressure include chlorthalidone, hydrochlorothiazide (Microzide) and others."[55]  A side effect of diuretics is increased urination, which could reduce potassium levels."[56]

### 2. Angiotensin-Converting Enzyme (ACE) Inhibitors

23. ACE inhibitors "help relax blood vessels by blocking the formation of a natural chemical that narrows blood vessels."[57]  Examples of ACE inhibitors include lisinopril (Prinivil, Zestril), benazepril (Lotensin), and captopril.[58]  Enalapril is an ACE inhibitor.[59]  The Epaned® Kit, which contained enalapril, was also an ACE inhibitor.[60]  The Epaned® Oral Solution, which also contains enalapril, is also an ACE inhibitor.[61]

### 3. Angiotensin II Receptor Blocker (ARB)

24. ARBs are "medications [that] relax blood vessels by blocking the action, not the formation, of a natural chemical that narrows blood vessels."[62]  Examples of ARBs include candesartan (Atacand) and Iosartan (Cozaar), among others.[63]

---

[55] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[56] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[57] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[58] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[59] https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/204308s000lbl.pdf; Exhibit 11, p. 78 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).

[60] https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/204308s000lbl.pdf.

[61] https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208686s002lbl.pdf.

[62] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[63] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

### 4.   Calcium Channel Blockers

25.     Calcium channel blockers "help relax the muscles of your blood vessels" and some slow your heart rate."[64]  Examples of calcium channel blockers include amlodipine (Norvasc) and diltiazem (e.g., Cardizem, Tiazac), among others.[65]

### 5.   Alpha Blockers

26.     Alpha blockers can be used if an individual is having trouble reaching their blood pressure goal with combinations of diuretics, ACE inhibitors, ARBs, or calcium channel blockers.[66]  Alpha blockers "reduce nerve signals to blood vessels, lowering the effects of natural chemicals that narrow blood vessels" and include doxazosin (Cardura) and prazosin (Minipress), among others.[67]

### 6.   Alpha-Beta Blockers

27.     Alpha-beta blockers can be used if an individual is having trouble reaching their blood pressure goal with combinations of diuretics, ACE inhibitors, ARBs, or calcium channel blockers.[68]  Alpha-beta blockers work by blocking "nerve signals to blood vessels and slow[ing] the heartbeat to reduce the amount of blood that must be pumped through the vessels.  Alpha-beta blockers include carvedilol (Coreg) and labetalol (Trandate)."[69]

---

[64] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.
[65] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.
[66] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.
[67] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.
[68] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.
[69] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

### 7. Beta Blockers

28.     Beta blockers "reduce the workload on your heart and widen your blood vessels, causing your heart to beat slower and with less force."[70]  Beta blockers include acebutolol and atenolol (Tenormin), among others.  Usually, beta blockers are not "recommended as the only medication [] prescribed, but they may be effective when combined with other blood pressure medications."[71]

### 8. Aldosterone Antagonists

29.     Aldosterone antagonists are considered diuretics.[72]  Examples of aldosterone antagonists include spironolactone and eplernone (Inspra).[73]  Aldosterone antagonist "block the effect of a natural chemical that can lead to salt and fluid buildup, which can contribute to high blood pressure."[74]

### 9. Renin Inhibitors

30.     Aliskiren (Tekturna) is a renin inhibitor.[75]  Renin is "an enzyme produced by your kidneys that starts a chain of chemical steps that increases blood pressure."[76]  Aliskiren should

---

[70] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[71] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[72] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[73] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[74] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[75] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[76] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

not be taken with ACE inhibitors or ARBs due to risk of serious complications, including stroke.[77]

### 10. Vasodilators

31.     Vasodilators "work directly on the muscles in the walls of your arteries, preventing the muscles from tightening and your arteries from narrowing."[78]  Vasodilators include hydralazine and minoxidil.[79]

### 11. Central-Acting Agents

32.     Central-acting agents "prevent your brain from telling your nervous system to increase your heart rate and narrow your blood vessels."[80]  Examples of central-acting agents include clonidine (Catapres, Kapvay), guanfacine (Intuniv), and methyldopa.[81]

### F.     Patents

33.     I understand that on February 11, 2021, Azurity filed a complaint against Annora asserting the '868 patent and the '476 patent.[82]  As listed in the FDA Orange Book, Epaned® practices the '868 patent as well as seven additional patents.[83]  All patents listed in the Orange

---

[77] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[78] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[79] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[80] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[81] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

[82] Exhibit 10 (Complaint).

[83] https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=208686&Appl_type=N.

Book for Epaned® expire on March 25, 2036.[84] I understand from counsel that the '868 patent and the '476 patent are the only patents at issue in the present request for injunctive relief, which are discussed in further detail below.

### 1.    '868 Patent

34.    U.S. Patent No. 10,772,868, titled "Enalapril Formulations," issued on September 15, 2020 and I understand it expires on March 25, 2036.[85]  The abstract of the '868 patent is reproduced below.

> Provided herein are stable enalapril oral liquid formulations.  Also provided herein are methods of using enalapril oral liquid formulations for the treatment of certain diseases including hypertension, heart failure and asymptomatic left ventricular dysfunction. [86]

### 2.    '476 Patent

35.    U.S. Patent No. 10,799,476, titled "Enalapril Formulations," issued on October 13, 2020 and I understand from counsel that it expires on March 25, 2036.[87] The abstract of the '476 patent is reproduced below.

> Provided herein are stable enalapril oral liquid formulations.  Also provided herein are methods of using enalapril oral liquid formulations for the treatment of certain diseases including hypertension, heart failure and asymptomatic left ventricular dysfunction.[88]

---

[84]
https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=208686&Appl_type=N.
[85] Exhibit 16 (U.S. Patent No. 10,772,868);
https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=208686&Appl_type=N.
[86] Exhibit 16 (U.S. Patent No. 10,772,868).
[87] Exhibit 17 (U.S. Patent No. 10,799,476).
[88] Exhibit 17 (U.S. Patent No. 10,799,476).

████████████████████████████████████████████████

## V.    THE FINANCIAL PERFORMANCE OF EPANED®

36.    In gauging whether the entry of a generic competitor to Epaned® introduced by the Defendant would cause Azurity irreparable harm, it is important to examine ██████████ ████████████████████████████████████████████████████ ██████████████████████████. In what follows, I examine Epaned®'s financial performance.

### A.    Sales

37.    Azurity began selling Epaned® Oral Solution in January 2017.[89]  Azurity also began discontinuing the Epaned® Kit around this time.[90]  For comparative purposes, net sales of Epaned® and the Epaned® Kit are shown below in **Figure 1**. ██████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████

---

[89] See, for example, Exhibit 18 (SLVGT-RTU-EPA_00105691).
[90] See, for example, Exhibit 19 at 221 (*Silvergate Pharmaceuticals, Inc. v. Amneal Pharmaceuticals, LLC*, C.A. No. 19-678 (D. Del.), Beckloff Deposition (hereafter, "Beckloff Deposition")).
[91] *See* Exhibit 4.1 and Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).
[92] *See* Exhibit 4.1 and Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).



38.     The U.S. unit sales of Epaned® and Epaned® Kit are shown below in **Figure 2**.

Units of the Epaned® Kit and Epaned® Oral Solution are equivalent from a duration and dosing

perspective, with a unit of each comprising a 30-day supply totaling 150 mL.[94]

---

[93] *See* Exhibit 4.1 and Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).
[94] Exhibit 10 (Complaint); Exhibit 19 at 185.
[95] *See* Exhibit 4.1 and Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).
[96] *See* Exhibit 4.1 and Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).



**B.    Market Share**

39.    I also examined Epaned® sales relative to other enalapril-based drugs.



---

[97] *See* Exhibit 4.0; Exhibit 4.1; Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx); Exhibit 15 (SLVGT-RTU-EPA_00105668).
[98] Exhibit 5.0.



41.

[99] Exhibit 5.0.
[100] Exhibit 5.0.
[101] Exhibit 5.2.



42.

---

███████████████████████████████████

43.   ██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████ ██████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████ ██



---

[104] Exhibit 5.3.
[105] Exhibit 5.1.



**C.** ████████ ████████████████████

44.   Epaned® Oral Solution has been sold ██████████████████████████

██ All else equal, a higher-priced product which practices one or more patents not practiced by

a lower-priced related or comparable product is indicative of the value of the practiced patent(s).

---

[106] Exhibit 11, p. 111 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).

[107] ████████████████████████████████████████████ *See* Exhibit 4.0 and Exhibit 4.1.



45.     The price premium for Epaned® Oral Solution was explained by Mr. Michael

Beckloff, co-founder and Chief Development Officer for Azurity.  Mr. Beckloff testified that the

market was willing to pay more for Epaned® Oral Solution because "it's a superior product.  You

don't have to reconstitute it and it has very good shelf life."[108]  The higher prices paid for

---

[108] Exhibit 11, p. 111 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Trial Testimony of Michael Beckloff dated February 1, 2021).

███████████████████████████████████

Epaned® Oral Solution are indicative of its acceptance in the market and it being a superior

solution relative to at least the Epaned® Kit.

**D.** ███████████████ ███████████

46.    The gross margin (in dollars) of Epaned® Oral Solution is shown below in **Figure 5**.[109] A measure of net margin (in dollars) of Epaned® Oral Solution is shown in **Figure 6**.



---

[109] Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).
[110] Exhibit 4.1.



47. ███████████████████████████████████ ████████████████████

███████████████████████████████

---



48. ████████████████████████ ████████████████████████ ████████████████████████ ████████ All else equal, increased profitability of a drug that practices the asserted patents relative to an alternative drug that does not practice the asserted patents indicates the patents are driving the profitability of the drug.

**E.** ████████████████████████ ████████

49. While gross and net profits are accounting measures of the profitability of a product over the chosen accounting period, these measures do not examine whether the product has recouped its development and commercialization costs incurred to bring the product to market. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[113] Exhibit 4.0.
[114] Exhibit 13 (SLVGT-RTU-EPA_00105661); Exhibit 21 (SLVGT-RTU-EPA_00105659).
[115] Exhibit 14 (SLVGT-EPA_0102401 (PTX-255) v2 (blue highlight).xlsx).
[116] Exhibit 4.2.



**F.** ████████ █████████████

50.     In evaluating Epaned®'s financial performance, it is instructive to consider marketing expenditures.  One reason is that an analysis of marketing expenditure can aid in determining whether sales of a drug are attributable to disproportionate marketing expenditures.



---

[117] Exhibit 19, Beckloff Deposition at 189.
[118] Exhibit 19, Beckloff Deposition at 188.
[119] Exhibit 19, Beckloff Deposition at 188.
[120] Exhibit 19, Beckloff Deposition at 189.
[121] Exhibit 19, Beckloff Deposition at 206.



52.

53.

---

[122] Exhibit 19, Beckloff Deposition at 189-191.
[123] Exhibit 19, Beckloff Deposition at 192.
[124] Exhibit 15 (SLVGT-RTU-EPA_00105668) (*see* "Income Statement" worksheet, row 33).
[125] Exhibit 15 (SLVGT-RTU-EPA_00105668) (*see* "Income Statement" worksheet, row 33).
[126] Exhibit 23 (Epaned Marketing Spend_2020-2021 v2.xlsx).
[127] Exhibit 23 (Epaned Marketing Spend_2020-2021 v2.xlsx).



**G.**  ███████████████

54.     Azurity discontinued the sales of Epaned® Kit with the issuance of Epaned® Oral

Solution.[129] ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

55.     ████████████████████████████████████████████

████████████████████████████████████████████████

█████████ ██   Mr. Beckloff testified that "there were a number of issues over time that …

were reported" with the pharmacist's reconstitution of the Epaned® Kit.[130]  These issues included

the wrong diluent being used, contamination issues from fibers of the pharmacist's sweater, and

foreign matter in the powder from the item used to puncture the product's index seal.[131] ██

█████████████████████████  ████████████████  ████████████████

---

[128] Patel Decl., ¶ 8; Exhibit 5 to Patel Declaration.
[129] Exhibit 11, pp. 119-120 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).
[130] *Id*. at pp. 78-79.
[131] *Id*.
[132] Exhibit 19, Beckloff Deposition at 46.

██████████████████████████████████████████████

████████ ███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

████ Mr. Beckloff testified that the ready-to-use version of Epaned® is also safer as it didn't have to be reconstituted or compounded,[134] and has fewer excipients and additives.[135]  Finally, at an FDA meeting in 2014, the FDA informed Azurity that it considered a ready-to-use formulation to be "clinically superior" to compound or extemporaneously prepared products generally, although I understand the FDA did not formally make this determination specific to the Epaned® Kit and Epaned® one way or the other.[136]  More specifically, I understand it was the FDA's view that a ready-to-use solution was preferable because it would prevent pharmacy mix-ups.[137]

56.    Against these considerations, I have weighed various countervailing considerations such as the fact that the FDA found Epaned® Oral Solution to be bioequivalent to the Epaned® Kit,[138] the Epaned® Kits having the same approved indications as Epaned® Oral Solution,[139] and the general discontinuation of the Epaned® Kit at approximately the time that Epaned® Oral Solution was introduced into the market. ████████████████████████

███████████████████████████████████████████████

███████████████ ███████████████████████████████████

---

[133] Exhibit 20 (SLVGT-RTU-EPA_00105406).
[134] Exhibit 11 at 103 (*Silvergate Pharmaceuticals, Inc. v. Bionpharma Inc*. C.A. No. 18-1962, D.I. 193, Public Trial Testimony of Michael Beckloff dated February 1, 2021).
[135] *Id*. at 104; Exhibit 24 (SLVGT-RTU-EPA_00056326).
[136] *Id*. at 88-89 and 121; Exhibit 25 (SLVGT-RTU-EPA_00006253).
[137] *Id*. at 104-105.
[138] *Id*. at 117.
[139] Exhibit 19, Beckloff Deposition at 151.



## VI.   IRREPARABLE HARM

57.     I consider in this section whether Azurity is likely to suffer irreparable harm in the event that: (1) Annora's generic product enters the market; (2) this product is allowed to be sold during the duration of this matter; and (3) the court ultimately decides that the sales of these products infringe the patents asserted by Azurity against Annora.  Irreparable harm is the type of harm where monetary compensation cannot cure or put conditions back the way they were.

58.     The Federal Circuit has determined that evidence of price erosion, loss of market share, loss of profits, loss of research opportunities, and possible layoffs may constitute irreparable harm.[140]  Moreover, "[i]reparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction."[141]

59.     I understand that the mere ability to quantify the movant's potential harm that would be incurred absent the requested injunctive relief, does not, in and of itself, preclude a finding of irreparable harm.  For example, in discussing irreparable harm in a matter involving sod harvesters, the Federal Circuit stated that "[e]ven though [the movant] may be able to

---

[140] *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1010 (Fed. Cir. 2009).
[141] *Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1344 (Fed. Cir. 2013).

███████████████████████████████████

estimate the price of sod harvesters, how much profit it makes per sod harvester, and how many sod harvester sales it makes (and thus may lose) per year, that does not automatically mean money damages are adequate.  Rather, the record shows that a loss of market share and customers is a loss that [the movant] is not likely to recover."[142]  The Federal Circuit has also held that "[s]imply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury."[143]

60.   In this matter, I am of the opinion that Azurity will suffer irreparable harm if injunctive relief is not granted.  I hold this opinion based on ██████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

## A.   Potential Overall Business Impact to Azurity

61.   In general terms, the introduction of a generic competitor will more severely impact the manufacturer of a branded drug the higher proportion of sales the branded drug contributes to the manufacturer's overall sales.  This is because it is comparatively more difficult to offset lost sales and lower prices that typically follow the introduction of generic competitors through sales of other branded drugs and products.

62.   ███████████████████████████████████

████████████████████████████████████████

---

[142] *Trebro Mfg., Inc. v. Firefly Equip., LLC*, et al., 748 F.3d 1159, 1170 (Fed. Cir. 2014).
[143] *Douglas Dynamics,* 717 F.3d at 1344.
[144] Patel Decl., ¶ 5.



**B.**

63.

64.

---

[145] Patel Decl., ¶ 8.

[146] Patel Decl., ¶ 8.

[147] Patel Decl., ¶ 16.

[148] Patel Decl., ¶ 16.

[149]

[150] " *See* Exhibit 6 (Enalapril Raw Data 120721.xlsx).

[151] Exhibit 6 (Enalapril Raw Data 120721.xlsx).



65. █████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████████

66. ███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[152] Patel Decl., ¶ 16.



67.     ████████████████████████████████

████████████████████████ Certain academic studies have demonstrated that lost market share following generic entry can be significant.  For example, a 2013 paper by Grabowski et al. reviewed market exclusivity periods for 257 new molecular entities ("NMEs") with initial generic entry between January 1995 and September 2012.[154]  The authors examined market share erosion by generics, among other areas, and found that "[g]eneric erosion has increased dramatically over the past decade" preceding the article.[155]  The authors found that for "all NMEs [New Molecular Entities] facing first generic entry in 2011-2012, brands retained an average of only 16% … of units at 1 year."[156]  The retained brand share by month post first-generic entry identified by the authors is shown below (Figure 8).[157]  The most recent period shown in the graph is 2011-2012.  During this period, the branded share was reduced from 100% to approximately 30% by the end of the first full month post generic entry (bolded line with circular markers).  Given that the data in **Figure 8** is an average across various molecules, there

---

[153]  Patel Decl., ¶ 16.
[154]  Grabowski, et al., "Brief Report Recent Trends in Brand-Name and Generic Drug Competition," J. Med. Econ., 1-8 (2013), p. 1. (http://fds.duke.edu/db/attachment/2575)
[155]  *Id*. at 6.
[156]  *Id*. at 6. Share defined as "…the unit share of brands for a given molecule divided by the sum of units for brands and their corresponding generics…".
[157]  *Id*. at 7.

████████████████████████████████████

are, by definition, some molecules with even steeper market share declines than shown in the graph.

**Figure 8: Average Monthly Brand Share of Standard Units of the Molecule/Form Following First Generic Entry[158]**



68.   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

**C.**   ████████████████████████████████

69.   ██████████████████████████████████████, there would be various other effects after Annora's generic market entry.   ███████████████████████████████

---

[158] *Id*. at 7.  With regards to the graph's x-axis, the authors explain: "Initial generic entry occurs at some point during month "0". Month "1" is the first full month of generic competition."

37



70. ████████████████████████████████

71. ████████████████████████████████

---



[159] Patel Decl., ¶ 18.

[160] ████████████████████ *See* Exhibit 26 (Exhibit 47 - Enalapril Sales Units and Dollars Apr 21 through Oct 2021.xlsx).

[161] ████████████████████ *See* Exhibit 6 (Enalapril Raw Data 120721.xlsx).

72.     A continued decline in price levels over time following generic entry is observed in the academic literature.

- Berndt and Aiken (2010) found that for ACE inhibitors the average daily cost of treatment declined from $0.49 in the pre-generic period to $0.37 after 12 months following generic entry (a decline of 24%) and at 24 months post-entry the average daily cost was $0.27 (a decline of 43.9% from the pre-generic average daily cost of treatment).[162] The ACE inhibitor calculation was based on a review of Altace[TM] and the entry of ramipril in December 2007.[163]

- A 2016 study by the IMS Health Institute found that in the preceding decade, "[o]ral generics that entered the market between 2011 and 2013 had prices 74% lower than pre-expiry brand prices within 8 months of becoming available" and also found that "[i]mmediate savings in the first month of generic availability has also accelerated, with 46% lower prices in the first month compared to reductions of only 36% for oral generics that entered the market between 2002 and 2004."[164] The study also found that in cases where the generic manufacturer is granted a 180-day exclusivity period, after which more manufacturers typically enter the market, there is "typically … a price reduction line that plateaus for the first six months before declining further."[165] In addition, the price reductions following loss of exclusivity appears to greater in recent years for oral medications (**Figure 9**).

---

[162] Berndt, E.R. & M.L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the Waxman-Hatch Legislation." National Bureau of Economic Research Working Paper 16431 (2010), p. 19.
(https://www.nber.org/system/files/working_papers/w16431/w16431.pdf)
[163] *Id*. at 19.
[164] IMS Institute for Healthcare Informatics. "Price Declines after Branded Medicines Lose Exclusivity in the U.S." January 2016. (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf), at 2.
[165] *Ibid*.

████████████████████████████████████████████

**Figure 9: Monthly Price Reductions for Oral Medicines after Loss of Exclusivity[166]**



73.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████.

**D.**    ████████████████████████████████

74.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[166] *Id.* at 4.
[167] Patel Decl., ¶¶ 30-32.
[168] Patel Decl., ¶ 32.



**E.**

75.     Epaned® Oral Solution is one of three products in Azurity's cardiovascular product portfolio                                              The other two products are Qbrelis® and Katerzia®,

[169] Patel Decl., ¶ 32.
[170] Patel Decl., ¶¶ 30-32.
[171] Patel Decl., ¶ 24.
[172] Patel Decl., ¶ 24.
[173] Patel Decl., ¶¶ 24-25.
[174] Patel Decl. ¶ 25, Exhibit 5 to Patel Declaration.
[175] Patel Decl., ¶ 25.
[176] Patel Decl., ¶ 26.



**F.**

76.

77.

---

[177] Patel Decl., ¶¶ 27 – 28.
[178] Patel Decl., ¶ 27.
[179] Patel Decl., ¶ 5.
[180] Patel Decl., ¶ 8.
[181] Patel Decl., ¶ 33.
[182] Patel Decl., ¶ 33.



78.

G.

79.

---

[183] Patel Decl., ¶ 34.
[184] Patel Decl., ¶ 34.
[185] Patel Decl., ¶ 30.
[186] Patel Decl., ¶ 33.
[187] Patel Decl., ¶ 34.



80.

81.

---

[188] Patel Decl., ¶ 23.
[189] Patel Decl., ¶ 23.
[190] Patel Decl., ¶ 23.
[191] Patel Decl., ¶ 20.

██████████████████████████████████

████████████████████████████████████████ ██ █

███████████████████████████████████████████

███████████████████████████████████████████

## VII.   BALANCE OF HARDSHIPS

82.    In determining the balance of hardships, it is important to consider the harm that

may be incurred by either party if the restraining order is granted and if the restraining order is

not granted.  Below I outline the harm that will be suffered by Azurity if injunctive relief is not

granted, and I also consider the harm that will be suffered by Annora if a restraining order is

granted.

### A.    Harm to Azurity

83.    As discussed above, the potential harm to Azurity is not quantifiable or

compensable through a monetary payment.  I have considered ██████████████████

████ ██████████████████████████████████████

████████████████████████████████████████

██████

84.    If injunctive relief is not granted, adverse consequences to Azurity are expected to

include at least the following: ████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ The impact of these harms is not

---

[192] Patel Declaration, ¶¶ 21-22.



quantifiable or compensable.  In my opinion, the balance of hardships favors Azurity and therefore, injunctive relief should be granted.

### B.   Harm to Annora

85.    I understand from counsel that even if Annora is temporarily restrained and unable to enter the market, that Annora is not the first-filer and thus there are no issues concerning loss of 180-day exclusivity.  ████████████████████████████

████████████████████████████████████ ██  █████████████████████████

███████████████████████████████████ Thus, injunctive relief would not disadvantage Annora in this respect.  █████████████████

██████████████████████████████████

██████████████████████████████ █

Indeed, the harm to Annora would be limited to a loss in Annora's "ability to go on to the market and begin earning profits earlier."[195]

86.    In my opinion, particularly given that the earliest time at which Annora could launch is around February 13, 2022, and that trial in this matter is scheduled for July 20, 2022 (both of which I understand from counsel), any hardship to Annora in having to delay its market entry by a handful of months is much outweighed by the irreparable harm that Azurity would face in the event of Annora's launch.

---

[193] Patel Decl., ¶ 23.
[194] *See, e.g.*, *Research Found. of State Univ. of N.Y. v. Mylan Pharms., Inc.*, 723 F. Supp. 2d 638, 662 (D. Del. 2010).
[195] *Glaxo Grp. Ltd. v. Apotex, Inc.*, 64 F. App'x 751, 756 (Fed. Cir. 2003).

## VIII.   PUBLIC INTEREST

87.     I have also been asked to consider if, from an economic perspective, the public interest would be better served by the granting of injunctive relief.  As explained below, it is my opinion that the public interest would be better served if injunctive relief is granted.

88.     The Federal Circuit has held that "the touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects."[196]  The Federal Circuit has also held that "[t]ypically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief."[197]  In an ANDA context, the Federal Circuit has held that "[w]hile the statutory framework under which [Defendant] filed its ANDA does seek to make low cost generic drugs available to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents."[198]  Other courts have also found that "the patent system is designed to provide incentives for innovative drug companies to continue costly development efforts" especially where, as here, the company has invested significant resources into the drug's development.[199]  Based on the foregoing, I understand that the preservation of patent rights would generally weigh in favor of the public interest barring some otherwise critical injury to the public interest.

---

[196] *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010).
[197] *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988) (citations omitted).
[198] *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005).
[199] *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA,* 821 F. Supp. 2d 681, 696 (D. N.J. 2011).

89.     I have also evaluated economic considerations germane to the impact of injunctive relief on the public interest.  Specifically, I evaluated the possible impact on consumer prices, the size of the potentially impacted market, and supply considerations in forming my opinions on whether injunctive relief would, on balance, negatively impact the public interest.

90.     With respect to consumer prices, I understand that Annora has not yet disclosed the gross or net price at which it intends to sell its generic competitor.  I also understand that Annora has not disclosed any projections or estimates of the average end price (i.e., out-of-pocket price) that would be paid by consumers for its generic competitor to Epaned®.  As such, I have evaluated this consideration based on available information found in the economic literature.

91.     As discussed earlier, Berndt and Aiken (2010) found that for ACE inhibitors the average daily cost of treatment declined from $0.49 in the pre-generic period to $0.37 after 12 months following generic entry (a decline of 24%) and at 24 months post-entry the average daily cost was $0.27 (a decline of 43.9% from the pre-generic average daily cost of treatment).[200]  The ACE inhibitor calculation was based on a review of Altace[TM] and the entry of ramipril in December 2007.[201]  The authors do not disclose data on price declines for the studied ACE inhibitors in the post-generic period on a monthly basis.  Evidence from the economic literature suggests a continued pricing decline over a period of time (as opposed to an initial pricing decline upon entry that held constant over the initial year post-entry).[202]

---

[200] Berndt, E.R. & L.M. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the Waxman-Hatch Legislation." National Bureau of Economic Research Working Paper 16431 (2010), p. 19 (https://www.nber.org/system/files/working_papers/w16431/w16431.pdf).
[201] *Ibid*.
[202] *See, e.g.*, **Figure 9**.



92.     In addition, the portion of the public that would be impacted by a delayed or foregone price decrease would be relatively small. ████████████ ██████████████

████████████████████████████████████████████

████████████████████████████████ For comparative purposes, I understand that in a matter before the Southern District of New York, there were 48 million *daily* users of the branded drug; however, the court weighed the public interest factor in favor of the branded drug manufacturer (although I note that the number of daily users was not the only information considered).[204]

93.     Finally, I have considered whether there are any supply considerations that would adversely impact the public interest.  For example, if Azurity could not meet customer demand for Epaned® Oral Solution, then the public interest could arguably be served by the entrance of a generic competitor to provide additional supply. ████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

94.     Accordingly, it does not appear there is any potential harm to the public interest insofar as patients who are prescribed Epaned® Oral Solution being unable to acquire it or having prescriptions unfilled due to a capacity shortage on the part of Azurity. ████████████████

---

[203] Exhibit 5.0.
[204] *Sanofi-Synthelabo v. Apotex Inc*., 488 F.Supp.2d 317, 345 (S.D.N.Y. 2006).  On appeal the Federal Circuit upheld the district court's irreparable harm evaluation weighing in favor of Sanofi, although the Federal Circuit's analysis of the public interest addressed considerations other than the number of daily users. *See Sanofi-Synthelabo v. Apotex, Inc*. 470 F.3d 1368, 1383-1384 (Fed. Cir. 2006).

███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████   In summary, I do not find sufficient economic basis to conclude that the public

interest would be significantly harmed by the granting of injunctive relief.

---

[205] Patel Decl., ¶ 35.

95.     I declare under the penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed:

December 17, 2021

Date:                                              _____

                                                   Jeffery A. Stec, Ph.D.
                                                   Managing Director
                                                   Berkeley Research Group

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 17, 2021, upon the following in the manner indicated:

| | |
|---|---|
| Stephen B. Brauerman, Esquire<br>Ronald P. Golden III, Esquire<br>BAYARD, P.A.<br>600 North King Street, Suite 400<br>Wilmington, DE  19801<br>*Attorneys for Defendant Annora Pharma*<br>*Private Limited* | *VIA ELECTRONIC MAIL* |
| Todd S. Werner, Esquire<br>Saukshmya Trichi, Esquire<br>CARLSON, CASPERS, VANDENBURGH,<br>   & LINDQUIST, P.A.<br>225 South Sixth Street, Suite 4200<br>Minneapolis, MN  55402<br> *Attorneys for Defendant Annora Pharma*<br>*Private Limited* | *VIA ELECTRONIC MAIL* |

*/s/ Megan E. Dellinger*

_____
Megan E. Dellinger (#5739)